FOR THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION OF WILLIAM F. RIESBERG

COPY

GEE & JENSEN ENGINEERS,
ARCHITECTS AND PLANNERS,

Plaintiff,

vs. CASE NO. 1:05-cv-00457-LIB

UNITED STATES OF AMERICA,
DEPARMENT OF THE NAVY,

Defendant.

---

DEPONENT: WILLIAM F. RIESBERG

DATE: APRIL 5, 2007

TIME: 9:00 A.M.

LOCATION: PEDERSEN & SCOTT, P.C.
775 St. Andrews Boulevard
Charleston, South Carolina 29412

REPORTED BY: DENISE MCCAULEY, RPR, IA-CSR, GA-CCR
CLARK & ASSOCIATES
P.O. Box 73129
North Charleston, South Carolina 29422
(843)762-6294

EXHIBIT
tabbies
5

or how did it show up?
A. Just those areas. It was not any regular pattern.
Q. Was it sort of uniform along the whole wall in that area, or was it spiked at any area or anything else?
A. There was no uniformity to it.
Q. Were there any areas that you found damage on the first floor?
A. No leaks were reported on the first floor.
Q. Do you know why you were asked to do this? Was it just solely because of the leaks?
A. Yes.
Q. Did they tell you what -- did anybody tell you what they thought the cause of the leaks were?
A. I don't recall.
Q. What were you asked to do?
A. To go to the site and to make a recommendation on how to proceed.
Q. And as I understand it, there was originally a forensic engineering consulting service?
A. Yes.
Q. One delivery order?
A. Yes.
Q. What resulted from that? What did you

Q. Where was the tape actually? Was it on the sill or underneath the sill?

A. Well, you had tape on the top of the sill and tape down below depending on how far we brought this polyethylene.

Q. And so you had it taped off basically on the nose of the sill?

A. Yes.

Q. And then that --

A. And down onto the masonry below.

Q. So the only place you were testing was this horizontal joint that's coming out from the wall?

A. Yes.

Q. And in that, if the caulking had performed as it was intended, water would not have gotten through; isn't that correct?

A. Yes.

Q. Okay. And where did the water get to on the inside?

A. On those places adjacent to the roof, it got to the top of the flashing.

Q. Okay. And what did it do once it got to the top of the flashing?

A. Spilled into the room.

Q. And if you look at WP-2, this is WP-1.2?

A. In 2004. I inspected 100 percent of the joints in question on the first floor and all of the joints adjacent to a roof and/or the patios.

Q. And did you prepare a report at that time?

A. I prepared a report as such. I reported to NAVFAC what I found.

Q. What did you report to them?

A. That most of the sealant joints had failed.

Q. And why did they fail?

A. From two causes. One, improper joint depth-to-width ratio.

Q. And that would have been whose responsibility?

A. The contractor. But most of the failure was on account of improper mixing of two-part urethane sealant.

Q. Again, a contractor problem?

A. Yes.

Q. Now, did you notice any additional damage to the interior walls when you went back in 2004?

A. No.

Q. Do you know if any water actually got through any of those joints between 2000 -- 1998 or 1999 when you did your test and 2004?

A. Must have.

Q. How do you know it must have?
A. If I found leakage back then when I report that the joints are mostly made well and I come back and I look and I see widespread failure of sealant joints, water had to be getting in.
Q. Do you know if it was causing any damage?
A. Mostly on the second floor.
Q. Can you say here today that when you went back in 2004 you saw additional damage that did not exist in 1998?
A. No. I didn't open up the walls.
Q. So all the water that came in could have been going down in the cavity wall and draining out for all you know?
A. Not likely.
Q. But it could have been?
A. It's possible.
Q. And you didn't see after the construction defects were completed --
A. Construction defects were completed?
Q. Yes.
A. I don't understand that.
Q. Well, in 2002, I mean, 2000 Pizzagalli came back and did repairs?
A. Yes.

Q. And I'm trying to figure out -- and I'll represent to you Mr. Herrington said that he has not seen evidence of any additional damage since that work was done until just recently and he doesn't even know the cause of that. But between 2000 and 2004 when -- or 2005 when Hitt did these repairs, it says they didn't have any more indication of water damage. So I'm trying to figure out how you can say that these design defects, this joint here, was causing damage when there's no evidence of it for 2002 after the construction defect construction repairs were done and 2004 when this work is done.

A. It is my opinion that it is more likely than not water was entering the walls.

Q. But you have absolutely no evidence of any damage that that caused?

A. No additional damage.

Q. And you can't say whether or not the water was coming all the way into the interior wall or going down in the cavity between the sheathing and the brick?

A. No. Take a break?

MR. SCOTT: Yeah.

(A break was taken.)

Q. What are the maintenance requirements for caulked joints with a backer rod?

A. Good sealant properly installed can be 10-, 15-, 20-year life expectancy.
Q. So if the caulking joints had been installed properly between these sills, you would have expected a life expectancy of that joint of a minimum ten years?
A. Yes.
Q. And if the caulked had not leaked, then water could not have gotten through?
A. Correct.
Q. And the design repair that you actually designed is actually a caulking joint?
A. It is much more than a caulking joint.
Q. Well, tell me why it's much more.
A. It's a two-stage sealant joint with elastomeric neoprene gasket adhered to both sides of the precast sill.
Q. How do you make it adhere to both sides of the precast sill?
A. You put the glue on into the joint, and then the gasket is sized to be in compression, and you push the gasket in with a tool until it gets to the specified depth. You leave a void between it and the backer rod. You use a tool to install backer rod so that there's a void between the two and then throw the sealant joint on top of that as a deterrent seal.

Q. So basically you have three levels of protection? The caulking joint; correct?
A. Yes.
Q. And then the backer rod?
A. Well, the backer rod is just to support and shape the sealant joint during its installation.
Q. So but it does provide at least a minimal amount of water protection?
A. Yes. It's a closed-cell backer rod.
Q. And then this elasto -- I can't say it.
A. Elastomeric.
Q. Elastomeric?
A. Well, you have an air void first.
Q. You have an air void, and water could, I assume, go through that air void to drip out on the bottom?
A. Yes. On top of that gasket.
Q. Okay. And the original design with the caulking and backer rod, if done properly, would have had a joint that was properly shaped between the two sills; correct?
A. Yes.
Q. And that wasn't done?
A. Correct.
Q. And then it would have had the backer rod --

A. Yes.
Q. -- correct? And then it would have had the caulking?
A. No.
Q. The original, the original?
A. Caulking is on top of the backer rod.
Q. Yeah. I said the backer rod and then the caulking on top. That's what I thought I said.
A. Okay. I didn't understand.
Q. So the only thing your design did was put in an extra layer of protection underneath?
A. And a void, a permanent layer of protection.
Q. Well, how long is that material supposed to last?
A. At least 40 years.
Q. Is that considered flashing?
A. It's not flashing.
Q. Okay. So you did a design that was -- that met the code requirements?
A. Under the alternative methods and materials.
Q. And the 1991 code also provided for alternate methods; correct?
A. Yes.
Q. And approval could be given from the building official or in this case the government?

A. Yes.
Q. And the government gave you approval of your design?
A. Yes.
Q. And, in fact, the government gave A/E approval of its design; isn't that true?
A. In effect, yes.
Q. So both of those systems, yours and the one designed by the A/E, Gee & Jensen, met the building code?
A. Well, not technically.
Q. Well, both -- neither of them?
A. Their design was not submitted under the alternative materials. There is a specific code citation that requires use of flashing except where impractical. There is nothing impractical about providing flashing.
Q. But the code section provided that you could propose an alternative and the building official could approve it?
A. Yes.
Q. And that was done in both cases?
A. I don't think so.
Q. Well, I'm confused. I thought you just said it was?

A. I think mine was.

Q. Well, why do you think that the design by Gee & Jensen wasn't?

A. I've seen no evidence that would suggest that.

Q. Can you show me anywhere in any documents where you said, "I'm proposing this design to you as an alternative method"?

A. It was developed during the mediation, discussed with NAVFAC personnel from then and later.

Q. But there's nothing in writing from you saying, "I'm submitting this as alternative method to this code section"?

A. They already knew it.

Q. But you have no reason to believe that the building official didn't approve the design by Gee & Jensen?

A. I have no reason to believe that he did approve it.

Q. Well, have you ever considered that?

A. Under those conditions.

Q. Under what conditions?

A. I'm submitting this design as an alternative.

Q. Is there any requirement in the code that

says if you design -- if you want to do this as an alternative you must submit it with some cover letter or something else?

A. No.

Q. Okay. So do you know of any requirement in the code that Gee & Jensen failed to meet with regard to how they presented this design to the government?

A. I don't understand your question.

Q. Well, I want -- there's no requirement that you know of, any special requirement, that Gee & Jensen had to follow to have this, their design, approved as an alternative method; is there?

A. No.

Q. You talked about the A/E's inspection requirements. There's no -- you're not questioning the inspection that the A/E did of the sealant joints in these precast sills; are you?

A. No.

Q. The only thing you're questioning is his inspection of the upstand on the flashing?

A. The absence of the upstand on the flashing.

Q. And I think you would agree if the upstand had been installed on this second floor area over these wings, whether or not the sealant joint was installed improperly or not, wouldn't have made a difference. The

Q. -- 13, 17 --
A. -- 16, 15, 14 --
Q. -- 17?
A. -- 17.
Q. And I may be wrong, but the pictures didn't go in order, so I couldn't really --
A. No. We had a team out there, so -- I know there was in here. See if I've got another. Here we go.
Q. And, Mr. Riesberg, I'm going to show you a drawing that you just pulled out of your notebook, and can you tell me what this is?
MS. HOGAN: Do you have another copy?
MR. SCOTT: Yes. I'm sorry.
A. Locations of destructive openings for my forensic destructive investigation.
Q. And can you tell on here whether they're on the first floor or second floor?
A. Second floor.
Q. These are all on the second floor? Were there any openings on the first floor?
A. No.
Q. Do you have any evidence of damage on the first floor?
A. No.

A. Yes.
Q. So this isn't water coming through the sill. It's coming down from the window above?
A. Yes.
Q. And I don't recall, but did you test the sill at this point to see if water was coming through the sill?
A. I don't recall.
Q. Okay. Mr. Riesberg, if you didn't find any damage on the first floor, you didn't see any evidence of damage and you didn't do any openings in the first floor, why would you recommend doing this repair that you suggested on the entire first floor?
A. Sealant joints will fail. They're unreliable, and flashing should have been installed.
Q. But your design, which meets the design requirements, does not include flashing; correct?
A. Yes.
Q. That's a correct statement?
A. It is.
Q. And you would admit that on the first floor there is no damage, evidence of damage, from water infiltration?
A. I agree.
MR. SCOTT: I think those are about all the