**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **GEE & JENSON ENGINEERS, ARCHITECTS AND PLANNERS,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | Case Number: 1:05-cv-00457-LJB |
| **UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Gee & Jenson Engineers, Architects and Planners (hereinafter "Gee & Jenson") hereby moves for summary judgment on the Government's claim for breach of contract relating to Gee & Jenson's design of the NISE East Building located in Charleston, South Carolina. This motion is made pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) and is supported by this memorandum and the documents contained herein.

**STATEMENT OF THE ISSUES**

1. Did Gee & Jenson breach the contract by failing to design metal flashing under the precast sill for the windows?

2. Did the Government incur any damages as a result of the alleged breach of contract?

**STATEMENT OF THE CASE**

This case involves the design of the NISE East Building located in Charleston, South Carolina. In July 1993, the Government entered into an indefinite delivery requirements contract, No. N62467-93-D-0911 (hereinafter "the Contract") for design and engineering services with Gee & Jenson. The Contract provided for the design services for different buildings for the Government under separate delivery numbers. Delivery No. 00001 was issued for the design of the NISE East

Building. (Answer and Counterclaim, Counterclaim, par. 2-3). The Contract and Delivery No. 00001 required Gee & Jenson to provide design and engineering services in accordance with the Standard Building Code (1991 Edition). (Exhibit 5, Deposition of the Government's Expert, William F. Riesberg, p. 24, ln. 16-18 (hereinafter "Riesberg depo.")).

The NISE East Building is a two-story masonry and brick veneer building with a window wall extending essentially all the way around the building on each floor. The windows sit on a precast concrete sill. A picture of one side of the building is attached as Exhibit 1. Exhibit 2 is a picture looking down the window wall on the first floor showing the windows sitting on the precast concrete sill.

The contract for construction of the building was awarded to Pizzagalli Construction Company (hereinafter "Pizzagalli"). (Exhibit 7, Government Letter to Pizzagalli dated Nov. 3, 1999).

After the building was completed and accepted by the Government, in 1998 the Government began to have problems with water infiltration into the building. The Government hired Riesberg Architects, LLC to perform a forensic study to determine the cause of the water infiltration. After performing a study, Riesberg issued a report in November of 1998 listing what it considered to be both construction and design defects that it contended could have resulted in the water infiltration.

The Government advised both Pizzagalli and Gee & Jenson of the alleged problems in early-1999. Thereafter, Pizzagalli performed repairs to the building as a result of the alleged construction defects. (Exhibit 7, Government Letter to Pizzagalli dated Nov. 3, 1999; Answer and Counterclaim, Counterclaim, par. 10). Significantly, those repairs resulted in no further water infiltration problems into the building. (Exhibit 5, Riesberg depo. p. 43, ln. 19 - p. 45, ln. 21;Exhibit 6, Herrington depo. p. 54, ln. 17 - p. 56, ln. 3).

Despite the fact that there were no further water infiltration problems after Pizzagalli corrected the construction defects, the Government continued to insist that Gee & Jenson's design was defective. The Government awarded Riesberg Lunn, LLC (the successor to Riesberg Architects, LLC) a contract to design a repair for the alleged design errors. (Answer and Counterclaim, Counterclaim par. 12; Exhibit 5, Riesberg depo, p. 46, ln. 10 - p. 47, ln. 24).

At this point, the sole remaining issue is the design of the connection between the horizontal precast sills upon which the windows sit. The original design required installation of a caulking joint between the sills; however, it did not require metal flashing underneath the sills at all places. (Exhibit 3). The Government contends the design by Gee & Jenson was defective because it did not include metal flashing under the precast sills. The repair design by Riesberg required the installation of essentially two caulking joints between the sills as opposed to one caulking joint between the sills, but did not require installation of metal flashing underneath the sills. (Exhibit 4, Revised Drawing Detail AR97; Exhibit 5, Riesberg depo, p. 90, ln. 16-20). In March of 2004, the Government awarded a contract to HITT Contracting Company to implement the design by Riesberg Lunn, LLC. (Answer and Counterclaim, Counterclaim, par. 13).

The Government issued a final decision on April 7, 2004 finding that Gee & Jenson was liable for the repair cost resulting from the alleged design error, totaling approximately $182,000. This case followed.

## ARGUMENT

Gee & Jenson is entitled to summary judgment because (1) the design it prepared for the NISE East Building complied with the contract requirements, and (2) the Government has not incurred any damages as a result of any alleged breach.

This case involves a claim by the Government for which it bears the burden of proof. The Government must prove that (1) Gee & Jenson breached the design contract, and (2) the Government incurred damages as a result of the breach.

Summary judgment is appropriate where there are no genuine disputes as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). As the United States Court of Appeals for the Federal Circuit emphasized in *Sweats Fashions*, "the burden is <u>not</u> on the movant to <u>produce evidence</u> showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). "Rather, the burden on the moving party may be discharged by "showing" - - that is, pointing out to the [Court of Federal Claims] - - that <u>there is an absence of evidence to support the non-moving party's case</u>." *Id*. (emphasis in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. at 325).

Once the moving party meets its burden, the non-movant "must proffer countering evidence sufficient to create a genuine factual dispute." *Sweats Fashions*, 833 F.2d at 1562. The non-movant must, therefore, present sufficient evidence as to the existence of a dispute as to a material fact such that the trier of fact could reasonably find in favor of the non-movant. *See*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50. The Federal Circuit has delineated the non-moving party's burden as follows:

> The non-movant may not rest on its conclusory pleadings, but under Rule 56, must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984).

*Sweats Fashions*, 833 F.2d at 1562-63. The non-movant's burden to set forth the specific facts that generate the issue for trial, therefore, "is not met by reliance on its pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see, Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). The non-movant's response "must set forth facts [showing] that there is a genuine issue for trial." *Carrier Corp. v. United States*, 6 Cl. Ct. 169, 175 (1984); *see, D&S Universal Mining v. United States*, 4 Cl. Ct. 94, 96 (1984). As demonstrated below, there are no genuine issues of material fact in dispute and plaintiff is entitled to judgment as a matter of law.

**1. Gee & Jenson Did Not Breach the Contract**.

All of the parties agree that Gee & Jenson was required to design the building in accordance with the applicable building code in effect at the time, the 1991 Standard Building Code. (Exhibit 5, Riesberg depo. p. 24, ln. 16-18). There was no requirement in the Contract that required that Gee & Jenson exceed the requirements of the building code. (Exhibit 5, Riesberg depo. p. 59, ln. 8-11). With regard to flashing and veneer walls, the Code provides:

> Flashing shall be provided **as necessary** to prevent the entrance of water at openings in or projections through veneered walls. Flashing shall be provided at intersections of veneered walls of different materials unless such materials provide a self flashing joint and at other points subject to the entrance of water. Caulking shall be provided where such flashing is determined by the Building Official to be impractical. (Emphasis added). (1991 Standard Building Code, Section 811.1.4).

Gee & Jenson designed a caulking joint between the horizontal precast sills under the windows, but did not include a metal flashing underneath the sills. Gee & Jenson's chief architect on the project, Tim Hullihan, testified that metal flashing underneath the sills would not have been practical because of all the holes drilled in the metal flashing for the bolts to hold the concrete sill

down. Basically, the metal flashing would be full of holes so that water could run into the building. The caulking prevented the entrance of the water between the joints so that it could never get into the wall. Because holes were required in the metal flashing to allow for the bolts for the sill, that flashing would have been impractical to keep water out of the building. (Exhibit 9, Deposition of Timothy F. Hullihan, p. 69, ln. 8- p. 72, ln. 7).

With regard to approval by the building official, the Government's expert, Riesberg, admitted that the Government approved the design. Mr. Riesberg was asked:

"And, in fact, the government gave A/E approval of its design, isn't that true?"

Mr. Riesberg answered, "In effect, yes." (Exhibit 5, Riesberg depo, p.49, ln. 5-7).

Significantly, the repair design by Riesberg did nothing more than include a second caulking joint between the precast sills. According to Riesberg, his design provided for a two-stage sealant joint that provides a secondary barrier to water intrusion. (Exhibit 5, Riesberg depo, p. 46, ln. 10 - p. 48, ln. 12). However, there is no requirement in the Contract or building code that required a secondary barrier system. (Exhibit 5, Riesberg depo, p. 77, ln. 16-19). Further, while the Government claims Gee & Jenson's design was defective because it did include metal flashing under the precast sill, the design by Riesberg did not include metal flashing underneath the sills. (Exhibit 4, Revised Drawing Detail AR97; Exhibit 5, Riesberg depo. p. 90, ln. 16-20). Despite the lack of metal flashing, Riesberg contends his design met the building code requirements. (Exhibit 5, Riesberg depo, p. 25, ln. 21-23).

Since the code provided the architect with discretion to determine when flashing is "necessary," and since the flashing would have been impractical because of the holes in the flashing, and since the Government approved the drawings submitted by Gee & Jenson, there is no breach of

the contract. There was no breach of the standard of care. Accordingly, Gee & Jenson is entitled to summary judgment as a matter of law.

**2. <u>There Are No Damages as a Result of the Alleged Design Defect</u>.**

The Government admits that once Pizzagalli corrected the construction defects it did not have any further damages from water filtration. In addition, the Government cannot say what water got into the building as the result of alleged design defects verses construction defects.

To prevail, the Government must demonstrate that the alleged design defect resulted in damages. When claimed damages are allegedly the result of breaches by two or more parties, the Government must provide evidence to support a reasonably accurate determination of the amount of damages resulting from each party's breach. For example, in a case involving damages from latent and patent defects along with "faulty" specifications, the government's obligation, "is to delineate damages resulting from the latent defects as distinguished from the costs incurred due to patent defects and defective specifications. *Roberts v. United States,* 174 Ct.Cl. at 957, 357 F.2d at 948-49. Failure to satisfy this burden renders the government without entitlement to recover on a latent defect counterclaim." *M.A. Mortenson Co. v. U.S.*, 40 Fed. Cl. 389 (1998). See also, *Appeal of Bromley Contracting Co., Inc*, 81-2 BCA P 15191, DOTCAB No. 78-1 (1981)(Where deficiencies are due to both patent and latent defects as well as to factors for which appellant is not responsible, and where respondent has not submitted specific proof of the portion of the costs attributable to latent defects, recovery for the repair of latent defects is not sustained).

In this case, the Government's expert, Riesberg, admitted that the sealant joints installed between the precast sills by Pizzagalli were defective. According to Mr. Riesberg, all of the alleged leaks through the caulking joint in the precast sill resulted from poor workmanship in the caulking.

(Exhibit 5, Riesberg depo. p. 76, ln. 21- p. 77, ln. 4). The sealant joints had failed because the contractor failed to properly prepare the sealant and failed to install it properly. (Exhibit 5, Riesberg depo. p. 27, ln. 18-p. 28, ln. 3; p. 43, ln. 1-18). Mr. Riesberg also admitted that if Pizzagalli installed the caulking joints between the precast sills properly, the joints would not have allowed water to get through (Exhibit 5, Riesberg depo. p. 28, ln. 17- 24, p. 33, ln. 14-17), and that a good sealant properly installed would last a minimum of 10 years, and can last up to 20 years. (Exhibit 5, Riesberg depo. p. 45, ln. 24 - p. 46, ln. 6; p. 75, ln. 23 - p. 76, ln. 20). The Government did not have a maintenance plan for checking and replacing the caulking on the building. (Exhibit 6, Deposition of James Herrington, p. 25, ln. 3-7 (hereinafter "Herrington depo")). All of the alleged leaks at issue with the precast sill occurred within ten years and a maintenance plan would have included replacing or repairing the caulking joints within that ten year period. (Exhibit 5, Riesberg depo, p. 76 ln. 8-23). Therefore, if the joints had been installed properly by Pizzagalli, and if the Government maintained the building, the caulking joints between the precast sills would never be a problem.

More importantly, Riesberg admitted that he did not have any evidence that any additional water damage occurred after Pizzagalli completed repairs of the construction defects. (Exhibit 5, Riesberg depo., p. 44, ln. 23 - p. 45, ln. 21). Likewise, James Herrington, the facilities manager for the building, admitted that after Pizzagalli finished repairs of the construction defects there was no additional testing and he was not aware of any water damage since those repairs other than a relatively new problem that "only seems to show up when the sun and the moon are in their right phases." (Exhibit 6, Herrington depo., p. 54, ln. 17 - p. 56, ln. 3).

Significantly, while the Government hired HITT to make repairs on both the first and the second floor of the NISE East Building as a result of the alleged design defects, there was absolutely

no evidence that any damage ever occurred on the first floor. The Government's expert admitted there was never any evidence of damage on the first floor and no investigation on the first floor.

> Q. Were there any areas that you found damage on the first floor?
> A. No leaks were reported on the first floor.
> (Exhibit 5, Riesberg depo., p. 20, ln. 8-10)
>
> Q. And, Mr. Riesberg, I'm going to show you a drawing that you just pulled out of your notebook, and can you tell me what this is?
> (communication between court reporter and Mr. Scott omitted)
> A. Locations of destructive openings for my forensic destructive investigation.
> Q. And can you tell here whether they're on the first floor or second floor?
> A. Second floor.
> Q. These are all on the second floor? Were there any openings on the first floor?
> A. No.
> Q. Do you have any evidence of damage on the first floor?
> A. No.
> (Exhibit 5, Riesberg depo., p. 62, ln. 10-25)
>
> Q. And you would admit that on the first floor there is no damage, evidence of damage, from water infiltration?
> A. I agree.
> (Exhibit 5, Riesberg depo., p. 90, ln. 21-24)

One has to question why the Government performed work on the first floor when there was never any evidence of damage.

Likewise, on the second floor, Mr. Riesberg admitted that the only reason any of the caulking joints between the precast sills on the second floor over the two wings had to be repaired was because Pizzagalli failed to install an upstand as required by the original design. (Exhibit 5, Riesberg depo. p. 51, ln. 22 - p. 52 ln. 7).

Finally, the Government cannot say what water got into the building as the result of alleged design defects versus construction defects. (Exhibit 8, Deposition of Virgil Svendsen, p. 55, ln. 1-5; Exhibit 6, Herrington depo. p. 25, ln. 9-20).

Since the water infiltration problems stopped once the construction defects were completed, and there is no evidence of any damage directly attributable to the actual design of the joint between the sills, Gee & Jenson is entitled to summary judgment.

## CONCLUSION

Since the design contract did not specifically require flashing under the sill, and since the code allowed for the design provided by Gee & Jenson, there is no breach of the contract. Further, there are no damages as a result of the design. As soon as the construction defects were corrected, the water infiltration ceased. Therefore, Gee & Jenson is entitled to summary judgment.

Respectfully submitted,

**PEDERSEN & SCOTT, P.C.**

S/William A. Scott
William A. Scott
775 St. Andrews Blvd.
Charleston, SC 29412
(843) 556-5656
ATTORNEY FOR PLAINTIFF

Dated this 31st day of October, 2007.