FOR THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION OF JAMES HERRINGTON

COPY

GEE & JENSEN ENGINEERS,
ARCHITECTS AND PLANNERS,

Plaintiff,

vs. CASE NO. 1:05-cv-00457-LIB

UNITED STATES OF AMERICA,
DEPARMENT OF THE NAVY,

Defendant.

---

DEPONENT: JAMES HERRINGTON

DATE: APRIL 4, 2007

TIME: 1:00 P.M.

LOCATION: NAVFAC, SOUTHERN DIVISION
2155 EAGLE DRIVE
NORTH CHARLESTON, SOUTH CAROLINA

REPORTED BY: DENISE MCCAULEY, RPR, IA-CSR, GA-CCR
CLARK & ASSOCIATES
P.O. Box 73129
North Charleston, South Carolina 29422
(843)762-6294

EXHIBIT 6

A. That's agreeable.

Q. You have been designated by the government to talk about certain issues. I'll show you a letter dated March 29, 2007.

A. Hold up.

Q. Glasses come with age. I understand that you will be discussing design defects claimed by the government; is that correct? You can answer questions in that area?

A. I can answer some of them. I was not the designer of record at the beginning of this project. I inherited this project at the start of construction, so I can only answer from that standpoint on.

Q. When you say the start of construction, the start of the initial construction of the building or the repairs?

A. Initial construction.

Q. Okay. So you were there during the actual construction of the building from the ground up?

A. Pretty close, right after they got started.

Q. Okay. You were not involved with the original design. You just picked it up once the design was given to the contractor?

A. The construction contractor could get started on it.

Q. Okay. What about the construction defects claimed by the government that the government contends were the prime contractor's responsibility? Can you answer questions on those areas?

A. Now, when you say prime contractor, are we talking prime contractor, Pizzagalli, or are you talking prime contractor, A/E?

Q. Pizzagalli.

A. Pizzagalli.

Q. I'll talk the A/E and the contractor.

A. All right. I'm just trying to make sure that we're in agreement.

Q. And we're going to separate the two. I'm going to show what the government has claimed against one and the other and just go through the list.

A. Okay.

Q. But you can answer questions in those areas?

A. As much as I can remember.

Q. And then I understand you can talk about the actual repairs that were performed as a result of the construction defects?

A. I can speak a good bit on that, yes.

Q. Okay. And do you have any -- you're not here to talk about repairs as a result of the A/E defects, the work that was done by Hitt? Were you

involved with that at all?
A. Yes, I was.
Q. Okay.
A. But I had changed roles from the point of being a NAVFAC person to being a customer.
Q. Okay. And that's the next thing. Tell me what is your position now?
A. I'm the facility manager for SPAWAR.
Q. And how long have you had that position?
A. About three and a half years.
Q. And before that what was your position?
A. I was here at NAVFAC for 17 years, and SPAWAR had been a customer of mine and made me an offer I couldn't refuse.
Q. So when you say SPAWAR was a customer of yours, that was another branch of the government that you went from NAVFAC to SPAWAR?
A. Correct.
Q. What was your position at NAVFAC before you went to SPAWAR?
A. Well, immediately before I was in utilities branch, but prior to that I had always been in what you would call the project -- I don't know how to put it, but --
Q. Like the construction management/project

A. It's not supposed to, but it will over time as it deteriorates.

Q. Do you have a maintenance program for replacing the caulk on that building?

A. Not as of yet. We know that it's coming up. We're getting around the ten-year mark, and we're going to have to do it.

Q. Did -- when did you develop this maintenance plan?

A. Probably when all this work came up, we were having to have Hitt in there and we realized, oh, we've got a lot of caulking in this building, and we need to plan on doing a recaulking job.

Q. Okay. Before Riesberg came in and did this report, had any maintenance been done on this building?

A. I can't answer that question, because I was not there. I was at SPAWAR at the time.

Q. Okay. If water came in -- can you go back to WP-1 on Page 10? If you look at the intersection between where the window comes down and where the sill is, see that?

A. Correct.

Q. Is there any complaint about that design?

A. I'm afraid I'm not clear. I'm afraid you're going to have to point out what you're talking about.

it must have been -- I don't know. It's somewhere in these documents when they did it. It's probably several years, because I was at SPAWAR at the time, and I've been over there nearly four years.

Q. It was, when you say you've been over there four years, Pizzagalli had already finished the work over four years ago?

A. Well, what I'm saying is if Pizzagalli had that, they probably did this work in 2000. I think that's a reasonable assumption. Okay. Now, I don't know when Hitt did the work, but it's been within the last, probably, within the last few years, because I was over there working for them at that time.

Q. And I think this was in the time frame of 2004-2005?

A. And that would make sense.

Q. Okay. And I think you already said you didn't do any testing after Pizzagalli finished their work to see if that corrected all the problems?

A. None that I know of, but ask Bill Riesberg tomorrow.

Q. I will. Did you have any documentation of where the damage was when Pizzagalli did their repairs, or would the Riesberg report be the best evidence of that?

A. Riesberg would probably be the better report on that thing.

Q. Did you see any evidence of any continuing or additional damage after they did their work, Pizzagalli did the work?

A. I don't recall.

Q. Would you keep -- if somebody reported a problem, would that have been something you would have maintained?

A. Could have been, but at we're talking a transition from when I was there here and transitioned over there.

Q. Well, are you aware since you've been over there of any problems with water infiltration?

A. I've got one right now.

Q. And where is that?

A. It's back on the, back on one of the wings over the -- it would be the northeast wing.

Q. Okay. Now, from the time you went over there until the occurrence of this problem, have you seen any other issues with water infiltration?

A. None that I've seen shown up.

Q. The one that is there now, tell us what's there and --

A. Relatively new problem. I have not

investigated it to figure out what's going on, and it only seems to show up when the sun and the moon are in the right phases.

Q. Would it be fair to say that where water comes in is not necessarily where water goes out?

A. Typically doesn't work that way. Everything flows downhill.

Q. Flows downhill, but where it goes in the middle nobody knows?

A. Chasing water leaks is a very difficult project.

Q. Okay. Let's keep going with WP-3, the inadequate drip in the precast sill. That was corrected?

A. Yes.

Q. Okay. And then WP-4, that's inadequate structural glazing. Can you tell me what that is?

A. The specifications required a particular thickness of glazing on these window sills, and in some locations you did not get the thickness of the glazing. It has to do with wind ratings, not water issues.

Q. That's what I was going to ask. Does this have anything to do with water infiltration in the building?

A. No. Water -- structural issues, not water.