IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CASE NO.: 05-457C
(Judge Bush)

GEE & JENSON ENGINEERS,
ARCHITECHTS AND PLANNERS,

Plaintiff,

VS.

UNITED STATES,

Defendant.

West Palm Beach, Florida
September 27, 2007

DEPOSITION OF TIMOTHY HULLIHAN

Taken on behalf of the Defendant, before ALEX RAMIEREZ, a Notary Public within and for the County of Palm Beach, State of Florida, pursuant to Subpoena re Deposition.

EXHIBIT
9

APPEARANCES:

ON BEHALF OF THE DEFENDANT
BY: TARA HOGAN, ESQUIRE

ON BEHALF OF THE PLAINTIFF
BY: WILLIAM SCOTT, ESQUIRE (telephonically)

ON BEHALF OF THE PLAINTIFF
BY: JOSEPH KESSINGER, ESQUIRE

ALSO PRESENT:
PAMELA NESTELL, ESQUIRE

THEREUPON:

TIMOTHY HULLIHAN

A witness of lawful age, being first duly sworn in accordance with law, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HOGAN:

Q Good morning, Mr. Hullihan.

A Good morning.

Q Would you please state your name and spell it for the record?

A Timothy. You want me to spell that too?

Q Sure.

A Okay. T-I-M-O-T-H-Y. Middle name is Frederick. F-R-E-D-E-R-I-C-K. Hullihan. H-U-L-L-I-H-A-N.

Q Thank you. We met briefly earlier and my name is Tara Hogan. I am an attorney representing the United States in a complaint that's been filed --

A Okay.

Q by Gee & Jenson. With me today is Pam Nestell who is an attorney with the Department of the Navy. Who's also assisting me in this case. Have you ever had your deposition taken before?

A Never.

talking about a preplanning conference or a conference -- I'm sorry I just don't know what you mean.

Q Sure. There may be more than one though.

A We had a lot of meetings in Washington. I can tell you that.

Q Okay. So you were involved from the beginning?

A Yes.

Q Who was on this team that you mentioned earlier?

A The in house team or the whole consulting team?

Q Let's start with the in house team.

A Tom was the project manager. Tom Orlowski was the project manager. Don Goddeau was the principal in charge. I guess you could say I was third in command as the project architect. And underneath me were two other registered architects, Lisa Lemonovich and Dan Gonzalez. And underneath them were a team of designers and drafts people. Also within Gee & Jenson we handled all MEP and structural and civil work. And there are many, many people that I could name for you, if I could remember them, that worked on it. Outside the office -- I'm sorry. We didn't do the MEP. We had an outside consultant for the MEP.

Q And MEP is?

A Mechanical, electrical, plumbing.

Q Okay.

A We may have done some of it but primarily we had a

A In some cases there's a secondary means of waterproofing via flashing. In some cases, there's not in all cases. In all cases there's a vertical membrane. That keeps moisture from moving horizontally through the building. Again, my information, unfortunately, is only based on Mr. Riesberg's report and I honestly don't know how accurate it is.

Q Okay. Can you mark this as exhibit seventeen? Exhibit seventeen that has just been handed to Mr. Hullihan is the standard building code 1991, section 811, veneered walls.

A Do you want me to take a minute to read it?

Q Sure.

A Or is there a particular paragraph you want me read?

Q Well let me just start by, we agreed earlier that the 1991 standard building code was the code was to be used for the design of this building, right?

A That's the one we used. Yes.

Q Okay. Can you take a look at section 811, point 1.4, which is the last?

A Okay.

Q Go ahead and take a minute to read that.

A Okay. I've read it.

Q Okay. In this building there were veneered walls, right?

A Yes. Absolutely.

Q Okay. So the first section in that sentence says, flashing shall be provided as necessary to prevent the entrance of water at openings in or projections through veneered walls. Was that incorporated into the design?

A I found that very difficult to understand. So I have to read it three or four times.

Q Sure. Go ahead.

A Okay. I would say that we provided flashing where it was necessary.

Q Okay. And where was it necessary?

A Again, the only source of information is Mr. Riesberg's report and I don't know how accurate it is. But from that report it shows that in some cases we provided flashing where water is more likely to be a problem. Such as a roof and relied on sealant where water was -- it was reasonable to assume that water would not be a problem.

Q Okay. The second sentence says flashing shall be provided at intersections of veneered walls of different material unless such materials provide a self-flashing joint in another point subject to the entrance of water. Did the design provide flashing at intersections of veneered walls and different materials?

A I believe it did.

Q Okay. Were talking about these windows that have the pre-cast sills. Would that sentence not apply to that

detail?

A I guess you have to read the whole thing together. The last sentence where it says sealant -- the correct term actually is sealant, caulking is interior and sealant is exterior. Sealant shall be used where the flashing isn't practical. It's clear from the drawings that I've been provided that in some cases we relied on the sealant rather than flashing. I'm left to assume that there was some impracticality at those particular details.

Q What would have been the impracticality?

A It's hard to say. Clearly there's -- again there are three hundred sheets of drawings that had numerous details in them. Looking at all of those would show us which ones had flashing and which ones didn't. We might find a pattern there.

Q Generally speaking where would it be impractical to provide flashing?

A Impractical means it's a very complicated condition. The existence of the flashing does nothing because the flashing itself is penetrated by something so many times that it doesn't do anything for you. You put the flashing in and you put a spike through it and you made a big hole in the flashing. What's the point of putting the flashing in? That appears to be the case in this detail.

Q I'm sorry. Which detail are you referring to?

A The one that was provided to me that's in the Riesberg report. There's a pin that goes from the sill to the metal frame that if the flashing were there would have by its very existence created a hole and what you're trying to use as waterproofing. So that certainly falls into the heading of impractical. You spend all this money on flashing then put a hole in it.

Q I'm sorry. Can you go back and tell me what page you were looking at? All right. So we're on page ten of thirty-four on the November 11th Riesberg report and the detail provided under WP-1.1.

A Again I don't recall specific discussions. I'm trying to put pieces together from the information I'm being provided today. That would certainly be one possibility. I would have to look at the entire set of drawings to refresh my memory as to where our thoughts were.

Q Did the building official tell you that flashing would be impractical?

A I don't recall. There isn't really a building official. The Navy acts as their own building official. I don't remember.

Q To your knowledge the Navy never told Gee & Jenson that flashing would be impractical?

A I don't recall any direct conversation but the fact that this detail exists as it is after exhaustive reviews by