# Exhibit 13

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
P. O. Box 30938
295 Meeting Street
Charleston, SC
29417-0938/29401
(803) 577-3431
Fax (803) 577-9200
d/b/a PLLC in NC
riesbergarchitects.com

# REPORT

*On A*

## Forensic Study

*Of The*

## SPAWAR NISE EAST ENGINEERING CENTER

*To the*

Commander,
Southern Division, Naval Facilities Engineering Command

*Pursuant To*

Delivery Order 0004

Contract N62467-96-D-0819, Indefinite Delivery Requirement for Professional Forensic Architectural and Engineering Services within the Southern Division Naval Facilities Engineering Command Area of Responsibility

EXHIBIT
tabbies
Z

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



# REPORT

DATE: November 11, 1998

TO: Commander, Southern Division Naval Facilities Engineering Command
Attn: 077VGS

FROM: William F. Riesberg, FCSI, AIA, CCS

PROJECT: Contract N62467-96-D-0819, Indefinite Delivery Requirement for Professional Forensic Architectural and Engineering Services within The Southern Division Naval Facilities Engineering Command

SUBJECT: Report; Delivery Order 0004: SPAWAR NISE East Engineering Center

This is our report to you of our investigation pursuant to Delivery Order 0004. The commissioned study is referred to as a Forensic Study Type I. It includes three days of field investigation, including travel, plus time for data reduction, analysis and report. The commissioned study did not anticipate litigation support or the level of effort necessary to develop a refined and thoroughly developed professional opinion that would be used in a litigation setting. However, we approached this commission so that the information and data collected would be useful, reliable, and repeatable in that setting should the issues raised in this report escalate to resolution in that forum. As with any large construction project, there are thousands of pieces of information not available to us at this time. We would appreciate the opportunity to reconsider the opinions expressed herein as relevant information becomes available.

## PURPOSE

The purpose of the investigation was to gather additional information for developing professional opinions regarding life and fire safety and water infiltration issues raised during our forensic consultation.

## EXECUTIVE SUMMARY

This report expresses professional opinions as to responsibility for design or construction deficiencies and to recommend a repair/replacement program for defects. We found substantial deficiencies in the design and construction of the facility. We discovered additional deficiencies during our study that were not found during the forensic consultation, and reported on them also. Due to the nature of the design, and the manner in which the design was implemented, most of the deficiencies are pervasive.

We confirmed, to date, that in most cases water damage is moderate. However, in some cases active damage is still occurring. Damage is predicted to continue. If deficiencies are not corrected, they will result in severe damage over time. Corrective measures are recommended to provide long-term solutions.

We confirmed the widespread use of combustible insulation as firesafing where the metal stud framing of the exterior wall bypasses the floor line. We confirmed the widespread use of combustible insulation where it should be noncombustible. We found that the contractor failed to patch the sprayed fireproofing. Each of these issues presents a serious reduction in the life and fire safety afforded the occupants of the facility.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



Report ........ 1
PURPOSE ........ 1
EXECUTIVE SUMMARY ........ 1
METHODOLOGY ........ 3
Planning 3
Field Investigation ........ 3
Document Review ........ 5
Analysis 5
Deliverables: ........ 5
LIFE & FIRE SAFETY (LF) ........ 6
LF-1 Improper Firesafing ........ 6
LF-2 Improper Insulation ........ 8
LF-3 Failure to patch Fireproofing ........ 9
WEATHER PROTECTION OF THE BUILDING ENVELOPE (WP) ........ 6
WP-1 Inadequate Flashing ........ 10
WP-1.1 Failure to Flash under Precast Sill ........ 10
WP-1.2 Failure to Provide Upstand on Through-Wall Flashing ........ 12
WP-1.3 Attachment of Through-Wall Flashing to Precast Wall Panels ........ 13
WP-1.4 Improper Through-Wall Flashing Joints ........ 14
WP-1.5 Poor Flashing Workmanship ........ 15
WP-2 Inadequate Sealant Installation ........ 16
WP-2.1 Improper Sealant Joints ........ 16
WP-2.2 Installed On Top of Through-Wall Flashing ........ 17
WP-3 Inadequate Drip in Precast Concrete sill ........ 18
WP-4 Inadequate Structural Glazing ........ 20
WP-5 Delaminated Glass ........ 22
WP-6 Inadequte operable window Installation ........ 24
WP-7 Failure to Properly Weatherseal Glass Joints ........ 26
WP-8 Failure to Design Proper Stucco Termination ........ 27
WP-9 Failure to Patch Gypsum Sheathing Penetrations ........ 29
WP-10 Improper Thermal Value ........ 30
WP-11 Improper Drainage ........ 31
WP-12 Improperly Installed Head Sealant Joint ........ 33
WP-13 Poor Brick Workmanship ........ 34

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## METHODOLOGY

### PLANNING

A Field Work Plan was prepared and submitted to Code 077. I met with Wayne Pannullo of SPAWAR facilities on October 19, 1998, to review operations, security and logistical matters.

### FIELD INVESTIGATION

On October 20-22, 1998, I conducted a field investigation of the subject facility. David Roady, Andrew Miller and William Vukovich of the firm assisted me. Trident Construction Company of North Charleston, South Carolina, provided logistical support and closed the openings. The investigation team spent approximately 100 person-hours in the field.

We used destructive and non-destructive methods during the field investigation. We performed water testing of most openings.[1]

**Destructive Method:**

We made 19 openings[2] on the second floor into the exterior wall. Of these:

- 65% were where metal stud framing bypassed the floor line.
- 25% were adjacent to a roof.
- 10% were adjacent to a roof terrace.



Typical Opening:

We cut each opening, approximately 32" wide by 48" high, through the interior gypsum wallboard. The insulation was then removed to gain full visual access to the cavities.

We made the openings to:

- Learn more about the construction of the exterior wall assembly
- Access the inside of the wall to observe previous water damage
- Access the inside of the wall to observe leakage during water tests
- Determine the extent of kraft paper-faced blanket insulation and its use as a firesafing material

[1] Due to equipment problems on the last day, two openings could not be tested or fully observed from the exterior.

[2] We use the word "opening" to describe a location where an assembly was cut, usually by destructive methods, to view to underlying construction.

**Non-Destructive Method:**

- We made and recorded observations of each opening and of the exterior wall face outside each opening.
- We conducted a visual survey to ascertain the extent of laminated glass delamination.
- We took 102 measurements of structural glazing width for later analysis.
- We took 224 measurements of the margin between the window frame and the windowwall frame (both mullion and head) at 28 operable windows for later analysis.
- While inspecting several operable windows, we discovered that the frames had been bent during installation. We decided to make a survey for later analysis. We took 180 measurements of the margin between the operable sash and the window frame.
- We made 32 impressions of precast sill drip grooves for later measurement and analysis.
- We surveyed the sealant joint width of the window to stucco joint over a length of approximately 1500 feet.
- We opened the ceiling in three places to verify the extent of combustible insulation and to observe fireproofing.

**Testing:**
We water-tested 17 openings in accordance with AAMA 501.2 "Field Check of Metal Curtain Walls for Water Leakage." This is the same test required in specification Section 08900, Glazed Wall Systems, §3.3 which specifies to "Conduct field check test for water leakage on all wall areas, full height, after erection. Conduct test and take necessary remedial action as described in AAMA 501.2."





In each water test, we:

- Masked off the joint between the aluminum windowwall frame and the adjacent sealant joint (and lower construction where appropriate to the assembly)[3].
- Stationed an observer inside the building to control the test and observe leaks.
- Conducted the test for 5 minutes along each member or joint. (Note: One joint was tested for 10 minutes to see if additional time produced leakage; it did not.)
- Performed the test over a 5 foot length and included the adjacent intersections.
- First tested the sill, then the right mullion, then the left mullion.
- Removed the mask and began testing at the floor line and worked up the wall. We tested the joint between the:
  - Precast wall panel and brick at the floor line.
  - Brick and the precast sill.
  - Precast sill and windowwall sill.

We tested 6 operable windows.

[3] There was no need to do this where the wall was adjacent to a roof or roof terrace.

**Record:**
We documented our observations and photographs by dictating approximately 50 pages of transcribed field notes. In addition, we recorded fifteen sheets of hand written field notes and sketches of field measurements and observations.

We exposed ten rolls of film with a Nikon N90s and a Nikon F4s camera to record observed conditions. We supplemented our photographic record with a Kodak DC260 digital camera, by recording 23 high-resolution digital photographs (1536 x 1024 pixels).

## DOCUMENT REVIEW

To develop opinions, we reviewed the drawings, specifications, submittals, industry standards and select NAVFAC Guide Specifications.

## ANALYSIS

We analyzed structural glazing width measurements for average, minimum, maximum, the number of zero measurements, and for the number of measurements below 1/8" and 1/4". The results are reported under WP-4.

We analyzed measurements taken of 28 operable windows. The results are reported under WP-6.

We measured and analyzed the precast sill drip groove impressions. The width and depth of each sample was measured and recorded. We then computed the average, minimum, maximum, and number of zero width and zero depth measurements. The results are reported under WP-4.

## DELIVERABLES:

The following are deliverables under this contract:
- Field Work Plan
- This report (6 copies)
- A copy of each photograph (numbered and captioned)
- 4 Kodak CD-ROMs with digital copies of the film exposures
- Cost Estimate (to be delivered separately)

## LIFE & FIRE SAFETY (LF)

### LF-1 IMPROPER FIRESAFING

Firesafing is used as a firestopping to prevent the spread of fire from floor to floor and as a draftstopping to prevent the spread of smoke from floor to floor. In this building, the metal stud framing bypasses the floor line. The space between the studs, at the slab edge, forms a cavity that must be filled with firesafing. The drawings clearly indicate firesafing in this cavity.



We did not find firesafing at any of the 13 openings made to observe this condition. In all openings we found kraft paper-faced blanket insulation, an inappropriate material. In some openings there were voids between studs with no insulation at all. In most cases we found a short piece of blanket insulation at the edge of the floor in the same location where safing insulation was required. In other cases, we found the wall insulation continued past the floor edge. When we removed the insulation from the wall cavity, there was a noticeable amount of air flow through the cavity from the first floor below.

The kraft paper-facer will burn and the blanket insulation has a warning to that effect printed on the facer itself. This insulation complies with ASTM C665, Type II, Class C, which means it is a blanket with a non-reflective vapor-retarder membrane covering one principal face. This type of membrane-faced surface is not rated for flame propagation resistance. The paper-facing is combustible. In fact, a burnt piece of kraft paper-faced insulation was found in one of the openings[4].






The use of this blanket insulation as firesafing is a violation of the Standard Building Code, 1991 edition[5]. SBC§705.1.6 prescribes that any openings between the edge of the floor deck and an exterior wall shall be sealed using an approved material or assembly of materials designed and tested for this purpose.

Specification Section 07270, Firestopping, requires the use of materials that are noncombustible and are listed by the UL Fire Resistance Directory or are approved by FM P7825. Kraft paper-faced

[4] This was probably from a fire during construction.
[5] The code criteria referenced in the Basis of Design.

insulation is combustible and therefore does not meet the requirements of the specification. We were unable to find a submittal for Section 07270 so we could not confirm what material, if any, was submitted and approved for use. This raises a question as to how the contractor firestopped all of the floor penetrations at mechanical and electrical work.

The contractor failed to install firesafing that met the requirements of specification Section 07270. Specification Section 07270 also requires the contracting officer to witness the installation before closing the opening from view. We do not know whether this inspection was requested or performed.

Recommendations: Remove nonconforming materials at the second floor edge and replace with proper firesafing materials that conform to current building code requirements. To accomplish the work, the interior gypsum wallboard must be removed from the exterior wall to gain access to the work.

Investigate floor penetrations for firesafing installation.

## LF-2 IMPROPER INSULATION

In accordance with the Standard Building Code (SBC), 1991 edition, this building is Type II construction. Type II construction requires that the exterior non-load bearing walls must be of noncombustible construction. We found kraft paper-faced blanket insulation, a combustible material, installed in the exterior walls. This insulation complies with ASTM C665, Type II, Class C, which means it is a blanket with a non-reflective vapor-retarder membrane covering one principal face. This type of membrane-faced surface is not rated for flame propagation resistance. The paper-facer is combustible. The use of this type of insulation is a violation of the building code requirements.



We found kraft paper-faced blanket insulation at all wall openings and in the exterior stud space above the ceiling. Each piece of blanket insulation was printed with a warning on the facer: "WARNING: This facing will burn. Do not leave exposed. It must be covered with gypsum board or other code approved materials and installed in compliance with all building codes. To prevent fire, keep open flames and other sources of heat away from facing."

Further, SBC§719.2.1 prescribes that "...insulating materials, when concealed as installed, in buildings of any type of construction, shall have a flame spread rating of not more than 75 and a smoke developed rating of not more than 450." The blanket insulation that was found in the walls and above ceiling was not rated for flame propagation resistance and was therefore in violation of the building code requirements.

The use of paper-faced insulation is at variance with the requirements of specification Section 07212, Mineral Fiber Insulation. This section does not provide for Type II insulation, but only for insulation conforming to ASTM C 665, Type I blankets without membrane coverings and Type III, Class C, blankets with reflective coverings. The contractor submitted and received approval for Type I insulation. We found no submittal for Type II or III insulation. We are not aware of an approved material substitution in this case.

The drawings do not distinguish where each type of blanket insulation is to be used. The drawings only indicate where blanket insulation should be installed in the exterior walls and what its R-value should be at each location.

In summary, the contractor failed to install the approved insulation in the exterior walls and above the ceiling of the exterior walls. The A/E did not clearly indicate what type of facing was required at each location.

Recommendation: Remove all combustible insulation from the exterior walls of the first and second floors and replace it with insulation meeting the thermal and combustibility requirements of each assembly. See WP-10, Improper Thermal Value, for additional information.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



LF-3 FAILURE TO PATCH FIREPROOFING

Adequate fireproofing of structural steel members is essential in mitigating structural damage caused by fire. Where fireproofing is not present, local failure can occur during a fire. This results in an increased hazard for occupants and firefighters.



We found areas of fireproofing that had been scraped off of the structural steel to facilitate the installation of electrical conduit and similar components. In specification Section 07250, Spray-Applied Fireproofing, §3.6.3 specifies that fireproofing be repaired at these damaged areas.

The Contractor failed to patch the fireproofing.

Recommendation: Inspect all fireproofing for damage and repair in accordance with Section 07250.

## WEATHER PROTECTION OF THE BUILDING ENVELOPE (WP)

### WP-1 INADEQUATE FLASHING

#### WP-1.1 FAILURE TO FLASH UNDER PRECAST SILL

Flashing directs water that has entered a wall assembly to the exterior face. The architect failed to indicate flashing under the precast sill of the typical windowwall. No flashing was installed. The architect indicated only a 1/8" slope on top of the precast sill. With such a slight slope, water cannot rapidly drain off.




The architect failed to indicate flashing under the precast sill of the typical windowwall. No flashing was installed. Exacerbating the absence of flashing is the design and installation of the precast sill. The architect indicated only a 1/8" slope on top of the precast sill. With such a slight slope, water cannot rapidly drain off.




In addition, the joints between the ends of adjacent pieces of the precast sill are sealed. The sealant with backer rod follows the curved nosing and the top of the sill (which essentially a flat horizontal plane). Sealant cannot be expected to provide the only line of defense, especially on a horizontal joint. While the sealant is generally installed correctly, we found places where water is entering the wall assembly through the sealant joint.

Critical to long-term performance of this design is flashing under the precast sill. The flashing should extend to the inside face of the precast sill and turn up (upstand) to form a pan. Had this flashing been installed, none of the leakage would have occurred.

SMACNA[6] Architectural Sheet Metal Manual, 5th edition, Figure 4-1, shows a condition similar to this design (except the flashing is not

[6] Sheet Metal and Air Conditioning Contractors National Association.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com

turned up on the inside[7]). Architectural Graphic Standards[8], Eight Edition, page 183, shows a nearly identical situation where there is a precast sill under a window. Flashing is indicated under the precast sill and turned up the entire height.

Recommendation: In conjunction with other repairs, remove the windowwall assembly and precast sill. Install through-wall flashing which extends to the inside face of the precast sill. Provide an upstand of suitable height for the wind load. Extend and turn the flashing down the face of the exterior wall.

[7] Considered incorrect by the writer.
[8] A compilation of industry standards published by the AIA.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-1.2 FAILURE TO PROVIDE UPSTAND ON THROUGH-WALL FLASHING

While through-wall flashing directs entrant water out of a wall assembly to the exterior wall face, an upstand on the inside edge is required to prevent water from draining into the wall. This is especially critical when there is a wind-induced pressure differential across the wall assembly.




Details 8/A101 and 9/A101 of the drawings indicate through-wall counter flashing under the precast sills where they are adjacent to roofs. The detail indicates an upstand behind the precast sill. The upstand is not dimensioned. In specification Section 07600, Flashing and Sheet Metal, §3.1.10 specifies that the upstand was to be not less than 1/4".

Of the 5 openings made where this condition was observable, flashing was present in all 5, but no upstand was made.



We took this photograph during a water test where water entered on top of the flashing and drained into the wall. The photograph illustrates the amount of water entering the wall. Related to this problem is the inadequate drip on the underside of the precast sill discussed in WP-3. Water can easily bridge the drip and continue to travel toward the top of the flashing where it enters the joint by capillary action or kinetic energy. Winds produce a pressure differential across the assembly that can result in a large quantity of water draining into the wall. We conducted our tests under static conditions, which represents far less than design conditions.

Recommendation: Remove enough interior gypsum wallboard as necessary to gain access to the flashing under the sill. Clean the exposed surfaces of the existing flashing. Install an "L" shaped aluminum upstand fastened to the existing flashing. Over the joint between the flashing and the upstand, install a strip of a flexible modified bitumen flashing. Close the opening with materials of like kind and refinish to match existing.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-1.3 ATTACHMENT OF THROUGH-WALL FLASHING TO PRECAST WALL PANELS

Each building material has a coefficient of thermal expansion. When materials are used together, the design must contemplate differential movement. The architect failed to consider differential movement at the through-wall flashing under precast wall panels. The through-wall flashing (that drains the cavity) behind the typical precast wall panel is being deformed. Attachment of the flashing to the precast wall panels causing the deformation of the flashing. The top of the stucco, below the through-wall flashing, is not closed to the weather. The deformation of the flashing is providing an open avenue for water infiltration at the top of the stucco.

Detail 16/A165 of the drawings indicates a custom extruded bronze anodized aluminum trim piece below the through-wall flashing at the precast wall panel to stucco intersection. The trim piece was to be "L" shaped (2" x 1/2") and fastened to the precast wall panel and gypsum sheathing.[9] The trim piece is not present. It is unknown to the writer whether this trim piece was formally deleted.




We found that the flashing was attached with powder actuated fasteners to the precast wall panel. Due to differential thermal expansion[10], the flashing is being deformed because it bridges the joint between adjacent precast wall panels. The adjacent panels expand and contract independent of each other, but the flashing is attached to both panels. The result is that the flashing has to accommodate the movement across the joint in addition to its own expansion. The same effect, with a more severe result, would occur if the trim piece were present. The detail contradicts Specification Section 07600, Flashing and Sheet Metal, §3.1.2 specifies to "make sheet metal exposed to the weather watertight with provisions for expansion and contraction." §3.1.8 specifies to "provide for expansion and contraction joints at not more than of 32-foot intervals for aluminum..." Metal lath and building paper can be observed under the flashing. It can be observed that water can (and will) get into this joint.



The photograph to the left illustrates the disfigured flashing.

Recommendation: Remove the fasteners and reconfigured the flashing to turn down and lap over the stucco. Under the flashing, install a sealant joint to weatherseal the joint.

---

[9] Gypsum sheathing is not a suitable fastening base; it would have to be fastened to the metal stud framing.
[10] The coefficient of thermal expansion of aluminum is 1.65 times that of concrete.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-1.4 IMPROPER THROUGH-WALL FLASHING JOINTS

Through-wall flashing must be properly lapped and sealed to prohibit water from entering the wall assembly. In specification Section 04200, Unit Masonry, §3.9 specifies that flashing seams be lapped 4" and to "seal laps as necessary to ensure watertight construction." The seams were lapped approximately 4". In some cases they have a small bead at the head of the lap, but typically they are completely unsealed.




This photograph illustrates a lapped and unsealed flashing joint. (Note the absence of sealant below the flashing and presence of sealant above the flashing.)

Recommendation: Fasten and seal each lap joint.

WP-1.5 POOR FLASHING WORKMANSHIP

Through-wall flashing workmanship is paramount in prohibiting water from entering the wall assembly, especially at corners where joints occur. In specification Section 07600, Flashing and Sheet Metal, §3.1.2 specifies "...make sheet metal exposed to the weather watertight..."



This photograph illustrates an open void where the flashing turns a corner and water can enter the wall assembly.

Recommendation: Inspect each corner and make flashing watertight.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-2 INADEQUATE SEALANT INSTALLATION

### WP-2.1 IMPROPER SEALANT JOINTS

Sealant joints must be installed continuously, without voids and open joints, to deter water infiltration. We found most sealant joints on this building were well made and properly tooled. There are, however, some joints that need remedial work.




This joint leaked during a water test.

Recommendation: Inspect all joints and correct anomalies.

WP-2.2 INSTALLED ON TOP OF THROUGH-WALL FLASHING

Through-wall flashing directs water that enters the masonry veneer to the exterior face. Section 1/A62 below) of the drawings indicates through-wall flashing between the brick (above) and the precast wall panel (below). The section indicates a sealant joint and backer rod on top of the flashing (below the brick) but no note indicating the material. The section also indicates continuous sealant between flashing and the precast wall panel below. We found that the flashing was sealed on top of the flashing (below the brick) and below the flashing at the precast wall panel. When a joint above through-wall flashing is sealed, water is trapped within the wall and must somehow make its way to the weeps. The joint above through-wall flashing should never be sealed.




Recommendation: Remove the sealant above the through wall flashing.

WP-3 INADEQUATE DRIP IN PRECAST CONCRETE SILL

A drip breaks the surface tension of water at the underside of a horizontal surface. A drip may be an installed device or a formed recess. Detail 3/A97 of the drawings indicates a formed drip in a quarter round configuration with a 1/2" radius (1/2" deep and 1/2" wide). The shop drawings indicate the same profile.




When a drip is not present, or of improper geometry, water can bridge the drip and continue to travel horizontally. In this building, if the drip is bridged, the water will travel to a joint that is vulnerable to water entry. The joint is vulnerable because it is between two dissimilar materials and likely with voids where water can enter by capillary action or kinetic energy. This can occur whether there is no flashing (see WP-1) or sealant (see WP-2).

We found that the drip was not of the designed depth or width, and in some cases nonexistent.



The photograph to the left illustrates how water easily bridges the drip during a water test.

We made 32 sample impressions of the precast sill drip profile. The impressions were made at approximately 16 feet on center over about 500 lineal feet of wall. We marked the sample locations in an inconspicuous manner on the underside of the precast sill. The samples were placed in airtight zipper lock bags and returned to the office. Each bag was marked for identification purposes.

We measured the samples' width and depth. Three samples (10%) had zero width and height. The average width was 0.24". The average depth was 0.16". The minimum width measured was 0" and the maximum width measured was 0.36". The minimum depth measured was 0" and the maximum depth measured was 0.281".

Recommendation: In conjunction with the repairs outlined in WP1.1, cut a proper drip width into the bottom of the precast sill. In conjunction with the repairs outlined in WP1.2, install an "L" shaped aluminum extrusion fastened to the bottom of the precast sill with expansion provision at the joints between each precast sill piece.

## WP-4 INADEQUATE STRUCTURAL GLAZING

The windowwall is a structurally glazed system. In this system, the glass is adhered to the vertical aluminum mullion with silicone adhesive. Proper sizing and installation of the adhesive is critical to performance under wind loading. In specification Section 08900, Glazed Wall Systems, §1.4.5 specifies the criteria of 46 psf wind load. In specification Section 08800, Glazing, §2.2 specifies that the sealant be in accordance with the manufacturer's recommendations and §3.1 specifies preparation in accordance with the manufacturer's recommendations. The submittal for the sealant includes the manufacturer's recommended formula for determining sealant width. Using the criteria, we computed the required width to be 0.44", which would be rounded to 1/2".[11] A sealant joint width was not submitted. The windowwall shop drawings indicate the joint as 1/2". The structural spacer (Part E2-0106) is a silicone part of durometer 70 and is approximately 1/4" wide. The spacer installed is 3/8" wide.




The figure to the left is from the sealant submittal. It illustrates the various components.




We took 102 joint width measurements. The average width was 0.22" (50% of minimum required). Seven joints were measured as 0" width (7%); 23% were 1/8" or less; 78% were 1/4" or less. Only 3 measurements were 0.44" or greater.

The mullion width is 2". With a 1/2" between adjacent glass lites, 1-1/2" is available to be divided equally between the two adjacent structural glazing joints, or 3/4" each. With a required structural glazing joint width of 1/2" (each), only 1/4" is available for a spacer. The contractor used a 3/8" wide spacer for the joint. This resulted in only 1/4" being available for the structural sealant joint. In addition, the poor installation of the spacer resulted in even less width available for the structural sealant joint.

---

[11] As reported in the forensic consultation, the writer continues to have reason to believe that the design wind loading is insufficient, particularly at building corners.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com






Figure 1: From Windowwall Submittal





We found poor workmanship in the installation of the glazing pervasive. We found no weatherseal installed; no structural sealant installed; and extremely thin and extremely thick applications of structural sealant.

Recommendation: Remove and replace glazing. (If this is not done, glass could be lost at 1/2 the design wind load or less. If this occurs, the building will become internally pressurized and can result in great damage.)

## WP-5 EDGE SEPARATION OF LAMINATED GLASS

The installed glass is 9/16" laminated glass. Laminated glass is a combination of two sheets of 1/4" heat-strengthened glass with a 0.06" film of polyvinyl butyral (PVB) between them. The assembly is laminated together by a heat process. When edge separation occurs, all wind loads are transferred to the interior glass only which can result in failure because the interior glass has only a fraction of the strength of the laminated glass assembly. It also results in an unsightly appearance. Edge separation can occur because of a manufacturing defect or as a result of chemical incompatibility with materials that come in contact with the PVB film. The most common chemical compatibility problem is the use of solvents either in the sealant or use of a solvent to clean the glass edge during the glazing installation. If edge separation is caused by the presence of a solvent, most edge separation occurs early in the building's life, continuing until all solvents are released. Water vapor transmission through the sealant can also cause edge separation. Widespread (if not complete) edge separation of the glass lite edges is occurring.



This photograph illustrates a typical view of edge separation.

In specification Section 08800, Glazing, §2.2 specifies that the setting and sealing materials be "as specified in the FGMA GM [Glazing Manual]...and manufacturer's recommendations."

Edge delamination is a widely known potential problem with laminated glass, especially in a structural glazing application. The Glazing Manual warns of compatibility concerns: "The edges of laminated glass must not be exposed to organic solvents such as are in some glazing and caulking compounds. Polysulfide, silicone, or butyl rubber may be used if they contain no solvents...Laminated glass should be used in butt-joint or exterior flush glazing systems with caution. Water vapor transmission can occur through the butt-joint sealant system and delamination may occur...consult your glass and sealant supplier."

Glass manufacturers generally and specifically, in this instance, recommend that the structural sealant be tested for chemical compatibility with the glass. The submittal for specification Section 08800, Glazing, §SD-06 includes a letter from Pecora Corporation (Pecora), the sealant manufacturer. The letter confirms that the sealant was tested for compatibility with the LGC glass. The submitted sealant was Pecora 895, a silicone sealant. The letter also includes a caveat: "Sealant recommendations are valid only of Pecora has approved the glazing details and has had a chance to test all materilas, which may come in contact with the structural glazing sealant, for compatibility and adhesion." It is not known whether the installer cleaned the glass edge or the glass in the region of the weatherseal with a solvent.

The submittal for specification Section 08800, Glazing, §SD-02 glass, indicates the glass manufacturer (LGC) "warrants its laminated glass products for a period of five years from date

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com

of manufacture against defects ion material or workmanship which result in edge separation, let-goes, or delamination."

A technical representative LGC informed me that they had two suppliers of the PVB film at that time and they do not have the records necessary to determine which manufacturer provided the film for this project. I asked the sealant manufacturer to test two samples of each supplier's PVB that were included in laminated glass during the time period of this project. I asked the glass manufacturer to ship glass samples to Pecora for testing. The testing will take several weeks beyond the submission of this report and I will later supplement the report to include the test results. The testing is at no cost to the Government. The Government is cautioned that these tests are not independent and the tester potentially has a vested interest in the result.

In summary, these are the major issues raised:

- There is widespread, if not complete, edge delamination. The cause has not been identified with a reasonable degree of certainty.
- The Navy's Guide Specification Section 08800 does not warn or guide the A/E that incompatibility may be a concern with laminated glass. The use of laminated glass in butt-joint glazing systems is so risky that NAVFAC should consider prohibiting its use.
- As of this time, I conclude that the most likely cause of delamination is manufacturing defect.

Recommendation: Make a warranty claim for replacement of glass with edge separation.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-6 INADEQUTE OPERABLE WINDOW INSTALLATION

A sealant joint provides a weatherseal for water infiltration. The joint must be adequately sized to install the sealant properly.

Operable windows (in their own frames) are installed in the windowwall. The windowwall shop drawing detail (below) indicates a 1/4" sealant joint at the jamb and 5/16" sealant joint at the head. When the sealant joint is less than 1/4", it is not wide enough to make a proper joint. The back of the sealant joint should have a bond breaker to prevent three-sided adhesion. The specifications indicate the use of bond breakers. The perimeter sealant joint is not installed.




We conducted a survey of 28 windows, measuring the margin between the operable window frame and the adjacent mullion of the windowwall. Measurements were taken at each jamb in three locations (top, middle and bottom) for a total of 168 measurements. Of these measurements, the average was 0.18"; the minimum was 0.0"; and the maximum was 0.28". No measurements were such that the operable window could be reset within the existing windowwall opening. Of the head joint measurements, 43% were less than 5/16"; 23% were less than 1/4"; the minimum was 0.0"; and the maximum was 0.58". However, there appears to be sufficient space available at the sill to make a proper joint at the head and the sill.




While investigating the sealant joint, we discovered that blocking was not installed at

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



the fasteners. Without blocking, the screw is cantilevered, requiring it to carry the load in bending rather than in simple shear. Under the specified wind load, the screw is overstressed about 15 times allowable. The screws would fail at a fraction of the design load. That failure would result in a pressurized building with an increased likelihood of great damage. The blocking should be noncombustible.

The absence of the blocking is also causing distortion of the window frame. We measured the margin between the operable sash and window frame of 28 windows at each jamb in three locations (top, middle and bottom) for a total of 168 measurements. The average difference between adjacent measurements was 0.09"; the minimum was 0.0"; and the maximum was 0.31". These differences are very large and illustrate how much the window frames are distorted.

Each operable window tested, leaked, primarily due to the absence of sealant. The photograph illustrates leaks at the window head during the water test.



Recommendation: None of the openings between adjacent mullions at the windowwall are wide enough to permit simple removal and reinstallation of the window units (a 1/4" sealant joint cannot be achieved). The only remedy is replacing the adjacent glass lite with one of a smaller size along with moving the mullion. The operable window unit can then be reinstalled. Prior to reinstallation, inspect each jamb/sill and head/sill sealant joint and correct deficiencies caused by stress on the joint.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-7 FAILURE TO PROPERLY WEATHERSEAL GLASS JOINTS

Each of the butt glazing joints required a weatherseal joint to seal the adjacent pieces of laminated glass. Without an effective weatherseal, water can easily enter the windowwall assembly and possibly the interior of the building. Defects in the weatherseal can also cause edge delamination. We found one corner joint without any sealant. We found other voids where water can enter.





The photograph at the left is of an unsealed joint between the adjacent pieces of glass.

The photograph to the right is of a joint failure in adhesion and delamination of the metal panel.



The photograph at the left indicates failure in adhesion.

Recommendation: Survey the weatherseal joints completely and remedy defects.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-8 FAILURE TO DESIGN PROPER STUCCO TERMINATION

Detail 4/A97 of the drawings indicates stucco cladding above the typical windowwall assembly. Where the vertical and horizontal stucco meet, a corner bead was designed and installed in lieu of a drip screed, or spaced casing beads. Presently, there is no avenue for water to drain out of the wall nor is there a means to break the capillary action of water traveling horizontally back toward the window. The design is so fundamentally flawed, it is hard for the writer to believe that such a detail was designed to be installed over thousands of lineal feet of wall. The detail indicates no flashing to redirect water to the exterior; no drip screed to allow water to exit the stucco cladding and act as a drip; no slope or drip on the stucco soffit to break surface tension; and only a sealant bead to finally thwart water infiltration.[12]

No Flashing was Installed



Mildew is forming at the base of the stucco cladding where water has accumulated.[13]




A corner bead has no provision for draining water to the exterior. If the water is not drained to the exterior, the corner bead will corrode and cause spalling of the stucco and rusting of the metal lath.

A soffit drip screed or spaced casing beads along with flashing, to protect the head of the window, should have been designed. Figure D-4 below is from the PCI Stucco Manual and illustrates a common soffit drip screed.

327

[12] See also WP-12 for inadequate head sealant joint construction.
[13] The brightness and contrast of this photograph was enhanced to render what is obvious to the

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com





Fig. D-4
Soffit
Drip Screed

Recommendation: Remove enough stucco to perform the work. Cut back each successive layer of stucco so that when the stucco is reinstalled, the layers are overlapped. Install flashing and a soffit drip screed. Reinstall the stucco. Paint the entire wall surface with an elastomeric coating to blend the repaired areas with the remainder of the existing wall.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



WP-9 FAILURE TO PATCH GYPSUM SHEATHING PENETRATIONS

Precast wall panels form the outer screen for the cavity wall. The moisture protection level is at the inside of the air cavity where water will probably never reach. Detail 16/A165 of the drawings indicates continuous dampproofing on gypsum sheathing at the inside cavity face. In specification Section 07160, Bituminous Dampproofing, §3.2.2 specifies "Provide finished surface that is of uniform thickness and impervious to moisture." for the field applied dampproofing.

There are clip angles that connect the precast wall panels to the structural subframe. To make this connection, the clip angles must pass through the gypsum sheathing and therefore breach the dampproofing



At each opening made where we could view this condition, we found that the penetrations were not patched or sealed against moisture.

Recommendation: Patch the clip angles with mastic from the interior of the building.

### WP-10 IMPROPER THERMAL VALUE

The thermal value of the blanket insulation and the type of insulation facing used, contribute to the overall performance of the exterior wall and the comfort level of the building occupants. It is important that these two attributes be calculated as a part of the design process.

Specification Section 07212 Mineral Fiber Insulation, §2.1 specifies Type I (unfaced) and Type III (foil faced) blanket insulation. The wall sections (Sheets A41-A47, A50, A52 of the drawings) indicate R-19 blanket insulation in the exterior walls above the first and second floor windows but are silent as to what type of facing is required. We found ASTM C665, Type II, R-11, kraft paper faced blanket insulation at these locations on the second floor.[14]

R-19 (6-3/4") blanket insulation is too thick for the surrounding tube steel (4") and stud (3-5/8") framing at the second floor. The contractor installed R-11 insulation (3-5/8") which fit the tube steel and stud framing depth but did not have the required R value
Recommendation: Verify the thermal and vapor requirements of the exterior wall assemblies to determine the proper type of insulation facing and the thickness required at each location. Specify the R value and the facing of the replacement insulation and install under LF-2 Improper Insulation.

[14] We did not observe the first floor condition.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



## WP-11 IMPROPER DRAINAGE

Proper grading and drainage of a building perimeter alleviates potential water infiltration problems. Typically, the finish grade around a building should be below the floor elevation on the inside. In addition, the area around the building should be graded to drain water away from the structure.




Detail 3/A165 of the drawings indicates the exterior condition at the recessed floor areas of the northwest wing of the building. The detail indicates that the finish grade elevation is below the finish floor elevation, but with the recessed computer flooring, the slab level is approximately 12" below finish grade. The recessed floor is experiencing occasional flooding along the exterior wall footing.

At the perimeter of the northwest wing, we found the finish grade elevations that varied between the bottom of the brick weep course and the top of the next course above. At the worst condition, the finish grade is eight inches above the top of the waterproofing on the foundation wall and eighteen inches above the recessed floor slab inside. The lack of waterproofing at this level is allowing water to flow into the building through the joints in the first course of brick and under the concrete bond beam at this location. We did not find protection board installed over the waterproofing on the foundation wall.

The contractor installed the finish grades higher than shown on the sitework and architectural drawings. Grade elevations around the building should be within 0.10 feet of the finish grades indicated on the drawings.

The detail indicates that the foundation wall waterproofing stops below the finish grade elevation. The design of the waterproofing and the expansion joint at the edge of the recessed floor is tenuous at best. There is a hydraulic head of 24 inches at this joint. The A/E should have designed a drainage system that would direct water away from an area of the building that has a floor below grade.

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



Recommendation: Install a french drain system around the perimeter of this wing of the building. The invert of the drainage pipe should be no higher than the underside of the recessed slab. Route the new drain to the nearest convenient storm sewer box. Install protection board over the existing waterproofing. Extend the stone and filter fabric of the french drain vertically to the top surface of the ground so that it is exposed and will capture surface water runoff. Regrade the ground around the northwest wing to an elevation below the top of the waterproofing, fine grade the surface to allow drainage away from the building where ever possible. Restore all landscaping, pavements, and site utilities affected by this work.

## WP-12 IMPROPERLY INSTALLED HEAD SEALANT JOINT

Sealant provides the first line of defense for water infiltration and the only line of defense when flashing or other means of deterring or redirecting water is not utilized.




Detail 4/A97 of the drawings indicates the typical windowwall head. The sealant joint at the head of the windowwall was not installed in accordance with the windowwall shop drawings or the windowwall shop drawings. The joint width is not indicated on the detail. The shop drawings indicate a 3/8" sealant joint with backer rod. This sealant joint is critical to preventing water infiltration.[15]

We conducted a survey of approximately 1500 lineal feet of this condition. We found that in no case was the joint made with sealant and a backer rod. A fillet sealant bead was installed. A fillet sealant bead is a triangular bead applied between two perpendicular surfaces. The only way it can be successfully installed is to have a bond breaker at the heel. Without a bond breaker at the heel, a fillet sealant bead is an improper joint geometry highly prone to failure. Joint failure will occur in cohesion because the heel of the joint has infinite stress. In addition, the installed joint was poorly installed. We found joints that were almost non-existent; joints that were basically smeared on; and joints that had failed in cohesion and adhesion. The photograph below illustrates a poorly installed joint.



Recommendation: Replace the entire length of joint (Where it has not failed, it soon will and resulting water infiltration is inevitable.)

[15] To understand why this joint is so critical, see WP-8

RIESBERG ARCHITECTS, LLC
FORENSIC ARCHITECTURE & COST ESTIMATING
Charleston, SC
d/b/a PLLC in NC
riesbergarchitects.com



WP-13 POOR BRICK WORKMANSHIP

Brick workmanship is an important factor for watertight construction. Mortar joints that are not completely filled result in water infiltration which contributes to cracking and disintegration of the masonry. There are a number of areas where poor masonry workmanship is a concern, some of which are contributing to water infiltration.





In the left photograph, I pulled the brick on the left out of the wall with my hand–without tools. Note that there is no adhesion of mortar to the brick.)

In the right photograph, mortar was smeared into the precast drip rendering the precast sill drip useless.





The photograph on the left shows an obvious void in the mortar joint between the precast sill and the brick where water infiltration is occurring. The photograph on the right shows open voids below the flashing under the precast coping where water infiltration is occurring.

Recommendation: Inspect the entire surface of brick and tuckpoint where voids exist.

END OF REPORT