# Exhibit 20

From: Code 077 A-E Liability Specialist
To: A-E Responsibility Board
Via: Code 0731JEH, 077, COTR

Subj: REPORT OF INVESTIGATION OF POTENTIAL A-E LIABILITY: A-E CONTRACT N62467-93-C-0911, NISE East Building, Weapons Station, Charleston, SC

Ref: (a) SOUTHNAVFACENGCOMINST 4335.2C
(b) Bill Riesberg's Forensic Investigation Report
(c) Gee & Jenson ltr. dtd. 4/9/99

Encl: (1) Investigative data

1. Background. Pursuant to reference (a), reference (b) was accomplished to determine what grounds, if any, the Government had to pursue A-E liability for negligent design resulting in inferior construction under Construction Contract N62467-93-C-0911. Reference (c) presents the A-E's position on the issues raised by reference (b). Enclosure (1) is provided for supporting documentation.

2. Factual Issues

a. The architect failed to indicate flashing under the precast sill of the typical windowwall. No flashing was installed. Exacerbating the absence of flashing is the design of the precast sill. The architect indicated a very slight slope on top of the precast sill. With such a slight slope, water cannot rapidly drain off. Water is entering the wall at faulty or deteriorated caulk joints between the precast sills and around faulty or deteriorated sealant joints around the windows above the precast sills. The cost to remove the windowwall assembly, install through-wall flashing with an upstand of a suitable height for the wind load and turn the flashing down the face of the exterior wall is $454,485. This figure includes potential damage to the first floor. If the A/E is found liable, then additional investigation will be required to determine the actual damage or potential damage to the first floor. 44% of the cost of this item (0.44) ($454,485)=$199,937 is for the first floor only. $254,548($454,485 - $199,937) is the cost for rework to the second floor. It is anticipated that removal of all of the windowwall assembly will not be an acceptable solution and a less costly and less disruptive solution may be found acceptable. But until the Government can establish an alternative method, the cost for this rework in FY 2000 is (($254,548 x .030) + $254,548) = $262,184. The cost will be a mute point if the A/E is not found liable.

Strengths: A few years ago, Greiner made the same omission, were found liable and mailed us a check for $40,000. This A/E has made the same mistake, but on a much larger building. Gee & Jenson's position is, that it's a designer's choice, however at all other locations his choice was flashing. There is photographic evidence that this flashing is not installed. If this flashing were in place, water getting into the cavity would be directed to the exterior without causing corrosion to the metal studs or deterioration to the sheetrock. The damage is well documented with photographs. Gee & Jenson maintains that sealant failure is the cause of the leaks and that flashing serves no purpose if the proper sealant is used. They offered that sealant technology makes flashing less important industry-wide.

However, on other SOUTHDIV projects, Gee & Jenson has incorporated through - wall flashing in window head details, windowsill details and exterior door head details. Tim Hullihan designed these details for the Charleston Passport Office. Tim Hullihan was also the designer of the windowwall system for the NISE EAST facility.

Gee & Jenson incorporated through-wall flashing for the windowsills at the EMR Facility. Mr. Reyes was the designer for these details. This detail include a precast sill with a drip, but at a much steeper slope than at the NISE EAST facility, which would make the water run off the sill much more rapidly.

Gee & Jenson provided through-wall flashing for the windowsills and door heads at the BRAC CBU 412 Bldg. In King's Bay, GA.

Gee & Jenson provided through-wall flashing for exterior door and roll-up door heads, louver door heads, and window sills and louver sills at the Manned Diving Facility.

Gee & Jenson provided through-wall flashing for door and window heads, roll-up door heads and window sills at the Mine Warfare Research & Development Facility in Panama City, FL.

Recommendation: Determine if there is another viable alternative to pulling out the windows. If this is possible, it will eliminate some large cost items. They are:

Temporary weather protection --- $35,467
Hoisting equipment to lower and raise sills --- $14,896
Window demolition --- $14,123
Sills removal --- $45,553
Clean and reset sills --- $63,226

This is a total of ($173,265 x .44 = $76,236)($78,523 in FY 2000) that can be saved, if we can accept a solution that doesn't require removal of windows. This results in a total cost of $183,661. ($262,184 - $78,523)

The "fix" would have to be aesthetically pleasing with matching or compatible colors, and acceptable to the Government. If there is no other acceptable option, the cost of the work will be approximately $262,184. In any event the Government should pursue A/E Liability.

Weaknesses: none apparent. The A/E stated in his opinion, and as stated in reference © that flashing is not required, and that it was a designer's call whether flashing is required or not. They maintain that flashing serves no useful purpose if the proper sealant is used. They offered that sealant technology makes flashing less important industry - wide. It is readily obseved that Gee & Jenson's claim is weak and should be rejected.

Final recommendation: Pursue A/E Liability. Government has a strong case.

b. Details 8/A101 and 9/A101 of the drawings indicate through-wall counter flashing under the precast sills where they are adjacent to roofs. The detail indicates an upstand behind the precast sill. The upstand is not dimensioned. However, in specification Section 07600, Flashing and sheet Metal, paragraph 3.1.10 specified that the upstand was not to be less than 1/4". The Contractor failed to provide any upstand at all. Water is entering the wall at these locations. The cost to remove interior gypsum wallboard as necessary, provide an upstand for the existing flashing and refinish is $8,219. The flashing without upstand is well documented with photographs.

Strengths: one-fourth inch minimum upstand is small. Calculations by Riesberg indicate that the one-quarter inch upstand is inadequate for the design wind speed.

Weaknesses: The Contractor didn't put in any upstand, at all, at these locations. A/E can argue that the specs called for a minimum of 1/4" upstand, and that if the 1/4" upstand had been installed, it may have prevented all or some of the water infiltration at sills that are adjacent to roofs.

Recommendation: Do not pursue A/E Liability. Government has a weak case.

c. The architect failed to consider differential movement at the through-wall flashing under the precast wall panels. The through-wall flashing (that drains the cavity) behind the typical precast wall panel is being deformed. Attachment of the flashing to the precast wall panels is causing deformation of the flashing. The deformation of the flashing is providing an open avenue for water infiltration at the top of the stucco.

Investigation revealed that the flashing was attached with powder actuated fasteners to the precast panel. Due to differential thermal expansion, the flashing is being deformed because it bridges the joint between adjacent precast wall panels. The adjacent wall panels expand and contract independent of each other, but the flashing is attached to both panels. The result is that the flashing has to accommodate the movement across the joint in addition to its own expansion. The same effect, with a more severe result, would occur if the deleted trim piece were present. The A/E would not refute the fact that there was no provision for expansion and contraction of the flashing, except that there are provisions in the specifications for flexible joints. He also stated that the cavity and stucco substrate have dampproofing and that the gypsum sheathing is flexible. He also stated that a bead of sealant was missing.

The detail 16/165 contradicts Specification Section 07600, Flashing and Sheet Metal, paragraph 3.1.2 which specifies to "make sheet metal exposed to the weather watertight with provisions for expansion and contraction." Paragraph 3.1.8 specifies to "provide for expansion and contraction joints at not more than 32-foot intervals for aluminum..." Water is entering at these locations. The cost to remove the fasteners and reconfigure the flashing to turn down and lap over the stucco is $62,731. This includes installing a sealant joint under the flashing to weatherseal the joint.

Strengths: Strong because detail 16 on sheet 165 states to fasten the flashing to the sheetrock and the precast panel. This leaves no provision for expansion and contraction as stated above. Gypsum sheathing is not a suitable fastening base for the fasteners that would have attached the trim piece to the sheathing. They would have to have gone on into the metal stud to work. The trim piece was deleted by

modification, because it was too difficult to install (as per Jimmy Elmore). It can be shown that even if the trim piece were installed, water could still infiltrate, because the trim piece would have been fastened to the through-wall flashing and deflected with the through-wall flashing. Additionally, the gypsum sheathing would have been shredded at the point of entry by the fasteners. The A/E's detail violated his own specification.

Weaknesses: The A/E will probably argue that all of this is hypothetical and that if the trim piece had been installed, the inability of the flashing to expand and contract would be inconsequential and that this detail would have prevented water from entering the wall. A field meeting was held and the Government and the Contractor decided to delete a trim piece. The A/E was not invited to this meeting. Had the A/E been invited, he may well have prevented this modification, designed a suitable alternate, or improved his design in a suitable manner.

Recommendation: Do not pursue A/E Liability. Government has a weak case.

d. Section 1/A62 of the drawings indicates through-wall flashing between the brick (above) and the precast wall panel (below). The section indicates a sealant joint and backer on top of the flashing (below the brick) but no note indicating the material. The section also indicates continuous sealant between flashing and the precast wall panel below. Investigation revealed that the flashing was sealed on top of the flashing (below the brick) and below the flashing at the precast wall panel. When a joint above through-wall flashing is sealed, water is trapped within the wall and must somehow make its way to the weeps. The joint above through-wall flashing should never be sealed. The cost to remove the sealant above the joint is $6,064. The A/E disagreed that this was a problem.

Strengths: The referenced detail shows clearly the backer rod for the sealant on top of the flashing.

Weaknesses: Although this is not good practice, it's not clear that this is actually causing a problem. The water could possibly get to the weeps.

Recommendation: Do not pursue A/E Liability. It's not in the best interest of the Government to pursue.

e. Detail 4/A97 of the drawings indicates stucco cladding above the typical windowwall assembly. Where the vertical and horizontal stucco meet, a corner bead was designed and installed in lieu of a drip screed, or spaced casing beads. Presently there is no avenue for water to drain out of the wall nor is there a means to break the capillary action of water traveling horizontally back toward the window. The detail indicates no flashing to redirect water to the exterior; no drip screed to allow water to exit the stucco cladding and act as a drip, no slope or drip on the stucco soffit to break surface tension, and only a sealant bead to finally thwart water infiltration. A corner bead has no provision for draining water to the exterior. If the water is not drained to the exterior, the corner bead will corrode and cause spalling of the stucco and rusting of the metal lathe.

Mildew is forming where water has accumulated. A soffit drip screed or spaced casing beads along with flashing, to protect the head of the window, should have been designed. The PCI

Stucco Manual illustrates a common soffit drip screed. The recommendation is to remove enough stucco to perform the work, cutting back each successive layer of stucco so that when the stucco is reinstalled the layers are overlapped. Flashing and a soffit drip screed should then be installed. The repair is completed by painting the entire wall surface with an elastometric coating to blend the repaired areas with the remainder of the existing wall. The cost for these repairs is $228,519. The A/E brought up some construction issues that can result in water infiltration, but never addressed the issue of not providing a proper stucco termination.

The cost to install an aluminum drip only is $31, 055. This will prevent some of the water that is running down the wall from being drawn into the windowwall system. Presently the joint above the windowwall system is installed without a backer rod. This entire length of joint must be installed with backer rod and is the responsibility of the Contractor. If this is not done the windows will continue to leak.

Some provision must be made for water to be redirected to the outside. Our technical people should determine if there is any alternative measure to accomplish this, perhaps drilling holes. If something is not done, spalling of stucco and corrosion of corner bead will occur. If drilling of weeps is viable an estimate of $30,000.

Strengths: We have an expert forensic architect that says this does not meet the standard of reasonable care. He says stucco terminations are not done this way, and cites the PCI Stucco Manual which illustrates a common drip screed. A/E's design is fundamentally flawed. Our in-house folks agree. There is no drip or any other means to break the capillary action of water travelling horizontally two and a half inches back toward the windows. On other designs by Gee & Jenson, the designer provided details for stucco terminations and drips. See EMR Facilities drawings attached.

Weaknesses: There are some construction issues that could cause water infiltration. The A/E will argue that if these were solved there would be no problem.

Recommendation: Pursue A/E Liability somewhere in the range of $65,000 - $235,375. The A/E is negligent.

f. Detail 3/A165 of the drawings indicates the exterior condition at the recessed floor area of the northwest wing of the building. The detail indicates that the finish grade installation is below the finished floor installation, but with recessed computer flooring, the slab level is approximately 12" below finish grade. The recessed flooring is experiencing occasional flooding along the exterior wall footing. There is a hydraulic head of 24" at the expansion joint around the recessed floor. The A/E should have designed a drainage system that would direct water away from an area of the building that has a floor below grade. The recommendation is to install a french drain system around the perimeter of this wing of the building. See reference (b) for details. The estimated cost for this work is $42,351.

Strengths: This design is flawed. It would have been better not to have a finish grade so high above the computer room floor. The design of the expansion joint at the edge of the recessed floor has little value as a moisture barrier.

Weaknesses: May be a little hard to show negligence. The A/E did use waterproofing, so it's not like he totally overlooked the possibility of groundwater. Additionally the Contractor covered up some of the weep holes in that area.

Recommendation: Do not pursue A/E Liability. The Government does not have a strong case.

g. The A-E disclaims financial responsibility for the problems. The A-E contends that where water intrusion is a problem, it is due primarily to the construction not being in compliance with the project plans and specifications.

3. Discussion.

a. The A/E used some other facts, opinions and general information in his defense. They are described briefly as follows:

"The standard should not be perfection. A line left off of details should not be considered negligence."

"If construction had been adequate, we wouldn't be here."

There were changes in the field that the A/E did not know about.

"There was an adversarial relationship with the Contractor resulting in poor communication."

Delay in change orders taking place.

Title II man allegedly was told that he couldn't talk to the Contractor without going through the ROICC. He allegedly said, "What am I doing here, I can't leave the trailer."

"The Contractor got away with stuff. He was told execution was primary concern."

"There were a lot of field changes requested by the Customer."

"Customer had a lot of differing opinions internally."

"The Standard of acceptance changed. Black and White was not the standard six years ago."

"We were asked if we could get the job done in four or five months, a very aggressive schedule."

"The push to meet the schedule was intense. Generic labs and offices were designed. New owners had new requirements. A tremendous amount of changes occurred. We moved out without paperwork."

b. The latent defects have resulted from an A/E error. The Government was damaged by the design error. Financial damages include repairing damage to the wall system and the rework charges.

c. The Government incurred additional administrative expenses to resolve these problems. These costs have not been quantified. A 6% surcharge, or $29,854 maximum, would be excessive. Since these cost are not quantifiable, a charge of $5,000 is appropriate. The cost of the forensic study is $41,413. Prorated, the amount attributed to the A/E is 27% of this cost, or $11,332.

4. Final Recommendation. The A-E should be held financially responsible for damages in the amount of $513,891($497,559 + $11,332 + $5,000). He has failed to provide any credible reasons for the negligent design. This is a maximum. With variables that have been discussed, the amount may be less.

5. Estimate Synopsis.

a. The estimates include field overhead expenses, supervision, project management, quality control, temporary project controls and equipment.

b. The time sensitive items are based on an overall project duration of ten (10) months. This project can be phased so that the work in one area of the building is 100% complete before moving on to the next area. Phasing will allow the Government to plan around any impacts that the construction will have on the operations of the facility. Please note that the costs do not include any amounts for moving and storage of occupants or economic loss of use charges.

c. The final costs, of course, will be negotiated. The estimate cannot be finalized until the Responsibility Board and Contracting Officer reach a decision as to how much remedial work is the responsibility of the A/E's. Additionally, the cost to the A/E will depend on what items the Contractor ultimately is responsible for. An example of this would be Item WP-1.2. This issue occurs at windowsills that are adjacent to roofs. The forensic consultant notes that removal and reinstallation of interior finishes for this item is to be performed under item LF-2, which is the responsibility of the Contractor. If the Contractor does not accomplish this work, then the Government will have to decide how much of this work the A/E should be accountable for. This is an example. There are many such relationships, and the combinations are endless; but an estimate can be prepared whenever the Responsibility Board concludes this investigation.

VIRGIL G. SVENDSEN, P.E.
A-E Liability Specialist

Copy to:
Code 07 A-E Liability File
Construction Contract File N62467-93-C-1096
A/E Contract File N62467-93-C-0911
Code 077(VGS) 0731(JEH)

# ELEMENTS OF CASE FOR A/E LIABILITY

## Riesberg report: WP-1.1

Flashing directs water that has entered a wall assembly to the exterior face. The architect failed to indicate flashing under the precast sill. Had this flashing been installed no water could have entered the building. SMACNA and Architectural Graphic Standards indicate flashing under precast sills.

## Riesberg report: WP-8

Where the vertical and horizontal stucco meet above the window wall assembly, there is no avenue for water to drain out of the wall, nor is there a means to break the capillary action of water travelling horizontally back toward the window. The design is fundamentally flawed over thousands of linear feet of wall. The detail shows no flashing to redirect water to the exterior, no drip screed to allow water to exit the stucco cladding and act as a drip, no slope or drip on the stucco soffit to break the surface tension and only a sealant bead to finally thwart water infiltration.

1) GEE & JENSON used through wall flashing/drips in five other Govt. jobs around same time frame as N.I.S.E. EAST.

Charleston Passport Center
Manned Diving Facility
Mine Warfare Research & Development Facility
BRAC CBU 412 Bldg.
EMR Facility

2) A/Es other than GEE & JENSON used through-wall flashing. (FY96 Dorm, VOA...FY97 Dorm, GLICK BOEHM)

FY00 Dining - Robert A. Kastens, AIA
FY 96 Dorm
FY 97 Dorm

3) Our Technical Guide for Architecture, TG 1001 states that it is important to note that for every one of our projects, . the Architect must provide an effective barrier against the elements.

**4) Construction Details of this Guide state that some kinds of details such as building envelope and those describing elements of a high volume of work are of the highest importance to the Navy.**

**5) SMACNA guidance indicates flashing at a sill turned up the entire height of the sill.**

**6) Architectural Graphic Standards indicates flashing under sills and turned up the height of the sill.**

Gee & Jenson's portion of damages is determined by the proportion of their specific liability as determined by Riesberg's study, compared with the total liability as determined by the study. This same procedure was used to determine the Construction Contractor's portion and the Government's portion.

A/E portion = A/E Liability/Total Liability = **$683,004/$2,932,131 = 23.29%**

Contractor portion = Contractor liability/Total Liability = $744,482/$2,932,131 = 25.39%

Government portion = Government Liability/Total Liability = $1,504,645 = 51.32%

**7) Breakdown of damages:**

**a. Failure to Flash Under Precast Sill** **Total for a. and b. = $683,004**
**b. Failure to Design Proper Stucco Termination**

**c. Corroded Metal Track Stud = $5,433 (23.29% of total)**
**d. Gee & Jenson's portion of forensic consultation and study = $10,719 (23.29% of total)**
**e. Gee & Jenson's portion of 6% surcharge for admin costs associated with rework = $40,974 (23.29% of total.)**
**f. Gee & Jenson's portion of admin. Costs to complete investigation. = $22,481 (23.29% of total)**

**Total = $762,611**

8) Gee & Jenson hired their own consultant, KRA, Inc. to investigate and respond to Riesberg. They said:

Best practice would have been to install through-wall flashing under the sill, channeling any water to the exterior of the building. However they have seen installations without the flashing. In their opinion, it meets the standard of care for detailing at the time and place.

They said that, in their opinion, Gee & Jenson produced a detail for the project that met the standard of care for architectural services at that time and place.

# Exhibit 21

From: A-E Responsibility Board
To: Contracting Officer, A-E Contract N62467-93-C-0911

Subj: A-E FINANCIAL RESPONSIBILITY, A-E CONTRACT N62467-93-C-0911
NISE East Building, Weapons Station, Charleston, SC.

Ref: (a) SOUTHNAVFACENGCOMINST 4335.2C
(b) Report on a Forensic Study of SPAWAR NISE East Engineering Center, by Riesberg Architects, LLC, dtd.November 11, 1998(Forensic Study date)
(c) Code 077(VGS) report of investigation memo of 10/06/99

1. As required by reference (a), the A-E Responsibility Board reviewed reference (b) and (c) and other available records regarding potential A-E financial responsibility. The Board also received a briefing from Code 077(VGS) on this issue. Based on this review, the A-E Responsibility Board recommends the following:

( ) There is no A-E financial responsibility.

( ) There is no A-E financial responsibility. The Government would have incurred the additional construction cost if included in the initial design and there was no other significant damages to the Government involved.

( ) There is A-E financial responsibility. Even though the design deficiency did not result in construction cost above those which would have been incurred if the initial design had been correct, the Government has incurred significant administrative cost in processing the action. The cost is quantifiable and action to recover should be initiated.

( ) There is A-E financial responsibility, however, the costs are considered non-recoverable.

(x) There is A-E financial responsibility and the costs are considered recoverable. Action to recover should be initiated.

( ) There is A-E financial responsibility and the costs are considered recoverable; however, recovery is not in the best interest of the Government.

2. The reasons behind the Board's recommendations are outlined in reference (b) and (c).

3. The Board's recommendation is to pursue full financial recovery of all costs associated with or arising out of the Government's action to correct Item WP- 1.1 of reference (b), Failure to Flash under Precast Sill. The facts that supported the Board's decision were as follows:

a. Photographs documented the absence of flashing.
b. Photographs documented corrosion of metal track stud and damaged sheetrock due to cavity wall holding water. Flashing would have redirected water to the exterior of the building.

c. Five previous projects designed by Gee & Jenson that required flashing for all wall penetrations including window heads, windowsills, door heads and louver heads and sills.
d. Three projects by other A/E firms that do Government work, all required flashing at windows, doors and louvers.
e. SOUTHDIV Design Guide which requires that all A/E's provide an effective barrier against the elements, states that details affecting the building envelope are of the highest importance to the Navy and requires A/E's to exercise care in designing EIFS systems. It also states that the preferred wall is one that has a system to drain away any water that may have gotten through all of the other barriers, because penetrating water is likely to remain in the wall system long enough to cause dame to water sensitive sheathing and structural systems.
f. The SMACNA and Architectural Graphic standards both show flashing at sills.

4. The Board's recommendation is to pursue full financial recovery of all costs associated with or arising out of the Government's action to correct item WP-8 of reference (b), Failure to Design Proper Stucco Termination. The facts that supported the Board's decision were as follows:

a. Photographs documented the absence of a drip screed.
b. Tests revealed that water can and does get into the windows and walls due to the lack of the drip.
c. Photographs documented staining and mildew where the stuccoed wall was holding water.
d. Photographs documented water pouring into the building at the head of the windows.
e. Previous Gee & Jenson project, EMR Facility, Construction Contract N62467-94-C-0703, where a drip edge was incorporated into the stucco design to prevent water from being drawn into building by capillary action and wind.
f. SOUTHDIV Design Guide which requires all A/Es to provide an effective barrier against the elements, states that details affecting the building envelope are of the highest importance to the Navy and requires A/Es to exercise care in designing an EIFS system.

5. The Board recommended that the Government not pursue four design issues as itemized in reference (b).

a. WP - 1.2 Failure to Provide Upstand on Through - Wall Flashing.

1. The Board decided that since the Contractor did not provide any upstand, we could not hold the A/E liable, because he did specify a 1/4" upstand.
2. It is a low cost item($8,209)

b. WP - 1.3 Attachment of Through -Wall flashing to Precast Panels

1. The A/E maintained that the deleted trim piece was the problem and that he had no opportunity to review this modification. If he had been given the opportunity, he would have resolved resulting problems.

2. The Board decided since the Government did not give him this opportunity, he could not be held liable.

c. WP - 2.2 Sealant Installed on Top of Through - Wall Flashing.

1. The Board ruled that although this is poor practice, it is not clear that this item is causing any leaks.
2. It is a low cost item($6,064)

d. WP - 11 Improper Drainage Design

1. The Board ruled that this was an error on the A/E's part, but did not constitute negligence. The A/E set his weep holes for the cavity wall about 2" too low.

SENIOR MEMBER

MEMBER

MEMBER

James ... P.E.

MEMBER

MEMBER/COUNSEL

Virgil G. Swenson, P.E.

MEMBER

RECORDER

Contracting Officer Comments:

N/A

Approved/~~Disapproved~~ 10/28/99
(Date)

CONTRACTING OFFICER

Original to:
Code 07 A-E Liability File

Copy to:
ROICC (CHAS)
Construction Contract File N62467-93-C-1096
A/E Contract File N62467-93-C-0911
44
05, 052, 0523
07, 07A, 0712, 077(VGS), 077(VGS), 0731JEH, 0213, 09Cmwj

# Exhibit 22

DEPARTMENT OF THE NAVY
NAVAL FACILITIES ENGINEERING COMMAND
SOUTHERN DIVISION FIELD OFFICE, CHARLESTON AREA
2120 QUALITY CIRCLE
GOOSE CREEK, SC 29445-8611

R10
N62467-96-C-1096
03 November 1999

Mr. Angelo Pizzagalli
Pizzagalli Construction Company
50 Joy Drive, P.O. Box 2009
South Burlington, Vermont 05407-2009

SUBJECT: CONTRACT N62467-96-C-1096 – NISE EAST ENGINEERING CENTER NAVAL WEAPONS STATION, CHARLESTON, SC

Ref: (a) Phoncon between CDR Joe Hedges and Angelo Pizzagalli of 3 Nov 1999
(b) Pizzagalli Letter dtd 16 Apr 99
(c) Riesberg Architects Forensic Report dtd 11 Nov 98
(d) 19 Mar 99 Meeting with Pizzagalli Construction and Southern Division
(e) Pioneer fax of 1 Mar 99

Mr. Pizzagalli,

Per reference (a), the Government forwards you the following list of construction deficiencies pertaining to Contract N62467-93-C-1096 for your immediate corrective action:

a. Improper Insulation: Per reference (b), the Government accepts your corrective plan of action of inspection and repair. However, your letter indicated that you would accomplish an inspection of this item by 23 April 1999 and we have received no confirmation that this occurred.

b. Improper Firesafing: Firesafing was used in many areas in this facility. Per reference (b), you indicated the difference between firesafing and firestopping. However, in reference (c) page 6, the A/E states: "Firesafing is used as a firestopping...," demonstrating that these terms are interchangeable. Per reference (b), the Government approved the firestopping material submittal for electrical penetrations only. Documentation provided by you shows this to be correct; however, no record can be found pertaining to other firestopping submittals required throughout this facility

c. Poor Flashing Workmanship: Per reference (b), the Government accepts your corrective plan of action of inspection and repair.

d. Failure to Provide Upstand on Through-wall Flashing: Per reference (c), the upstand on the through-wall flashing required by the contract documents (1/4 in. minimum) was not made. Your firm is responsible for corrective action.

e. Inadequate Drip in Precast Concrete Sill: Per reference (b), you indicated that the sill manufacturer's response would be forwarded to the Government in April 1999. To date, we have not received any corresponding documentation. Therefore, your firm is responsible for corrective action.

f. Inadequate Operable Window Installation: Per reference (b), the Government accepts your corrective plan of action.

g. Poor Brick Workmanship: Per reference (b), the Government accepts your corrective plan of action of inspection and repair.

h. Inadequate Sealant Installation: Per reference (d), the Government accepts your corrective plan of action.

i. Improper Installation of Insulation and Cladding on Ice Storage Tank: Per reference (e), the Government accepts your corrective plan of action.

The Government requests your plan of action and schedule to correct the above mentioned construction deficiencies, no later than 15 November 1999.

Sincerely,

J. D. HEDGES
CDR, CEC, USN
Resident Officer in Charge
Of Contracts

Copy to:
053
SPAWARS

# Exhibit 23

DEPARTMENT OF THE NAVY
SOUTHERN DIVISION
NAVAL FACILITIES ENGINEERING COMMAND
P.O. BOX 190010
2155 EAGLE DRIVE
NORTH CHARLESTON, S.C. 29419-9010

24 NOV 1999

REGISTERED MAIL - RETURN RECEIPT REQUESTED

Gee & Jenson Engineers-Architects-Planners, Inc.
One Harvard Circle
West Palm Beach, FL 33409

Subj: A-E CONTRACT N62467-93-D-0911, N.I.S.E. EAST BUILDING, WEAPONS STATION, CHARLESTON, SC

Gentlemen:

Our letter of 18 FEB 1999 advised you that we were investigating potential architect-engineer financial responsibility for design problems associated with water infiltration of the building envelope. As you know, deficiencies found were the result of a forensic study prepared by Riesberg Architects, LLC. The deficiencies that we have been investigating are:

Failure to Flash Under Precast Sill

Failure to Provide Upstand on Through - Wall Flashing

Attachment of Through - Wall Flashing to Precast Panels

Sealant Installed on Top of Through - Wall Flashing

Failure to Design Proper Stucco Termination

Improper Drainage Design

We have completed our review of these issues and have concluded that your firm's failure to provide an effective deterrent against water penetration and failure to provide means to direct penetrating water to the exterior constitutes design negligence. Specifically, your failure to provide flashing under the precast sill and your failure to design a proper stucco termination were the items in which you were found negligent. Although the remaining items were considered to be errors, they did not constitute negligence.

You, as well as the Construction Contractor and the Government will share the cost of the rework to correct the deficiencies. Your total liability is calculated using your share of the liability from Riesberg's study and adding that to your portion of the liability for the following:

(1) Additional costs not identified by Riesberg.
(2) The cost of the forensic study.
(3) Additional administrative costs borne by the Government in managing the rework.

(4) Additional administrative costs borne by the Government in managing the investigation.

Your portion of these additional costs is determined by the proportion of your specific liability as determined by Riesberg's study, compared with the total liability as determined by this study. This same procedure was likewise used to determine the Construction Contractor's portion. Any remaining costs will be the responsibility of the Government. The percentages are calculated as follows:

A/E portion = A/E Liability / Total Liability = $683,004 / $2,932,131 = 23.29%

Contractor portion = Construction Contractor Liability / Total Liability = $744,482 / $2,932,131 = 25.39%

Government portion = Government Liability / Total Liability = $1,504,645 / $2,932,131 = 51.32%

The resulting damages to the Government, for which you are liable totaled $762,611. ($683,004 for rework shown on Riesberg's estimate, $5,433$ for rework not shown on Riesberg's estimate, $10,719 for a portion of the forensic consultation and study, $40,974 for increased Government administrative expenses for the rework and $22,481 for Government administrative costs required to complete the investigation). The damages are described and defined as follows.

Failure to Flash Under Precast Sill - The windowwall assembly and precast sill will have to be removed. Through-wall flashing will have to be installed and extended to the inside of the precast sill. An upstand of suitable height for the wind load will have to be provided. The flashing will have to be extended and turned down the face of the exterior wall. This work will be coordinated with work to be performed by the Contractor.

Failure to Design Proper Stucco Termination - A proper stucco termination will have to be provided at the bottom of all stucco walls. The existing stucco will be ground back in layers to allow feathering on new stucco mixture after the flashing and drip screed has been installed. The entire surface will be painted with an elastometric coating to provide uniform color and to hide existing discoloration.

$683,004

There is a deficiency not addressed in Riesberg's estimate, but none-the-less, it needs correcting, and you are partially responsible due to inferior flashing design. The corroded metal track stud that partially supports the precast sill must be removed and replaced. This is a shared item. 2,916 lf. x $8/lf. = $23,328. Your portion is 23.29% of $23,328 or .2329 x $23,328 = $5,433.

$5,433

The cost of the forensic consultation and study was $46,026. Your portion of responsibility is 23.29% of this or .2329 x $46,026 = $10,719.

**$10,719**

**Total: $699,156**

Your portion of responsibility for a 6% surcharge has been added for Government administrative costs associated with the rework (6% x $2,932,131 = $175,928. $175,928 x .2329 = $40,974.

**$40,974**

The Government administrative costs to complete the investigation were $96,528. Your portion of responsibility is .2329 x $96,528 = $22,481.

**$22,481**

**Grand Total = $762,611**

Pursuant to the Responsibility of the Architect-Engineer clause (FAR 52.236-23) of your contract, your firm has been found to be financially liable for damages to the Government in the amount of $762,611.

It is essential that you reply to this correspondence within 30 days, either by forwarding a check for $762,611 payable to the U. S. Treasury or by providing factual information which you believe mitigates the extent of your liability. Failure to reply within this time will be construed to mean that no mitigating information exists. In the absence of payment with 30 days, the Government will exercise it's right, after considering any mitigating information, to make formal demand for payment in a claim against your firm under the Disputes clause (FAR 52.233-1) of your contract.

Sincerely,

J.D. Daniel

J.D. DANIEL

J. D. DANIEL
HEAD, CLAIMS/ACQUISITIONS
SUPPORT BRANCH
CONTRACTING OFFICER

Blind copy to:
ROICC
0213
Code 07A A-E Liability File
07
Construction Contract File N62467-93-C-1096
07A
A/E Contract File N62467-93-C-0911
CIRC
077(VGS)
07 05 077(VGS) 0731JEH 021 COTR 07PM 077 09C

# Exhibit 24

Pizzagalli says this is what they will d

pizzagalli
construction company

50 Joy Drive, Post Office Box 2009
So. Burlington, Vermont 05407-2009
T 802-658-4100
F 802-651-1269
www.pizzagalli.com

November 30, 1999

J.D. Hedges, CDR, CEC, USN
Resident Officer in Charge of Contracts
Department of the Navy
Naval Facilities Engineering Command
Southern Division Field Office, Charleston Area
2120 Quality Circle
Goose Creek, SC 29445-8611

Dear Commander Hedges:

Just a note to recap our meeting of November 22, 1999. Reference to your letter of November 3, 1999, the following is our understanding:

A. Improper Insulation and B. Improper Firesafing. The Navy will definitize problem areas (if any). PC will fill holes in exterior wall at edge of floor slab where missing. Existing material is not to be removed.

C. Poor Flashing Workmanship. PC agrees to repair.

D. Failure to Provide Upstand on Through-wall Flashing. Water intrusion is problem, not flashing. Navy will locate leak areas.

E. Inadequate Drip in Precast Window Sill. PC to do. Mike Flood is taking action to do this work ahead of the other repairs. We want to do all correction work at one time. However, this one might solve some problems, so we will get it done as soon as we can. Some coordination will be required with the owner and user. Mike will be in contact.

F. Inadequate Operable Window Installation. PC will do.

G. Poor Brick Workmanship. PC to do after joint review of problem areas. John Goethe is in charge of joint review

H. Inadequate Sealant Installation. Review exterior caulking. OK in general; may need minor touchup. PC agrees to do.

I. <u>Improper Installation of Insulation and Cladding on Ice Storage Tank</u>. Should be done. PC will look for appropriate letter. PC will complete if not done.

Let's stay in touch. As soon as we have agreement on all items, we will start correction work. Sill work will start regardless.

Sincerely,

Angelo Pizzagalli

AP:mbp

# Exhibit 25

GEE & JENSON
Engineers • Architects • Planners, Inc.
SINCE 1951
One Harvard Circle
West Palm Beach, FL 33409
Telephone (561) 515-6500
Executive Fax (561) 515-6503
Fax (561) 515-6502

January 7, 2000

Dale C. Johannesmeyer, PE
Southern Division Naval Facilities Engineering Command
2155 Eagle Drive
P.O. Box 190010
North Charleston, SC 29419-9010

Re: A/E Contract N62467-93-D-0999; NISE East Building, Weapons Station, Charleston, SC

Dear Mr. Johannesmeyer:

Virgil Svendsen called after our telephone conversation with the Board on Wednesday concerning the amount of time that would be available for us to provide a response to your claim letter which we received on November 29, 1999. We were disappointed to hear that the Board had only allowed 30 days time for us to respond to the claim.

As I stated during our telephone conversation, we believe that we responded appropriately to the comments and recommendations contained in the Riesberg report dated November 11, 1998, both verbally at the March 16, 1999 meeting in your offices and with our letter dated April 9, 1999. Please recall that you only gave us two weeks to respond to your letter of 19 February 99 which we received on 25 February 99. At the end of that meeting it was our understanding that the Navy had yet to meet with the contractor; after that meeting you would get with us concerning the Board's recommendations and position. No cost estimates or allocation of costs associated with the Riesberg report were presented to us at that time. Virgil Svendsen and I spoke several times during 1999, noting that we were awaiting the Board's position. We had no indication of what the Board was doing or that any further information was desired from Gee & Jenson. We had no knowledge of what would be required until we received your letter on November 29, 1999.

As I stated during the phone conversation, it was and remains our intention to have independent experts evaluate our design, the conditions in the field and other pertinent matters including the cost estimates. They will then provide us (our insurance company and ourselves) with their opinion of whether there was any negligence involved in our design. We will then discuss their opinions with our insurance company so that, if negligence was involved, we may make an informed position concerning a fair settlement.

E:\GODDEAU\LETTERS\SouthDivltltr.doc

Dale C. Johannesmeyer, P.E.
Page 2 – January 7, 2000

We believe that a presentation of the facts and the expert opinions of both sides, together with a negotiation to settle the issue equitably, is a much more desirable resolution than litigation. We do not believe that the foregone conclusion to the resolution of this issue is litigation.

We will proceed to retain our experts and take the actions briefly discussed above as expeditiously as possible. We will attempt to provide that information back to the Board prior to your February 5, 2000 deadline. We do not believe it is fair for the Board to limit our time for response to 30 days when the government took well over a year to do it's investigation and provide us with information about it's position. We will nevertheless, attempt to provide a response within this limited time frame. It may not be as complete as it could or would be if we were given more time to respond. We will then endeavor to facilitate a settlement of the issue.

Sincerely,

Donald L. Goddeau, P.E. NSPE
President

DLG:tvb
52:081.00

cc: Phil Cowan, CNA Pro



One Harvard Circle • West Palm Beach, FL 33409 • Telephone (561) 515-6500 • Fax (561) 515-65
Engineering # EB 0002934 • Architecture # AA C000656 • Landscape Architecture # LC C000050 • Land Surveying # LB 0002934 • Interior Design # IB 0001020

# Exhibit 26

DEPARTMENT OF THE NAVY
SOUTHERN DIVISION
NAVAL FACILITIES ENGINEERING COMMAND
P.O. BOX 190010
2155 EAGLE DRIVE
NORTH CHARLESTON, S.C. 29419-9010

18 JAN 2000

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Gee & Jenson Engineers-Architects-Planners, Inc.
One Harvard Circle
West Palm Beach, FL 33409

Subj: A-E CONTRACT N62467-93-D-0911, N.I.S.E. EAST BUILDING, WEAPONS STATION, CHARLESTON, SC

Gentlemen:

Our letter of 24 November 1999 advised you that our A/E Liability Board had concluded that your firm's failure to provide an effective deterrent against water penetration and failure to provide means to direct penetrating water to the exterior, constituted design negligence

Our letter stated that it was essential that you reply to this correspondence within 30 days, either by forwarding a check for $762,611 payable to the U.S. Treasury or by providing factual information which you believe mitigates the extent of your liability. Our letter further stated that failure to reply within this time frame would be construed to mean that no mitigating information existed. And finally this correspondence stated that in the absence of payment within 30 days, the Government would exercise its right, after considering any mitigating information, to make formal demand for payment in a claim against your firm under the Disputes clause (FAR 52.233-1) of your contract.

On 20 December 1999 your Don Goddeau asked for an extension of approximately 90 days in which to make a reply. Mr. Goddeau stated that this time extension was required in order to do an independent forensic investigation using an independent consultant. Mr. Jim Daniel informed Mr. Goddeau that he would need to explain to the A/E Liability Board, his reasons for needing the extension. Mr. Goddeau requested that this explanation be done by telephone and this request was granted.

The Board, after listening to Mr. Goddeau's rationale for an extension, has agreed to wait until 5 February 2000 to issue a formal demand for payment. At this time a Contracting Officer's Final Decision will be issued and collection procedures will be initiated. However, please be advised that on 29 November 1999, interest began accruing on $762,611.

Sincerely,

A. H. Demos

A. H. DEMOS
DIRECTOR FACILITIES ACQUISITION
CONTRACTING OFFICER

Copy to:
ROICC Charleston

# Exhibit 27

KRA INC.

ARCHITECTURE, PLANNING, ENGINEERING

February 2, 2000
Project No. 3281

Fax Memo to: Kent Stair 404 222-9482
Don Goddeau 561 515-6583

From: Terry Keane

These are my initial thoughts regarding the project.

GEE&JENSON VS NAVFAC SOUTHDIV - SPAWARS BLDG

We meet on January 13th at Shem Creek for lunch with Don Goddeau, Kent Stair, Phil Cowan, and Mike Ethridge to review project and issues. Then drove to Naval weapons station to look over project. We first looked at the precast concrete window sills, aluminum storefront, and stucco head. Then we went into the building, talked to Scott — a maintenance person, who took us to a few areas where exterior walls had had moisture problems. These had been opened and repaired some time ago and apparently fixed. We asked to see current problem areas with water intrusion, mildewing walls, but none were noted. We then went up on a roof deck adjacent to an area that had had problems in the past. This area happened to have the precast sill with full flashing under it, tied into the roofing system.

We noticed the following:

- Precast sill units appear to have many cracks, mostly hairline, which may allow moisture to migrate thru the units. We suspect inferior quality precasting. Some testing of precast units is probably warranted.
- The area that was shown to us as having had problems did have sill flashing in place.
- The sealant between the adjoining precast units generally appeared to be quite well done. We noted that the sealant between the bottom of the window unit and that between the precast was not bonding and may be a leak problem. Apparently the two sealants are not compatible.
- We noted that there was some apparent discoloration or mildew on the stucco, mostly on north facing surfaces.
- There did not appear to be current water infiltration problems of any magnitude.

Comments:

The architectural detailing of buildings is literally a never ending process. Improvements can almost always be made to a system or detail. The extent of detailing usually is the result of a combination of pressures, including construction budget, time constraints, production budget, as well as expectations and the 'standard of care' of the design architect.

We are addressing two issues here, referenced in the Riesburg Report of Nov. 11, 1998 as item WP-1 INADEQUATE FLASHING; and WP-8 FAILURE TO DESIGN PROPER STUCCO TERMINATION.

Regarding WP-1:

The architect designed a precast concrete sill resting on a wall with continuous dampproofed inner face, an air space and covered by face brick. Best practice would certainly indicate a through wall flashing under the sill, channeling any water to the

P O Box 7906 Hilton Head Island, South Carolina 29928 Ph: 843 686-2020 FAX: 843 686-6064 E-mail: kra@hargray.com

ATTACHMENT

exterior of the building. In my experience, we have often seen and in fact have produced similar details using precast sills with out through wall flashing immediately below the sill. It is reasonable to expect that with good quality construction including the proper installation of sealants and the continuous dampproofing of the inner wall, the system would perform adequately over the years with proper maintenance. In fact, as water will sheet down the face of the brick wall below the sill anyway, one would expect some water infiltration along the face of the wall. This was accounted for in the design by the inclusion of the dampproofing and flashing at the base of the wall with appropriate weeps. While, the detail could certainly be improved, it is our opinion that it meets the standard of care for detailing at the time and place.

Regarding WP-8:

EIFS detailing has gone thru a 'revolution' in the last few years as a result of epidemic water infiltration problems. The solution the Riesberg suggests is good for current detailing. The design as detailed and built was appropriate and consistent with current practice and knowledge at the time the work was done. In fact, many of the EIFS manuals from that period suggest a very similar detail to the one provided by the Architect. (Copy of a Acrocrete and Insul/Crete details attached). Again, it is our opinion that Gee & Jenson produced a detail for the project that met the standard of care for architectural services at that time and place.

Sidebar:

I don't know the lineal footage of the building perimeter. I appears to me that the amount of sill and head detail in the complaint is a significant number. It occurs to me that a very small percentage of the installation has caused problems. We believe that a reasonable fix for the precast condition might consist of removal of sealant joints between both sill members and between sill and aluminum window system. Provision of a two step sealant consisting of an expanding foam inner seal, topped with a good quality elastomeric sealant. Recaulk the aluminum window system with a compatible sealant. A waterproofing treatment to the precast sills should be researched.

We have yet to be convinced that water behind the EIFS system is a problem. We suspect that poor installation (the finish appears uneven in places) is a major contributing factor to the appearance problem. We also believe that a periodic washing with a good mildew inhibitor would significantly improve the appearance of the building.







SOFFIT AND PARAPET







DO NOT PUNCTURE FLASHING WITH INSUL/CRETE FASTENER

GRAVEL STOP

HIGH WALL AT LOW ROOF




JAMB IS SIMILAR WITH 90° CORNER

## HEAD RETURN




JAMB IS SIMILAR WITH 90° CORNER

## INSULATED HEAD RETURN




JAMB IS SIMILAR WITH 90° CORNER
(OMIT FLASHING AT JAMB)

## HEAD RETURN




JAMB IS SIMILAR WITH 90° CORNER
(OMIT FLASHING AT JAMB)

## HEAD RETURN

## WINDOW DETAIL I
### Wood/Metal Studs



## WINDOW HEAD/LIGHT GAUGE FRAMING ALUMINUM FRAME W/INTEGRAL FLASHING



# DOOR HEAD/LIGHT GAUGE FRAMING
# HOLLOW METAL FRAME

