# Exhibit 42

# ARCHITECTURAL SHEET METAL MANUAL

SMACNA

SHEET METAL AND AIR CONDITIONING CONTRACTORS NATIONAL ASSOCIATION, INC.

## THROUGH WALL FLASHING—INSTALLATION— AT COPING

**FIGURE 4-2**

Figure 4-2 illustrates the method of flashing the top of a parapet wall to receive a masonry coping. In Figure 4-2A dowels are placed by the mason as the wall is built. Specially deformed metal flashing is installed by the sheet metal contractor and each dowel is capped as shown in Section A-A. The metal may be drawn around the dowel as shown in Alternate Section A-A.

Where desired, a through-wall flashing may be extended down the roof side of a parapet wall to serve as a moisture relief.

Figures 4-2B, C, D, and E illustrate some of the deformed metal patterns available.




**THROUGH WALL FLASHING-
INSTALLATION COPING**

**FIGURE 4-2**

# Exhibit 43

# CHAPTER 1

# ADMINISTRATION

## 101 TITLE AND SCOPE

**101.1 Title**

The provisions of the following chapters shall constitute and be known and be cited as the "Standard Building Code" hereinafter known as "this Code."

**101.1.1 Purpose.** The purpose of this chapter is to provide for the administration and enforcement of the Standard Building, Gas, Mechanical and Plumbing Codes, and the National Electrical Code, hereinafter referred to as the "technical codes," as may be adopted by the state or local jurisdiction.

**101.2 Code Remedial**

**101.2.1 General.** This Code is hereby declared to be remedial, and shall be construed to secure the beneficial interests and purposes thereof — which are public safety, health, and general welfare — through structural strength, stability, sanitation, adequate light and ventilation, and safety to life and property from fire and other hazards attributed to the built environment including alteration, repair, removal, demolition, use and occupancy of buildings, structures, or premises, and by regulating the installation and maintenance of all electrical, gas, mechanical and plumbing systems, which may be referred to as service systems.

**101.2.2 Quality Control.** Quality control of materials and workmanship is not within the purview of this Code except as it relates to the purposes stated herein.

**101.2.3 Permitting And Inspection.** The inspection or permitting of any building, system or plan by any jurisdiction, under the requirements of this Code, shall not be construed in any court as a warranty of the physical condition of such building, system or plan or their adequacy. No jurisdiction nor any employee thereof shall be liable in tort for damages for any defect or hazardous or illegal condition or inadequacy in such building, system or plan, nor for any failure of any component of such, which may occur subsequent to such inspection or permitting.

**101.3 Scope**

**101.3.1 Applicability:**

**General** Where, in any specific case, different sections of this Code specify different materials, methods of construction or other requirements, the most restrictive shall govern. Where there is a conflict between a general requirement and a specific requirement, the specific requirement shall be applicable.

**Building** The provisions of the Standard Building Code shall apply to the construction, alteration, repair, equipment, use and occupancy, location, maintenance, removal and demolition, of every building or structure or any appurtenances connected or attached to such buildings or structures.

## 811 VENEERED WALLS

### 811.1 General

**811.1.1** Veneer refers to a facing of brick, tile, concrete, masonry units, metal, including metal coated with porcelain enamel, glass, wood or similar material securely attached to a wall for the purpose of providing ornamentation, protection, or insulation but not so bonded as to exert a common reaction under load.

**811.1.2** Veneer shall not be assumed as supporting any load other than its own weight, neither shall it be assumed to add to the strength of the wall.

**811.1.3** Veneered walls shall provide weather protection for the building at the walls.

**811.1.4** Flashing shall be provided as necessary to prevent the entrance of water at openings in or projections through veneered walls. Flashing shall be provided at intersections of veneered walls of different materials unless such materials provide a self flashing joint and at other points subject to the entrance of water. Caulking shall be provided where such flashing is determined by the Building Official to be impractical.

### 811.2 Anchored Masonry Veneer

**811.2.1** Anchored veneer is veneer secured with approved mechanical fasteners to an approved backing. All masonry units, mortar and metal accessories used in anchored veneer walls shall meet the physical requirements of Chapter 14. Anchored veneer units shall not be less than 1 5/8 inches (41 mm) in actual thickness for solid masonry units and not less than 2 5/8 inches (67 mm) in actual thickness for hollow masonry units.

**811.2.2** Anchored veneer shall be supported on footings, foundation walls or other approved noncombustible structural supports. The weight of all anchored veneer installed on structures more than 30 ft (9144 mm) in height above the noncombustible foundation or support shall be supported by noncombustible structural framing. The structural framing shall have horizontal supports located at each story height above the initial 30 ft (9144 mm).

EXCEPTION: These height restrictions may be increased for noncombustible structural framing when special design techniques, approved by the Building Official, are used in construction.

**811.2.3** Noncombustible lintels and noncombustible supports shall be provided over all openings where the anchored veneer is not self- supporting. The deflections of all structural lintels and horizontal supports required by 811.2.2 and 811.2.3 shall not exceed 1/600 of the span under full load of the anchored veneer.

**811.2.4** Masonry veneer anchored to wood framing shall be attached with corrosion resistant corrugated sheet metal and shall be not less than 0.029 inch (0.74 mm) by 7/8-inch (22 mm) wide or corrosion resistant ties of strand wire and shall not be less than 0.148 inch (3.76 mm) (No. 9 W&M ga) wire with ends of the wire bent to a 90° (1.6 rad) angle to form a hook not less than 2 inches (51 mm) long. The metal ties shall be embedded in



EXHIBIT 16 4-5-07 [illegible]

# Exhibit 44

FOR THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION OF WILLIAM F. RIESBERG

COPY

GEE & JENSEN ENGINEERS,
ARCHITECTS AND PLANNERS,

Plaintiff,

vs. CASE NO. 1:05-cv-00457-LIB

UNITED STATES OF AMERICA,
DEPARMENT OF THE NAVY,

Defendant.

---

DEPONENT: WILLIAM F. RIESBERG

DATE: APRIL 5, 2007

TIME: 9:00 A.M.

LOCATION: PEDERSEN & SCOTT, P.C.
775 St. Andrews Boulevard
Charleston, South Carolina 29412

REPORTED BY: DENISE MCCAULEY, RPR, IA-CSR, GA-CCR
CLARK & ASSOCIATES
P.O. Box 73129
North Charleston, South Carolina 29422
(843)762-6294

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

COPY

PEDERSEN & SCOTT, P.C.
BY: WILLIAM A. SCOTT, ESQ.
775 St. Andrews Boulevard
Charleston, South Carolina 29412
(843)556-5656

ON BEHALF OF THE DEFENDANT:

U.S. DEPARTMENT OF JUSTICE
BY: TARA K. HOGAN, ESQ.
Commercial Litigation Branch
Civil Division
1100 L. Street, N.W., Room 7034
Washington, D.C. 20530
(202)616-2228

NAVAL ENGINEERING COMMAND
BY: PAMELA NESTELL, ESQ.
720 Kennon Street, S.E.
Washington Navy Yard
Washington, D.C. 20374
(202)685-2136

ALSO PRESENT: KENNETH SCHNEIDER, JR.
JOSEPH KESSINGER
ERIC LAQUIERE

# I N D E X

Page

EXAMINATION

By Mr. Scott........................ 4

By Ms. Hogan........................ 91

Certificate of Reporter.................. 97

## INDEX OF EXHIBITS


| EXHIBIT | | PAGE |
|---|---|---|
| 11 | 7/7/98 expert report............... | 21 |
| 12 | 2/26/07 expert report.............. | 53 |
| 13 | Destructive openings diagram........ | 63 |
| 14 | Architect/engineering statement of.. work for contract | 94 |

you tell me what problems this indicates to you?
A. The absence of flashing underneath precast sill at all those areas that are not adjacent to the roof.
Q. Can -- there are some arrows on there in some blue. I'll represent to you that those were put their yesterday by Mr. Herrington.
A. Yes.
Q. Okay. Where are you saying that the flashing did not exist?
A. Underneath the precast sill.
Q. And what contract requirement in the A/E contract specifically required flashing to be underneath that sill?
A. Well, it starts with the building code.
Q. Is there any particular building code that's required to be followed by the specifications?
A. Standard Building Code, 1991 edition.
Q. And what does it require?
A. I'm referring to my report on Page 3, report dated February 26, 2007.
Q. Okay.
A. The relevant citations there.
Q. Now, that building code has been changed, I think, and a new one is now in effect, the 2000 building

code?
A. 2003 International Building Code.
Q. When you redid the design in 2000, when did you redo this design that Hitt actually did? 2004, I think?
A. 2004.
Q. So what code would it have been under?
A. 2000 edition of the International Building Code.
Q. Were there any substantial differences between the 1991 building code that Gee & Jensen was required to follow and the 2000 building code that you were required to follow with regard to this issue?
A. No.
Q. They both basically said the same thing; didn't they?
A. Yes.
Q. And they both provide for deviations based on acceptance by the building official?
A. Yes.
Q. And you certainly in your design met the requirements of the code?
A. Yes.
Q. Now, is there any problem, if you go back to Exhibit -- I mean, Exhibit 2 and this detail -- is there

Q. Where was the tape actually? Was it on the sill or underneath the sill?

A. Well, you had tape on the top of the sill and tape down below depending on how far we brought this polyethylene.

Q. And so you had it taped off basically on the nose of the sill?

A. Yes.

Q. And then that --

A. And down onto the masonry below.

Q. So the only place you were testing was this horizontal joint that's coming out from the wall?

A. Yes.

Q. And in that, if the caulking had performed as it was intended, water would not have gotten through; isn't that correct?

A. Yes.

Q. Okay. And where did the water get to on the inside?

A. On those places adjacent to the roof, it got to the top of the flashing.

Q. Okay. And what did it do once it got to the top of the flashing?

A. Spilled into the room.

Q. And if you look at WP-2, this is WP-1.2?

Page 34

A. Yes.
Q. This is the detail that would be applicable in those locations; correct?
A. Yes.
Q. And there was no upstand; correct?
A. Correct.
Q. So if it got down to the flashing and you were pointing the nozzle -- where was the nozzle pointed?
A. Probably did around the nose.
Q. So you would have taken it and gone at an arc around that?
A. Yes.
Q. Okay. So the water would have hit that flashing, and because there was no upstand, it would have been diverted into the building?
A. Yes.
Q. Okay. If there had been an upstand, what would have happened?
A. It would have drained to the exterior once the water was removed.
Q. Now, that upstand I think was supposed to be what? I think a half or a quarter of an inch?
A. Quarter of an inch.
Q. Did that meet the contract requirements?

A. In 2004. I inspected 100 percent of the joints in question on the first floor and all of the joints adjacent to a roof and/or the patios.

Q. And did you prepare a report at that time?

A. I prepared a report as such. I reported to NAVFAC what I found.

Q. What did you report to them?

A. That most of the sealant joints had failed.

Q. And why did they fail?

A. From two causes. One, improper joint depth-to-width ratio.

Q. And that would have been whose responsibility?

A. The contractor. But most of the failure was on account of improper mixing of two-part urethane sealant.

Q. Again, a contractor problem?

A. Yes.

Q. Now, did you notice any additional damage to the interior walls when you went back in 2004?

A. No.

Q. Do you know if any water actually got through any of those joints between 2000 -- 1998 or 1999 when you did your test and 2004?

A. Must have.

Q. If they met the code, would they meet the standard of care?
A. No.
Q. You mean you would have to build higher than the code to meet the standard of care?
A. Typically, yes. The code is an absolute minimum.
Q. Do you know of any requirement in the contract that said that they had to exceed the requirements of the building code?
A. No.
Q. Do you know of any instructions that they were provided and were required -- any instructions by the Navy or the government that were included as part of the contract that they were required to comply with that required sill flashing as you have stated?
A. No.
Q. So the only thing you know of is you say they didn't meet the code?
A. Yes.
Q. But if they had submitted something to the government as an alternative method as the code provided, the government accepted that as a building official, would that meet the code?
A. Technically, yes.

A. Yes. Or poorly mixed sealant.
Q. But not an A/E problem?
A. Well, had there been flashing, those leaks wouldn't have gone anywhere.
Q. And in the same token, if they had installed caulking properly, there would have been no need for any other flashing?
A. I don't believe that. Can't rely upon sealant as a primary deterrent.
Q. But you can rely on a neoprene gasket?
A. Yes.
Q. What's the difference?
A. Fully adhered to both sides, you've got a material that is impervious and there's a drainage channel.
Q. Is there any requirement that you know of in the contract or the code that requires a secondary barrier system?
A. No, there's not.
Q. I'm going to show you ID 832, the bottom picture. Can you tell me what that is?
A. It was a water test at opening 5, which we looked at earlier.
Q. So is that six or five?
A. Five.

questions I have. I want to take just a minute or two and see, and we'll wrap this up.

MS. HOGAN: Okay.

(A break was taken.)

Q. Mr. Riesberg, is there any --

MS. HOGAN: Are we back on the record? I'm sorry.

MR. SCOTT: Yeah. Back on the record real quickly.

Q. Is there any place on this building that you can say that the only cause of damage was from water coming through the joint in the sill?

A. No.

MR. SCOTT: Those are all the questions I have.

EXAMINATION

BY MS. HOGAN, at 11:38 a.m.:

Q. I just have a few questions. Would you consider Gee & Jensen's original design to be an alternative to the normally specified flashing?

A. No.

Q. Why not?

A. The code requires flashing. There's nothing impractical about installing it at this location.

Q. Why is it not impractical?

A. It's very common material. It is used in this manner.

Q. And if you were designing this building back in 1993, would you have used neoprene compression seal that was the fix, or would you have specified flashing?

A. I would have specified flashing.

Q. Why?

A. It is an impervious material that, with proper upstand, is reliable to redirect water to the exterior.

Q. How did you choose where you made the destructive openings?

A. Mostly at random. Some associated with damage.

Q. And is the random openings, is that in accordance with the forensic standards?

A. It's normal the way I do it.

Q. I think earlier you testified that you knew going into the forensic study that there was water damage at openings six, seven, 11, 18, and 19. Is that --

A. Sounds correct.

Q. When you said that there was water damage, are you referring to water damage that was already visible from the inside?

# Exhibit 45

FOR THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION OF KENNETH G. SCHNEIDER, JR.

GEE & JENSEN ENGINEERS,
ARCHITECTS AND PLANNERS,

Plaintiff,

vs.

**ORIGINAL**

CASE NO. 1:05-cv-00457-LIB

UNITED STATES OF AMERICA,
DEPARMENT OF THE NAVY,

Defendant.

---

DEPONENT: KENNETH G. SCHNEIDER, JR.

DATE: APRIL 5, 2007

TIME: 1:00 P.M.

LOCATION: PEDERSEN & SCOTT, P.C.
775 St. Andrews Boulevard
Charleston, South Carolina 29412

REPORTED BY: DENISE MCCAULEY, RPR, IA-CSR, GA-CCR
CLARK & ASSOCIATES
P.O. Box 73129
North Charleston, South Carolina 29422
(843)762-6294

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

PEDERSEN & SCOTT, P.C.
BY: WILLIAM A. SCOTT, ESQ.
775 St. Andrews Boulevard
Charleston, South Carolina 29412
(843)556-5656

ON BEHALF OF THE DEFENDANT:

U.S. DEPARTMENT OF JUSTICE
BY: TARA K. HOGAN, ESQ.
Commercial Litigation Branch
Civil Division
1100 L. Street, N.W., Room 7034
Washington, D.C. 20530
(202)616-2228

NAVAL ENGINEERING COMMAND
BY: PAMELA NESTELL, ESQ.
720 Kennon Street, S.E.
Washington Navy Yard
Washington, D.C. 20374
(202)685-2136

ALSO PRESENT: WILLIAM RIESBERG
JOSEPH KESSINGER
ERIC LAQUIERE

# I N D E X


| | Page |
|---|---|
| EXAMINATION | |
| By Ms. Hogan........................... | 4 |
| By Mr. Scott........................... | 87 |
| Certificate of Reporter.................. | 91 |


## INDEX OF EXHIBITS


| EXHIBIT | | PAGE |
|---|---|---|
| 15 | Schneider report...................... | 6 |
| 16 | Section 811 veneered walls........... | 30 |
| 17 | Keane report.......................... | 72 |
| 18 | Goddeau letter........................ | 75 |
| 19 | Statement of work..................... | 83 |
| 20 | Gee & Jensen basis of design......... | 86 |

well.

Q. Maybe we can back up and I'll just ask you a more basic question. How would you, how would you define flashing? Well, what is flashing?

A. An impervious material that is used in the interface between two dissimilar surfaces to shed water.

Q. Is there any reason why flashing would be impractical to design and install under a precast sill?

A. No.

Q. Do you know if there's any professional reason to design and install flashing at the roof but not under a precast sill?

A. No. It's a matter of choice.

Q. And why is it a matter of choice?

A. Well, the building official, the building official didn't have to okay this. It was if the architect wanted to do that, but the building official didn't say that it was wrong.

Q. Okay. So your understanding is that the building official at the N.I.S.E. East project said that not using flashing under the precast sill was okay?

A. Well, the drawings went through the same review process that they would have gone through in my office when I was the chief architect for the state of Tennessee, and I would, I would, if I didn't want those

something like the Brick Institute to fit this particular project, that he would have to make it job specific. But look in those manuals and see how many times that both sides are shown as an acceptable way to use metal flashing or to use sealants.

Q. But you can't tell me which specific standard out of any of those would allow those, allow that, the interchange?

A. Well, all of those are suggested solutions. It's up to the architect. According to the code -- and we'll go back, let's go back to the rule.

Q. Let's do that.

A. Flashing shall be provided as necessary to prevent the entrance of water at openings and/or projections through veneered walls.

Q. Uh-huh.

A. And the manual, one of the, one of the other codes goes further to say in such a manner as to be leakproof. Well, let's look at the concept. The code wants delivered the building to be leakproof. And I don't think that the code says that you've got to do it this way knowing that the ultimate solution is something that is required by the architect to design. And that's where we are with the standard of care, that if he complied with the code with its intent, if his intent

was that the building would leak, then I think that he's breached the standard of care.

Q. And so even if the code says that flashing shall be provided at those intersections --

MR. SCOTT: Object. That's not what it says.

Q. Okay. Let me make sure I read this correctly. The code says, "The flashing shall be provided at intersections of veneered walls of different materials, unless such materials provide a self-flashing joint and other points subject to the entrance of water."

MR. SCOTT: Object. That is not what it says. Read the first sentence.

Q. Okay. You can go ahead and answer that.

MR. SCOTT: Yes. Please answer it.

Q. Let me finish my question, then you can answer it. If the flashing, if -- and you can tell me if I'm wrong, but if the code says that the flashing shall be provided at intersections of two different types of materials, are you saying that an architect who doesn't use flashing but whose intent is to have a leakproof building has met the standard of care?

A. That's right. And it specifically allows caulking shall be provided where such flashing is

determined by the building official to be impractical. It doesn't say that the architect can't use that. This just gives the building official the authority to make the change if he thinks it's impractical.

Q. Okay.

A. It's not -- this doesn't allow the building official to design the building is what I'm saying, is what I'm telling you.

Q. Okay.

A. It's the architect's design responsibility to design the building.

Q. Okay.

A. So if the architect wants to use sealant, then use sealant. What Mr. Riesberg did, his example, his fix was the same as the architect's. I don't know -- what are we arguing about here? I don't understand it. Your own expert fixed the building the same way the architect designed it.

Q. Okay. We'll get to that later. I just want to make sure I understand what your understanding of what the code provides, and your understanding is that as long as the intent of the architect is to have a leakproof building, they can design a building that does not have flashing?

A. Yes.

Q. Okay.
A. I have seen, I have seen the drawings, and I think that the drawings are adequate, and I think that the drawings were prepared with the intent to comply with the code, and I think that the drawings are well within the standard of care. In fact, better than most that I've seen.
Q. Can you explain why they're better?
A. They have more detail.
Q. What kind of detail are you talking about?
A. What kind of detail?
Q. Yeah. Why is -- are you talking about the detail for the -- these kind of intersections that we're talking about or just detail of the project overall?
A. Detail of the project as a whole.
Q. Okay. Have you ever served as an architect/engineer for a government-owned project where you designed the building?
A. Yes.
Q. When was that?
A. I can't give you the year. It was when I first opened my practice we did some government work.
Q. Where were those buildings?
A. In Tennessee.
Q. Is there any other time that you served as

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on January 18, 2008, a copy of the foregoing "APPENDIX TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara K. Hogan