IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| GEE & JENSON ENGINEERS, ARCHITECTS, AND PLANNERS,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 05-457C<br>(Judge Bush) |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims, the defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its Cross Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment.

1. On 20 July 1993, Southern Division, Naval Facilities Engineering Command, Charleston, SC, ("SOUTHDIV") awarded contract number N62467-93-D-0911 to Gee & Jenson Engineers, Architects & Planners, for architect-engineering (A-E) design services for waterfront and industrial facilities in support of surface ships and submarines in Florida, Georgia, South Carolina and Texas. DA2.

2. Appendix B of the contract, Architect-Engineer Clauses, Indefinite Delivery Requirement (IDR) Contract (June 1993), included FAR 52.236.23 Responsibility of the Architect-Engineer Contractor (Apr 1984) which stated:

> (a) The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor under this contract. The Contractor shall, without additional compensation, correct or revise any errors or deficiencies in its

> design, drawings, specifications, and other services.
> (b) Neither the Government's review, approval or acceptance of, nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or of any cause of action arising out of the performance of this contract, and the Contractor shall be and remain liable to the Government in accordance with applicable law for all damages to the Government caused by the Contractor's negligent performance of any of the services furnished under this contract.
> (c) The rights and remedies of the Government provided for under this contract are in addition to any other rights and remedies provided by law.
> (d) If the Contractor is comprised of more than one legal entity, each such entity shall be jointly and severally liable hereunder.

DA21.

3. On 3 September 1993, the Navy awarded Delivery Order 0001 under the contract for A-E Services for the project entitled NISE East Complex, to include construction of a new engineering center, conversion of several buildings to lab spaces and upgrading warehouses at the Naval Weapons Station, Charleston, SC. DA35.

4. The delivery order included Appendix A: Statement of Work, dated 22 July 93, Rev. 27 Aug 93. In Section 2 - Scope of Services, it described the scope of services as follows:

> Phase I of the A/E services includes project development, and on site analysis sessions. Phase II of A/E Service includes on site schematic sessions, facilities studies, and parametric cost estimating and programming, for the Project. Phase III of A/E services includes development of a complete design for the Project including preparation of drawings, specifications, design calculations, and detailed estimates of construction cost. The A/E shall conform to the requirements of SOUTHNAVFACENGCOM P-141 (A-E Guide), except as modified herein. The A-E will be held responsible for the quality of their work. If the EIC/AIC determines that a design submittal is unacceptable, thus necessitating a resubmittal, the Contracting Officer may require the A/E to travel to SOUTHNAVFACENGCOM at no additional cost to the Government to resolve the problems with the design.

DA40.

5. The A-E Guide (SOUTHNAVFACENGCOM P-141) dated June 1989 was applicable to this contract. DA 03 Section 2, entitled Command Design Policy, describes the underlying philosophy as one of responsive, responsible and defensible design for Navy shore facilities with a commitment to design principles and practices which are requirements-based, logical and conservative. Section 2, paragraph 2, Implementation, stated:

> Before beginning the design, the A/E should review current criteria, instructions and guide specifications provided by SOUTHNAVFACENGCOM, and make a thorough study of conditions at the site and requirements of the project. If, after an analytical review, the A/E is of the opinion that a deviation from instructions, Navy criteria or building codes would be of benefit to the Government, the A/E shall bring the matter to the attention of the EIC for a decision. Government construction is also required to conform to the nationally recognized building codes, which predominate in the local area. SOUTHNAVFACENGCOM encourages the A/E to use his ingenuity, talent and professional expertise to develop the best possible design for all elements of the project within the constraints imposed. However, the use of untried concepts and materials for which no "track record" exists, is discouraged and will be rejected. . . .

DA76.

6. The A-E Guide, Section 5, Responsibilities of the A-E, paragraph 3, described the quality of work as follows:

> The work of the A/E will be reviewed by SOUTHNAVFACENGCOM to the extent necessary to establish conformance with the authorized scope and applicable Navy design criteria, and to establish a reasonable assurance that the work can be completed within the funds authorized. SOUTHNAVFACENGCOM WILL NOT UNDERTAKE A DETAILED TECHNICAL REVIEW OF THE WORK. It will be the responsibility of the A/E, acting in a professional capacity, to ensure the accuracy, completeness and correctness of the cost estimate and all engineering concepts and details of the work, including the coordination of the various architectural, structural, mechanical, electrical, and other subdivisions thereof with each

> other and with the specifications. The A/E ASSUMES FULL RESPONSIBILITY FOR THE TECHNICAL ACCURACY AND PROFESSIONAL ADEQUACY of all work which he presents over his signature. THE A/E SHALL ASSIGN COMPETENT ARCHITECTS AND ENGINEERS, EXPERIENCED IN THEIR RESPECTIVE DISCIPLINES, TO THE VARIOUS PARTS OF THE WORK TO INSURE ALL ELEMENTS ARE DESIGNED CORRECTLY AND IN ACCORDANCE WITH THE BEST ARCHITECTURAL AND ENGINEERING PRACTICES. ERRORS AND/OR DEFICIENCIES IN A/E's PERFORMANCE SHALL BE CORRECTED OR REVISED BY THE A/E AT NO ADDITIONAL FEE.

(emphasis in original) DA82.

7. The A-E Guide, Section 5, paragraph 4, describes the requirement for conformance to criteria as follows: "All work shall be in accordance with current SOUTHNAVFACENGCOM criteria, instructions and guide specifications, and shall be in accordance with the best architectural and engineering practices." DA83.

8. The contract Statement of Work also included "Section 3 - Additional Considerations." DA53. Section 3.1, Design Criteria and Project Specifications, described the design criteria to be used to design the project as follows:

> A/E shall design the project and prepare the project specifications in accordance with criteria and guide specifications listed in the current "SOUTHNAVFACENGCOM Index of Criteria" (Guide 00001), and with other criteria as may be provided by the EIC/AIC. This "Index of Criteria" lists Guide Specifications, NAVFAC Design Manuals, Military Handbooks, and other types of criteria documents; the "Index of Criteria" can only be obtained from SOUTHNAVFACENGCOM. The Compact Disc-Read Only Memory (CD-ROM) system titled Construction Criteria Base (CCB), distributed by the National Institute of Building Sciences (NIBS), includes most of the criteria used for SOUTHNAVFACENGCOM projects; this same criteria is available (in paper copies) from the Naval Publications and Forms Center.

DA53.

9. Section 3.1.3, Specifications, described the preparation of the project specifications as follows:

> The project specifications shall be prepared utilizing the "SPECSINTACT" system of the "Construction Criteria Base" (CCB). Note the emphasis on the requirement to use the "SPECSINTACT" system; merely subscribing to CCB and then developing specifications by any other method, other than "SPECSINTACT", will not be acceptable. The A/E shall use the Guide Specifications listed in the current "SOUTHNAVFACENGCOM Index of Criteria" for each project. Most of these Guides are included in the "NAVY" Master, or the "SOUTHDIV" Master, of the "SPECSINTACT" System. Additionally, the A/E shall incorporate all applicable SOUTHNAVFACENGCOM interim Regional Revisions, and any other pertinent specification information that the EIC/AIC may provide. Should there be a substantial time lapse between A/E's receipt of the initial Design Kit for a project and the time the A/E actually starts preparation of the specifications (more than three months), the A/E shall obtain a current SOUTHNAVFACENGCOM Index of Criteria, and a current set of SOUTHNAVFACENGCOM interim Regional Revisions before preparing specifications . . . .

DA54.

10. Military Handbook MIL-HDBK-1001/2, 15 July 1987, entitled Materials and Building Components, provided basic criteria for all Navy architectural and design projects. Section 2, General Criteria, contained guidance regarding the use of new materials. Section 2.8.1 entitled NAVFAC Policy provided:

> . . . NAVFAC recognizes the need to keep pace with technological developments in the construction industry, but new materials, equipment, and methods must be adequately tested and proven by actual performance before adoption. Newly developed materials, equipment, and methods not included in NAVFAC guide specifications may be used in limited applications with prior approval by the NAVFACENGCOM Engineering Field Division.

> Such newly developed materials, equipment, or methods should not be used extensively until the quality and durability are proven and appropriate requirements have been included in NAVFAC guide specifications.

DA176.

11. The NAVFAC Guide Specification for Unit Masonry (NFGS 04200J) dated 30 September 1993, was applicable to this contract. NFGS 04200J, Section 2.3.5 Through-Wall Flashing, stated the following:

> ************************************************************
> NOTE: See Note D located at rear of text.
> ************************************************************
> Provide one of the following types [except that flashing indicated to terminate in reglets shall be metal or coated-metal flashing] [and] [except that the material shall be one which is not adversely affected by dampproofing material.]
>
> a. Coated -Copper Flashing . . .
> b. Copper or Stainless Steel Flashing . . .
> c. Reinforced Membrane Flashing . . .

DA213.

12. NFGS 04200J, Note D provided:

> NOTE D: Require flashing in exterior masonry walls, including single-wythe construction, at all obstructions such as bond beams, <u>sills</u>, lintels, and concrete tie beams. The wall design and detailing must conform to National Concrete Masonry Association (NCMA) publications: TEK 13A, “Details for Building Dry Concrete Masonry Walls”; TEK 53, “Design of Concrete Masonry for Crack Control”; and TEK 126, “Flashing Concrete Masonry.” <u>Show locations and details on project drawings. This is a regional requirement which shall be used, when applicable, for SOUTHNAVFACENGCOM projects</u>**;** when appropriate the requirement may be used for projects in other areas. (Emphasis added.)

DA224.

13. No Navy official ever made a determination that flashing was impractical, or that Gee & Jenson was permitted to deviate from the clear requirement of the building code or NAVFAC guide specifications with respect to the issue of flashing. Haynes Decl. ¶ 6.

14. In Gee & Jenson's design, the joints between the adjacent precast sill members are not self-flashing. DA481.

15. On 16 September 1994, the Navy awarded contract no. N62467-93-C-1096 to Pizzagalli Construction Company for the construction of the NISE East Engineering Center at the Naval Weapons Station, Charleston, South Carolina. DA228. The contract included specification Section 04200 Unit Masonry (09/93), Section 07600 Flashing and Sheet Metal (09/93), and architectural drawings A62, A63, A65, A97. DA236-67.

16. On 29 September 1995, the Navy executed Modification 000113 to Gee & Jenson's contract (N62467-93-D-0911/0001) to include Title II Inspection and Surveillance Services at the NISE East Engineering Center. The modification included a statement of work describing the Title II inspection services as follows:

> The Architect-Engineer (A-E)/Engineer Services (E-S), Gee & Jenson EAP Inc., contract # 93-R-0911, contractor shall provide the services indicated below in connection with construction contract listed in paragraph 10 [N62467-93-C-1096] to assure compliance with construction contract plans and specifications. The specific requirements of the A-E/E-S representative is to inform the Resident Officer in Charge of Construction (ROICC) of whether or not the work meets the contract requirements. The A-E/E-S representative has no authority to direct the construction contractor in any way regarding methods or procedures and shall not interfere with the contractors method of performance. The ROICC will be responsible for and execute signature upon all correspondence and specific directives to contractors.

DA269-70.

17. On 3 June 1996, the Navy executed Modification 000121 to Gee & Jenson's contract (N62467-93-D-0911/0001) to include on-site support services for the NISE East Engineering Center in accordance with a statement of work dated 12 April 1996. The General Requirements

of the Statement of Work stated: "The Architect-Engineer (A-E)/Engineer Services (E-S) firm shall provide the services indicated below in connection with construction contract 93-1096 "NISE HEADQUARTERS" AT CHARLESTON, SC, to assure compliance with construction contract plans and specifications." DA279.

18. The NISE East Engineering Center was substantially complete on or about May 1997. Pannullo Decl. ¶ 4.

19. On or around spring of 1998, tenants at the NISE East Engineering Center noticed damage from water stains on the interior walls at several locations on the second floor. Pannullo Decl. ¶ 5.

20. On 2 June 1998, the Navy met with Gee & Jenson to review and discuss the leaks discovered at the NISE East Engineering Center. DA283.

21. On 16 June 1998, the Navy executed contract number N62467-96-D-0819/Delivery Order 0002 to Riesberg Lunn, LLC, a forensic architectural firm, to conduct forensic engineering consultation services to determine the source of the leaks at the NISE East Engineering Center. DA285.

22. On 7 July 1998, William Riesberg submitted the report of his forensic consultation of the NISE East building. He described the exterior wall assembly as being comprised of a structural steel tube framing system with brick veneer, conventional stucco, a ribbon curtainwall system and various finishes of architectural precast concrete panels, sills and trim. DA289-90. His hypothesis was that the source of the observed water infiltration was the joint below the precast sill, which extended continuously under the ribbon windowall system. DA290. He concluded that further investigation was needed to reveal the extent of the deficiencies, confirm the causes

and establish an opinion of culpability. DA294.

23. The Navy awarded contract number N62467-96-D-0819/Delivery Order 0004 to Riesberg Lunn on 15 October 1998, for A/E services to conduct Type 1 Forensic Engineering Study at the NISE East Engineering Center to investigate the water infiltration around the windows and fire safety deficiencies found during the forensic consultation. DA296.

24. On 11 November 1998, William Riesberg submitted his Report on a Forensic Study of the SPAWAR NISE East Engineering Center to the Navy. DA301-334. The report identified Life & Fire Safety issues (LF-1 through LF-3) and Weather Protection of the Building Envelope issues (WP-1 through WP-13). Regarding the water leaks, the report confirmed that to date the water damage in most cases was moderate, but noted that active damage was still occurring. The report predicted that damage would continue and if deficiencies were not corrected severe damage would result over time. DA301.

25. With regard to WP-1, Inadequate Flashing, the report stated:

> WP-1.1 FAILURE TO FLASH UNDER PRECAST SILL
>
> Flashing directs water that has entered a wall assembly to the exterior face. The architect failed to indicate flashing under the precast sill of the typical windowall. No flashing was installed.
>
> In addition, the joints between the ends of adjacent pieces of the precast sill are sealed. The sealant with backer rod follows the curved nosing and the top of the sill (which essentially a [sic] flat horizontal plane). Sealant cannot be expected to provide the only line of defense, especially on a horizontal joint. While the sealant is generally installed correctly, we found places where water is entering the wall assembly through the sealant joint.
>
> Critical to long-term performance of this design is flashing under the precast sill. The flashing should extend to the inside face of the precast sill and turn up (upstand) to form a pan. Had this flashing been installed, none of the leakage would have occurred.

DA310.

26. The corrective measure recommended by Mr. Riesberg to provide a long term solution to the lack of flashing was to remove the windowwall assembly and precast sill and install through-wall flashing which extends to the inside face of the precast sill . DA311.

27. In 1998, the cost to install new flashing throughout the building, excluding most of the cost of removal of the windows, was estimated to be over $455,000. Riesberg Decl. ¶ 8.

28. On 18 February 1999, the Navy notified Pizzagalli Construction of the issues involving potential contractor liability for construction problems at the NISE East Engineering Complex. DA336-37.

29. On 19 February 1999, the Navy notified Gee & Jenson of the issues involving potential Architect-Engineer responsibility for design problems associated with water infiltration problems at the NISE East Engineering Complex. DA339-40.

30. On 16 March 1999, the Navy met with representatives from Gee & Jenson to discuss the NISE East Engineering Center problems. DA 16 The specific items identified in the Navy's 19 February 1999 letter and the forensic report were discussed. With regard to issue WP-1.1, Failure to Flash Under Precast Sill, Gee & Jenson acknowledged the detail in drawing A97 does not show flashing. DA334.

31. On 9 April 1999, Gee and Jenson responded to the Navy's 19 February letter and to the 16 March 1999 meeting. The A-E informed the Navy that, in its opinion, the design furnished by Gee & Jenson was performed with the reasonable care, skill and competence normally exercised by other members of the profession under similar circumstances. Gee & Jenson stated that "the details utilized were those which, in the opinion of the designer, meet the requirements

of the particular situation in which they were utilized and were also cost effective." DA349. Gee & Jenson further stated that, in its opinion, where water intrusion is a problem it is due primarily to the construction not being in compliance with the project plans and specifications as prepared.

DA350.

32. On 16 April 1999 Pizzagalli Construction notified the Navy that it would schedule repair on the items it believed were the responsibility of Pizzagalli Construction. DA363-365.

33. In accordance with SOUTHNAVFACENGCOMINST 4335.2C, the Navy appointed an A-E Liability Specialist, Virgil G. Svendsen, to conducted an investigation of potential A-E Liability to determine whether grounds existed to pursue A-E liability for negligent design resulting in inferior construction under construction contract N62467-93-C-0911. DA381.

34. Mr. Svendsen investigated the findings in the Riesberg Forensic Study and recommended the Navy pursue A-E liability for WP-1.1 Failure to Flash Under Precast Sill, and WP-8 Failure to Design Proper Stucco Termination. DA382.

35. On or about 28 October 1999, the A-E Responsibility Board reviewed the Riesberg Forensic Report and the A-E Liability Specialist's report of investigation and concluded there was A-E financial responsibility and that the costs were recoverable. The Board recommended action to recover the costs associated with the correction of Item WP-1.1 "Failure to flash under precast sill" and Item WP-8 "Failure to design proper stucco termination." DA392-94.

36. On 3 November 1999, the Navy forwarded a list of construction deficiencies for immediate corrective action to Pizzagalli Construction. DA396.

37. On 24 November 1999, the Navy advised Gee & Jenson that the review of the design

problems associated with water infiltration was completed and that the Navy concluded Gee & Jenson's failure to provide an effective deterrent against water penetration and failure to provide means to direct penetrating water to the exterior constituted design negligence. The Navy further advised that Pizzagalli Construction and Gee & Jenson would share the cost of the rework to correct the deficiencies. Based on an apportionment of the liability between Gee & Jenson, Pizzagalli Construction and the Government, the Navy found Gee & Jenson to be financially liable for damages to the Government in the amount of $762,611. DA399-401.

38. On 30 November 1999, Pizzagalli construction notified the Navy of the actions it would take to correct the construction deficiencies identified by the Navy. DA403.

39. On 7 January 2000 Gee & Jenson sent a letter to the Navy stating that they intended to have independent experts evaluate its design and provide an opinion on whether there was any negligence by Gee & Jenson. It asked for additional time to respond to the Navy's 24 November 1999 letter. DA406-07.

40. By letter dated January 18, 2000, the Navy agreed to wait until 5 February 2000 to issue a formal demand for payment. DA409.

41. On 2 February 2002 Terry Keane, KRA Inc., an expert hired by Gee & Jenson, submitted a report on the water infiltration issue at the NISE East Engineering Center. DA411-17 Regarding the issue WP-1, failure to provide through wall flashing, Mr. Keane stated:

> The architect designed a precast concrete sill resting on a wall with continuous dampproofed inner face, an air space and covered by face brick. <u>Best practice would certainly indicate a through wall flashing under the sill, channeling any water to the exterior of the building</u>**.** In my experience, we have often seen and in fact have produced similar details using precast sills with out through wall

> flashing immediately below the sill. It is reasonable to expect that with good quality construction including the proper installation of sealants and the continuous dampproofing of the inner wall, the system would perform adequately over the years with proper maintenance. In fact, as water will sheet down the fact of the brick wall below the sill anyway, one would expect some water infiltration along the face of the wall. This was accounted for in the design by the inclusion of the dampproofing and flashing at the base of the wall with appropriate weeps. While, the detail could certainly be improved, it is our opinion that it meets the standard of care for detailing at the time and place. (Emphasis added.)

DA411-12.

42. On 3 February 2000 Kent T. Stair, Counsel for CNA Insurance and Gee & Jenson notified the Navy that he had visited the NISE East Engineering Center with representatives from CNA Insurance, Gee & Jenson and Mr. Keane. Based on findings detailed in the letter, the group concluded that the design of Gee & Jenson was not negligent and that their designs met the applicable standard of care at the time and place the design was accomplished. DA421. Mr. Stair further requested that the Navy and Gee & Jenson enter into mediation of the issue in an attempt to settle the matter. DA421-22.

43. On 29 June 2000, the Navy notified Gee & Jenson and Pizzagalli Construction that it found them to be both jointly and severally liable for the water intrusion problems at the NISE East Engineering Center. The Navy further stated that if the parties could not work together and provide a solution that was acceptable to the Government by 31 July 2000, the Navy would pursue correction of outstanding deficiencies by other means available to the Government and pursue recovery of such costs against both parties. DA424.

44. On 18 September 2000, Pizzagalli informed the Navy that it did not believe there were any outstanding issues for which it was responsible. Pizzagalli stated it promptly and

professionally corrected all deficiencies when the Navy demonstrated that it had not substantially complied with the contract documents and its contract obligations. DA426.

45. In a letter dated 4 October 2000, Mr. Donald Goddeau of Gee & Jenson notified the Navy that Gee & Jenson would like to bring closure to the A-E liability issue. He noted that Gee & Jenson did not agree with the Navy's findings concerning A-E liability due primarily to its expert's opinion and "based upon the information we received in January of this year concerning the absence of water intrusion problems since the original construction and remedial work." He requested a meeting to discuss the A-E liability issue. DA429.

46. In an email dated 25 October 2000, Virgil Svendsen advised Gee & Jenson that there was water intrusion at the NISE East building. He stated that:

> It [water] was observed in 19 separate openings 32" wide by 48" high through the interior gypsum wallboard. The insulation was removed to gain visual access. Our forensic engineer water-tested 17 openings from the outside and observed water running into the wall. In addition, water damage was observed. Ten rolls of film were exposed to document this and all other deficiencies. Observations and photographs were documented by 50 pages of transcribed field notes, 15 sheets of hand written field notes and sketches of field measurements and observations.
>
> Without the sheetrock removed about all one can see is blistering and stained sheetrock, paint peeling and mildew so I can appreciate that some employees that talked to you in your January [2000] visit, may not have been fully aware of the extent of the water intrusion problem. Wayne Pannula [sic], the facilities engineer at N.I.S.E. East is keenly aware of the extent of the problem.

DA4 32.

47. On 28 November 2000, the Navy notified Pizzagalli Construction that it was concentrating on three specific outstanding construction deficiencies (LF-1, LF-2 and WP-6). The Government noted it was pursuing correction of the outstanding deficiencies and reserved

the right to pursue recovery of such costs from Pizzagalli. DA434.

48. On 7 March 2001, Gee & Jenson responded to the Navy's 29 June 2000 demand letter. DA438-39. Mr. Goddeau stated that the basis of Gee & Jenson's denial of A-E liability for the water intrusion issues at the NISE East Engineering Center as follows:

> It is based on opinions concerning a designer's choice as to where to use flashing, the appropriate use of sealants, and the use of a drip edge which had not been standard practice at that time. As we have stated on a number of previous occasions, we do not feel that our design in either case was negligent, especially considered in light of SOUTHNAVFACENGCOMINST 4335.2c.

Mr. Goddeau indicated mediation would be acceptable as a means to resolve the issue. DA439.

49. The Navy and Gee & Jenson entered into mediation in an attempt to resolve the A/E liability issue. During the mediation, the Navy agreed to accept a repair to correct the effects of the defective design in lieu of pursuing the most conservative repair, which would be to completely dismantle the curtain wall system on the first and second floors. Pannullo Decl. ¶ 6.

50. On 25 September 2002, the Navy executed modification 000403 to contract N62467-96-D-0819/Delivery Order 0004 for A/E Services to conduct design services at the NISE East Engineering Center to implement the repairs recommended by the Type 1 Forensic Study previously awarded under delivery order 0004. DA442.

51. On 7 April 2004, the Navy issued Contracting Officer's Final Decision 04-S-03 to Gee & Jenson demanding payment of $138,083 for the recommended fix to the precast sill, the forensic engineering consultation study and services and associated administrative costs, plus interest. DA447-48. The final decision further stated that Gee & Jenson could complete the repair itself or the Government would complete the work and charge the cost to Gee & Jenson.

52. On April 19, 2004, counsel for Gee & Jenson requested design documents and the basis

for cost estimates of the recommended fix to the precast sills. He also requested an accounting of the costs for the forensic study and services and associated administrative costs. DA452.

53. The Navy provided Gee & Jenson the design documents and task orders issued for Mr. Riesberg's design services on 10 June 2004. DA455-466.

54. On 25 August 2004, the Navy notified counsel for Gee & Jenson that the Navy had been unsuccessful in its attempts to contact counsel regarding Gee & Jenson’s response as to the repair work. Counsel was notified that the Navy was anxious to begin repairs and that if the Navy was not notified within two weeks, it would undertake repairs and pursue recovery of costs.

DA468.

55. On 14 March 2005, the Navy awarded contract number N62467-01-D-8306/Delivery Order 0035 to Hitt Contracting, Inc., for remediation of water infiltration at the NISE East Engineering Center. DA470.

56. The remedial design installed consisted of a two-stage joint, in which the outer joint is a deterrent seal and the inner seal is a neoprene compressional seal adhered to the precast sill.

DA487.

57. On 8 April 2005 Gee & Jenson filed a Complaint against the United States (Department of the Navy) in the US Court of Federal Claims alleging the Navy wrongfully, improperly and without cause made a claim for damages against Gee & Jenson. Compl. ¶ 10.

Respectfully Submitted,

JEFFREY S. BUCHHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

S/Donald E. Kinner
DONALD E. KINNER
Assistant Director

S/Tara K. Hogan
TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th fl.
Washington, D.C. 20530
Tele: (202) 616-2228
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
PAMELA J. NESTELL
Trial Attorney
Department of the Navy
NAVFAC Litigation
720 Kennon St, SE, Bldg 36
Washington Navy Yard, DC 20374

January 18, 2008

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on January 18, 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara K. Hogan