IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **GEE & JENSON ENGINEERS, ARCHITECTS AND PLANNERS,** | ) | |
| **Plaintiff,** | ) | Case Number: 1:05-cv-00457-LJB |
| **vs.** | ) | |
| **UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S REPLY TO**
**DEFENDANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**
**AND**
**RESPONSE TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

WILLIAM A. SCOTT
Pedersen & Scott, P.C.
775 St. Andrews Blvd.
Charleston, SC 29412
(843) 556-5656
Attorney for Plaintiff

# TABLE OF CONTENTS


1. INTRODUCTION . . . . . . . . . . 1

2. FLASHING IS NOT A CONTRACT REQUIREMENT . . . . . . . . . . 3

   A. Flashing Is Not Required by the Building Code . . . . . . . . . . 3

   B. Flashing Is Not Required by the Guide Specifications . . . . . . . . . . 6

3. GEE & JENSON DID NOT BREACH THE STANDARD OF CARE . . . . . . . . . . 10

4. THE LACK OF FLASHING DID NOT CAUSE ANY DAMAGES . . . . . . . . . . 13

   A. Riesberg's Investigative and Design Costs . . . . . . . . . . 17

   B. Costs for Installing the New Sealant Joint Recommended by Riesberg . . . . . . . 19

   1. Repairs on the First Floor . . . . . . . . . . 20

   2. Repairs on the Second Floor Where Flashing Existed . . . . . . . . . . 21

   3. Repairs on the Second Floor Where Flashing Was Not Required by the Design 22

5. CONCLUSION . . . . . . . . . . 22

# TABLE OF AUTHORITIES

CASES

*American Savings Bank, et. al. v. United States*, 62 Fed.Cl. 6 (2004) . . . . . . . . . . . . . . . . . . . . . 15

*Bryant v. Hall,* 238 F.2d 783, 787 (5th Cir.1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*C.H. Guernsey & Co. v. United States*, 65 Fed. Cl. 582, 595 (2005) . . . . 3,10, 11, 16, 17, 21, 22

*Citizens Federal Bank and CSF Holdings, Inc. v. United States*, 474 F.3d. 1314 at 1318 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Die Casters International, Inc. v. United States*, 73 Fed.Cl. 174 (2006) . . . . . . . . . . . . . . . . . . 15

*Hol-Gar Manufacturing Corp. v. US.*, 169, Ct. Cl. 384, 395, 351 F.2d 972, 979 (1965) . . . . . . . 4

*Information Systems and Networks Corp. v. U.S.*, 68 Fed. Cl. 336, 342 (2005) . . . . . . . . . . . . 3, 6

*Lafaye Associates, Inc.* 89-1BCA ¶ 21,270, 1988 WL 115898 at 40 (1988) . . . . . . . . . . . . . . . 16

*Myerle v. United States*, 33 Ct.Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Precision Pine & Timber, Inc. v. United States*, 63 Fed.Cl. 122 at 128 (2004) . . . . . . . . . . . . . . 15

*Ralph M. Parsons Co.,* 85-1 BCA ¶ 17,787, 1984 WL 13893 (1984), aff'd on reconsid., 85-2 BCA P18112 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

*San Carlos Irrigation and Drainage Dist. v. US*, 877 F.2d 957, 959 (Fed.Cir.1989) . . . . . . . . . . 3

*Scott Timber Company v. United States*, 64 Fed.Cl. 130 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Spodek v. US*, 73 Fed. Cl. 1, 26 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Taisei Rotec Corporation*, 02-1 BCA P 31739, ASBCA No. 50669 . . . . . . . . . . . . . . . . . . . . . . 17

OTHER AUTHORITIES

6 C.J.S. *Architects* § 16 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

BRUNER & O'CONNOR § 17:40 at 636 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **GEE & JENSON ENGINEERS, ARCHITECTS AND PLANNERS,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | Case Number: 1:05-cv-00457-LJB |
| **UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S REPLY TO**
**DEFENDANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**
**AND**
**RESPONSE TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

## 1. INTRODUCTION

The Plaintiff, Gee & Jenson Engineers, Architects and Planners (hereinafter "Gee & Jenson") submits the following in reply and response to the Defendant's Response to Motion for Summary Judgment and Cross Motion for Summary Judgment. Three issues determine this case:

**(1) Did the Contract require the installation of flashing under the precast window sill?**

**(2) Did Gee & Jenson breach the standard of care by not including sill flashing in the design at all places under the sills?**

**(3) Did the Government incur any damages as a result of the alleged design defect?**

The undisputed facts considered in the light most favorable to the Government demonstrate that the Contract did not clearly require flashing under the sills, or, at best, the Contract was ambiguous as to whether flashing was required. Likewise, the undisputed facts demonstrate there was no breach of the standard of care. The Government cannot reasonably contend Gee & Jenson

breached the standard of care by using sealants to prevent water intrusion, when the Government's expert recommended a repair using sealants to prevent water intrusion - just more of it. Finally, the undisputed facts demonstrate the damages are the direct result of the construction contractor's (Pizzagalli) failure to properly install the sealant between the sills and its failure to install an "upstand" on flashing that was required, not the result of any design defect. No damages would have occurred but for Pizzagalli's defective work for which Gee & Jenson cannot be held responsible.

There is one significant fact that may not have been fully addressed by either party. Gee & Jenson included sill flashing in the design under the sills at one area in the building. Flashing was designed and installed on the second floor over adjacent roofs (the "wings"). See for example DA 383.[1] The building is two stories in most locations, but there are two "wings" where it is only one story. Where the one story level meets the two story level, flashing was shown on the design and was installed. However, Pizzagalli failed to install the flashing in accordance with the design by failing to install an "upstand." DA 312, 383, 396-397. While flashing was installed improperly by Pizzagalli in these areas, the Government claims Gee & Jenson is solely responsible for repairs even though the Government's expert testified that there was no reason to do the repairs in these areas other than the lack of the upstand that Pizzagalli failed to install. PA 14-15 (Riesberg depo, p. 51, ln. 14 - p. 52, ln. 7).

To recover for breach of contract against Gee & Jenson, the Government "must allege and establish (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract,

---

[1] "DA" refers to Defendant's Appendix to its Response and Cross Motion. "PA" refers to the Plaintiff's Appendix to this Reply and Response.

(3) a breach of that duty, and (4) damages caused by the breach." *C.H. Guernsey & Co. v. US*, 65 Fed. Cl. 582, 595 (2005)(citing *San Carlos Irrigation and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.Cir.1989)).

Because the undisputed facts demonstrate that flashing under the sill was not a contract requirement, flashing was not required by any industry standard, and because all of the damages occurred as a result of construction defects, not design defects, Gee & Jenson is entitled to summary judgment and dismissal of this case.

## 2. FLASHING IS NOT A CONTRACT REQUIREMENT

To prevail, the Government must prove that the Contract clearly and unambiguously required Gee & Jenson to include flashing under the precast sill in the design. If the contract requirements were unclear or ambiguous, the Court must rule in favor of Gee & Jenson. *Information Systems and Networks Corp. v. U.S.*, 68 Fed. Cl. 336, 342 (2005). The Government contends flashing was required by the Contract through reference to the building code and "guide specifications." As discussed below, neither the building code nor the guide specifications require flashing, or the requirement is ambiguous, therefore, Gee & Jenson is entitled to summary judgment on this issue.

### A. Flashing Is Not Required by the Building Code.

Both parties agree that the building had to be designed in accordance with the building code, but disagree as to whether the building code required flashing under the precast sills. Gee & Jenson contends that flashing is discretionary, and is not needed in every design where a sill sits on top of a veneered wall as in the NISE East Building. In contrast, the Government contends that the first sentence of the code, which states "Flashing shall be provided as necessary to prevent the entrance of water at openings in or projection through veneered walls" is "generic, introductory language

only." (Response/Cross Motion, p. 20). Instead, the Government reads the second sentence as mandating flashing in every case. The Government's reading of the code gives the first sentence no meaning, and is contrary to the plain reading of the code. See, *Hol-Gar Manufacturing Corp. v. US.*, 169 Ct. Cl. 384, 395, 351 F.2d 972, 979 (1965) (A cardinal rule of contract interpretation is that the contract must be read as a whole. An interpretation which give a reasonable meaning to all parts of an instrument will be preferred to one which leaves portions of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous, nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible). Reading the code section as a whole, it is clear that the architect has discretion to design flashing as necessary to prevent water intrusion. For example, in this case, there is no evidence of any water intrusion through the sills on the first floor (See Defendant's response Plaintiff's Proposed Findings of Uncontroverted Facts "PPFUF" ¶19), therefore, one has to ask: was flashing necessary? One also has to ask why the Government made repairs to the first floor when there was no evidence of any water intrusion on the first floor?

The Government also contends Gee & Jenson did not comply with the third sentence of the code section which states "Caulking shall be provided where such flashing is determined by the building official to be impractical." The Government admits it was the building official (Defendant's response to PPFUF ¶8), but contends no Navy official ever made a determination that flashing was impractical. In contrast, Gee & Jenson's position is entirely consistent with the Government expert's testimony regarding approval by the building official. When Mr. Riesberg was asked if the Government approved Gee & Jenson's design using sealant instead of flashing, Mr.

Riesberg responded "In effect, yes." PA 13 (Riesberg depo, p.49, ln. 5-7).[2]

Gee & Jenson does not contend that because the Government accepted the design it relieved Gee & Jenson of liability. Gee & Jenson pointed out that it met the code requirement to have the sealant approved by submitting the drawings to the Government for approval. Therefore, while the code does not specifically require flashing, Gee & Jenson still complied with the code by submitting the design for approval to the Navy as the building official.

The Government contends that Gee & Jenson violated the building code because it was not impractical to install flashing. Gee & Jenson's expert, Kenneth Schneider, admitted that it was not impractical to install flashing underneath the sill, DA 525, while Tim Hullihan, the chief architect on the project for Gee & Jenson, testified that flashing would be impractical. PA 25-28 (Hullihan depo. p. 69, ln. 8 - p. 72, ln. 7). In reality, both are correct. Admittedly, it is not impractical to install flashing underneath the sill. However, flashing underneath the sill is impractical because no matter how it is installed, water will get through for the reasons described by Mr. Hullihan. Mr. Hullihan explained that holes would have had to have been cut into the flashing to allow for the bolts holding down the sill and water would be able to pass through the flashing everywhere one of the holes existed. Therefore, as a practical matter, while flashing could be installed, it could not serve the intended purpose. See also, PA2-5 (TEK 126, Flashing Concrete Masonry, "Flashing should not be penetrated by shelf angle bolt-nut anchorages").

---

[2]The Government submitted the Declaration of William Haynes (who was not previously identified by the Defendant as a witness) (Court Doc. 36-2) who stated that a request for a deviation from the guide specifications would not have been approved. Significantly, the Declaration does not address approval under the building code by the building authority. Therefore, the only evidence in the record is the Government, as the building authority, did approve the design.

Based on the above, the code does not clearly require the installation of flashing as alleged by the Government. Reading the code section as a whole, the architect clearly has the discretion to install flashing where necessary. Reading the building code in the light most favorable to the Government, the code cannot be interpreted as clearly requiring flashing, and since flashing is not clearly required, any ambiguities must be held against the party preparing the specifications, in this case, the Government. Accordingly, the Government cannot prevail on its contention that the code required flashing, and Gee & Jenson is entitled to summary judgment as a matter of law.

**B. Flashing Is Not Required by the Guide Specifications**

Through a series of references to references, the Government contends that the design contract required Gee & Jenson to include flashing under the sills in accordance with guide specification 04200, Unit Masonry. The Government contends "this [guide] specification was required to be incorporated into the project's design." (Response/Cross Motion, p. 8). In contrast, Gee & Jenson contends the guide specifications do not impose a design requirement on the A&E, but are used as guide specifications for the construction contract with the builder, in this case, Pizzagalli. The A-E guide states "The A/E shall use these guides where they are applicable, however, he is CAUTIONED TO EDIT AND MODIFY THEM TO SUIT THE PROJECT REQUIREMENTS." (emphasis in original). DA 149. This is a classic case of contract interpretation, and the legal principle that any ambiguities in a contract must be construed against the drafter. *Information Systems*, 68 Fed. Cl. at 342.

The Delivery Orders, Section 2, set forth the Scope of Services for Gee & Jenson. Those services were broken into three (3) phases with the third phase including the preparation of detailed drawings and the preparation of specifications for construction. DA 40. Section 2.2, required the

preparation of "outline specifications" in accordance with Section 18 of the A/E Guide which refers to the use of the guide specifications. DA 48, DA149-157. Section 3.1, Design Criteria and Project Specifications, states the "A/E shall design the project and prepare the project specifications in accordance with the criteria and guide specifications listed in the current 'SOUTHNAVFACENGGOM Index of Criteria' (Guide 00001)...." DA53. Section 3.1.3, Specifications, states that "the Project Specifications shall be prepared by utilizing the 'SPECSINTACT' System of the 'Construction Criteria Base' (CCB). . . . The A/E shall use the Guide Specifications listed in the current 'SOUTHNAVFACENGGOM Index of Criteria' for each project." DA54. The Government then makes the leap that the Contract incorporated Guide Specification 4200, Unit Masonry, as a design requirement.

As an initial matter, the Government has failed to provide any documents that show guide specification 4200, Unit Masonry, was actually listed on the "current 'SOUTHNAVFACENGGOM Index of Criteria.'" Therefore, until the Government produces some document showing that guide specification 4200, Unit Masonry, was listed on the "current 'SOUTHNAVFACENGGOM Index of Criteria'" there is no evidence that it was actually included in the Contract by reference.

While Gee & Jenson acknowledged the guide specifications had to be used for development of the construction specifications, Gee & Jenson did not understand that the guide specifications impose specific design requirements. PA 47-48 (Affidavit of Timothy Hullihan). Gee & Jenson's position is supported by the A/E Guide, Section 18, SPECIFICATION PREPARATION, which specifically addresses the use of guide specifications for the preparation of the construction specifications: "The Guide Specifications listed in the current SOUTHNAVFACENGGOM Index of Criteria SHALL BE UTILIZED...." (emphasis in original). However, Section 18 continues with

a warning about the use of the Guide Specifications.

> 1.2. Guide Specifications: Over the years the repetitive projects construed by the Navy have resulted in the establishment of many standard methods of construction, materials and procedures. In addition, legal and regulatory requirements have caused standardization. NAVFAC and SOUTHNAVFACEENGCOM have developed guide specifications to cover a considerable number of these situations. The A/E shall use these guides where they are applicable, however, he is CAUTIONED TO EDIT AND MODIFY THEM TO SUIT THE PROJECT REQUIREMENTS. (Emphasis in original). DA149.

Based on the clear language of the Delivery Order and the A/E Guide, Gee & Jenson understood the Guide Specifications were provided to assist the A&E with preparation of the construction specifications for the contractor, but did not impose specific design requirements.

Even if the Court were to determine that the guide specifications were required to be followed in the design of the project, the guide specifications do not require sill flashing in this design. The guide specifications refer to TEK126, "Flashing concrete masonry" that provides information on how and where to provide flashing in concrete masonry construction, but it does not include any specific requirements for sill flashing in a design similar to the one in this case. PA 2-5 Further, TEK 126 supports Gee & Jenson's position that the architect has the discretion to design flashing "as necessary." This discretion is demonstrated by the Introduction to TEK 126 which states:

> Depending upon the exposure conditions, configuration and location of openings, and general conditions of the areas requiring protection, the type and installation details of flashing may vary. PA 2

Under Design Considerations, TEK 126 states:

> Proper flashing design involves comprehensive review of all individual conditions. A complete evaluation of each detail should be conducted to insure that:
> - Flashing should not be penetrated by shelf angle bolt-nut anchorages.
> - Flashing should not be penetrated with masonry anchors.
>
> PA2

Under Sills, TEK 126 states: "Flashing of masonry opening depends on sill shapes."[3] PA 3

TEK 126 does not include any specific requirements that sill flashing must be installed. The document describes the issues an architect should consider with regard to when and where flashing is necessary, and provides information to the contractor on how flashing should be installed to avoid construction defects. Significant to this case, TEK 126 specifically advises that flashing should not be penetrated by shelf "angle bolt-nut anchorages" or masonry anchors - the exact situation Mr. Hullihan described as making the flashing impractical. Mr. Hullihan explained that since the precast sill was bolted down, any flashing under the sill would have holes in it for the bolts to penetrate which would render the flashing useless for keeping water out. PA 24-28 (Hullihan depo., p. 69, ln.8 - p. 72, ln. 7). Gee & Jenson did what the A&E Guide directed it to do as far as the use of the guide specifications - "EDIT AND MODIFY THEM TO SUIT THE PROJECT REQUIREMENTS." (emphasis in original). DA149. The guide specifications did not required Gee & Jenson design flashing under the sills.

Gee & Jenson's position that the guide specifications did not impose design requirements was acknowledged by the Government's expert. Mr. Riesberg admitted that other than the code, he was unaware of any instructions provided by the Government that were included as part of the contract that required sill flashing. PA 16 (Riesberg depo., p. 59, ln. 8-20).

Since the guide specifications did not clearly impose design requirements, and they do not require sill flashing, and since any ambiguities in the contract requirements are held against the Government, the Government cannot hold Gee & Jenson responsible for not including flashing in

[3] The section on "Sills" appears to address window installation as opposed to the situation in this case. TEK 126 does not include details such as at issue in this case with windows sitting on a precast sill that sits on top of a brick veneer and metal stud wall.

the design based on the guide specifications. Accordingly, Gee & Jenson is entitled to summary judgment because the guide specifications were not clearly part of the contract, or it is ambiguous as to whether the guide specifications were a part of the contract or the guide specifications themselves are ambiguous as to whether flashing is actually required. Under any scenario, the Contract is at least ambiguous; therefore, Gee & Jenson is entitled to summary judgment on this issue.

## 3. GEE & JENSON DID NOT BREACH THE STANDARD OF CARE

The Government contends that even if the Contract did not require flashing, Gee & Jenson is still liable to the Government because the standard of care precluded Gee & Jenson from using sealants as the sole means of preventing water intrusion and by failing to include sill flashing in the design at all locations. Gee & Jenson did not provide evidence supporting its contention that it met the standard of care because it is the Government's burden to prove that Gee & Jenson failed to meet the standard of care since this is a claim by the Government.

The breach of the standard of care is a question of fact. *C.H. Guernsey & Co.* 65 Fed. Cl. at 595 (2005)(citing *Bryant v. Hall,* 238 F.2d 783, 787 (5th Cir.1956)). "An architect must exercise such care, skill, and diligence as others who are engaged in the profession would ordinarily exercise under similar circumstances, and statutory provisions regulating the profession of architecture may expressly so provide. 6 C.J.S. *Architects* § 16 (2004)." *Id.* The Navy similarly defines a breach of the standard of care for an A/E's as the "failure to exercise normal skill and competence normally exercised by other members of the profession under similar circumstances." SOUTHENAVEFACENGOCMIINST 4335.2C. DA368. In this case, the Government relies on the statement of Mr. Riesberg in his Expert Report that states "the architect breached the standard of care

by failing to design through-wall flashing except where they are adjacent to a roof. This opinion is based on a review of the applicable code, the project drawings, the project specifications, relevant industry standards and my experience as an architect." DA480.

However, "[a]s a matter of law, the applicable standard of care for a design professional does not require a perfect or flawless design. *See* Ralph M. Parsons Co., 85-1 BCA ¶ 17,787, 1984 WL 13893 (1984) (holding that Architect-Engineer clause in government contract "nor any other portion of the contract imposes upon architect strict liability for mistakes, ambiguities or so-called 'defects' in the specification it prepared.")." *C.H. Guernsey & Co.* 65 Fed. Cl. at 607. Therefore, an architect's work can be inaccurate or imperfect without being an actionable deviation from the standard of care. *Id*.

The mere fact that Gee & Jenson did not include sill flashing in the design does not mean it breached the standard of care. Significantly, there is no document that expressly states what the standard of care is for designing sill flashing, or when flashing is or is not required under a sill. Further, while Mr. Riesberg based his opinion "on a review of the applicable code, the project drawings, the project specifications, relevant industry standards and my experience as an architect" (DA 480), he admitted in his deposition that the Navy "in effect" approved the design as the building official, PA 13 (Riesberg depo., p. 49, ln. 5-7), he did not know of any requirements in the contract that required the A&E to exceed the requirements of the building code, PA 16 (Riesberg depo., p. 59, ln. 8-11), and he was not aware of any other government instruction or contract requirements that required sill flashing. PA 16 (Riesberg depo., p. 59, ln. 12-20). More notably, Mr. Riesberg did not state that Gee & Jenson failed to "exercise the normal skill and competence normally exercised by other members of the profession under similar circumstances." Mr. Riesberg's testimony is not only

contradictory, but it is unsupported and conclusory.

The repair design by Riesberg also demonstrates that Gee & Jenson did not breach the standard of care because his repair uses sealants and no flashing. The Government and Riesberg contend that "reliance on a sealant as the only means to address moisture migration fell below the standard of care . . . " (Response/Cross Motion p. 14), PA 21 (Riesberg depo., p. 77, ln. 5-9). The Government wanted "an architectural solution to provide adequate long term water intrusion protection." (Response/Cross Motion, p. 13). However, both the original design by Gee & Jenson and the repair design by Riesberg rely solely on sealants to prevent water intrusion - Riesberg just used two sealants - and neither relied on flashing. While the Government contends the repair was "not merely a 'second caulking joint,' as plaintiff contends" (Response/Cross Motion p. 23), that is exactly what the repair specifications describe it as.

> The work includes replacement of sealant joints between precast concrete sills with a **two-stage sealant joint** composed of an inner compression seal and an outer sealant joint with backer rod and incidental related work. (emphasis added).
> PA 1(Repair Specifications Section 01110N, p. 1)

Clearly, both designs rely solely on sealants. The only difference is Riesberg used two sealants which provided a secondary barrier that he admitted was not required by the building code. PA 21 (Riesberg depo., p. 77, ln. 16-19). Further, sealants were used to prevent water intrusion at other locations on the building, including around all of the windows. PA 7-8 (Riesberg depo., p. 26, ln. 7- p. 27, ln. 8). Since both designs rely solely on sealants, and sealants were used at other locations to prevent water intrusion, the Government's argument that the use of sealants is a violation of the standard of care cannot prevail.

Gee & Jenson's expert, Ken Schneider, contends that flashing was not required underneath

the sills, and the lack of flashing underneath the sill did not breach the standard of care, and that the use of sealants as a barrier against water intrusion meets the standard of care. PA 49-51 (Affidavit of Kenneth Schneider). Mr. Schneider's position is that the installation of a sealant in this particular design was probably more effective than flashing; flashing was not required by the building code; he has found no other contractual requirement requiring flashing; under the circumstances of this design, the use of sealants, as opposed to flashing, is normal and typical; and Gee & Jenson exercised the skill and competence normally exercised by other members of the profession under similar circumstances with regard to the sill design. PA 49-51(Affidavit of Ken Schneider). See also, DA 411-412.

While the breach of the standard of care is normally an issue of fact, the undisputed facts demonstrate that Gee & Jenson met the standard of care. Mr. Riesberg's statement that Gee & Jenson breached the standard of care is undermined by his own use of sealants in the repair design that he contends meets the contract requirement. The Government cannot reasonably argue that the use of two sealants, as opposed to one sealant, is the standard of care. Since the undisputed facts demonstrate Gee & Jenson met the standard of care, it is entitled to summary judgment on this issue.

**4. <u>THE LACK OF FLASHING DID NOT CAUSE ANY DAMAGES</u>**

Two undisputed facts demonstrate that Gee & Jenson cannot be held responsible for any damages. First, Gee & Jenson cannot be held responsible for construction defects by Pizzagalli. Second, if the sealant joints had been properly installed, there would be no leaks in the sills.

The Government claims it is not seeking damages for actual physical water damage to the building, but it seeks damages based on the lack of flashing and its impact on the life and maintainability of the building, and the Government is entitled to damages to provide "an

architectural solution to provide adequate long term water intrusion protection." (Response/Cross Motion, p. 13). Gee & Jenson has been unable to find any contract term or condition defining what "adequate long term water intrusion protection" might require. Gee & Jenson's position is that if Pizzagalli installed the sealants in the sills properly and the Government maintained the building properly that met any such requirement. Even the Government admits that a good sealant properly installed would last a minimum of 10 years, and can last up to 20 years. (Defendant's response to PPFUF ¶14).[4]

In order to support its claim for damages, the Government contends that the Court should adopt a "substantial factor" test as the proper standard of causation for damages as opposed to the "but for" test. The Government's position is an obvious acknowledgment that Gee & Jenson was not the sole cause of the claimed damages, but the damages were caused as a result of multiple construction defects along with the one alleged design defect claim against Gee & Jenson. The reliance on the "substantial factor" test by the Government is also an admission that the Government cannot meet its burden under the traditional "but for" test for causation. Therefore, if the Court determines that the "substantial factor" test is not appropriate under the circumstances of this case, Gee & Jenson is clearly entitled to summary judgment since the Government cannot prove damages under the "but for" test.

While the issue of causation is a question of fact, the correct standard under which to evaluate

[4] The Government refers to a fifty-year life cycle for the building at several places in its Response/Cross Motion. There is no contract requirement that the building be designed for a fifty-year life cycle, nor any requirement that it be maintenance free for fifty years. The reference to "fifty years" is found under "Cost Items" in what the Government understands is a part of the basis of design provided by Gee & Jenson. See, PA 39-40 (Schneider depo, p. 86, ln. 6 - p. 87, ln. 10) and PA 41-46 (Exhibit 20 to Schneider depo).

it is a question of law depending on the facts of the particular case. *Precision Pine & Timber, Inc. v. United States*, 63 Fed.Cl. 122 at 128 (2004), *Citizens Federal Bank and CSF Holdings, Inc. v. United States*, 474 F.3d. 1314 at 1318 (Fed. Cir. 2007). The "substantial factor" test has been used in several cases for breach of contract; however, those cases generally deal with loss of profits. *See, Citizens Federal Bank and CSF Holdings, Inc*., 474 F.3d. 1314; *Die Casters International, Inc. v. United States*, 73 Fed.Cl. 174 (2006); *Scott Timber Company v. United States*, 64 Fed.Cl. 130 (2005); *American Savings Bank, et. al. v. United States*, 62 Fed.Cl. 6 (2004); *Precision Pine & Timber, Inc*., 63 Fed.Cl. 122. The question of whether the breach was a substantial factor in causing damages is typically a material issue that precludes summary judgment. *Precision Pine & Timber, Inc.*, 63 Fed.Cl. at 129. What a "substantial factor" is has not been clearly defined by the courts; however, one court has noted that "a breach is a substantial factor causing the lost profits if it directly and primarily causes the injuries . . ." *Id.* at 128 (cited with approval by *Scott Timber Company*, 64 Fed.Cl. 130 at 138).

Gee & Jenson contends that the proper standard governing causation in a breach of contract action for repair costs as a result of an alleged defective design is the "but for" test. That standard was established more than 100 years ago in *Myerle v. United States*, 33 Ct.Cl. 1 (1897) where the court stated:

> plaintiff can only recover those items of damage which are the proximate result of the acts of the [defendant] . . . For a damage to be direct, there must appear to be no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly or even probably. . . . There must not be two steps between the cause and the damage. *Id.* at 27.

This is the standard that the Government traditionally argues is appropriate when a contractor claims

the Government breached the contract. *See, Citizens Federal Bank and CSF Holdings, Inc.*, 474 F.3d. 1318.

Regardless of whether the Court adopts the substantial factor test or the but for test, one fundamental principle of law controls A-E liability - if the construction contractor did not comply with the design, the A-E cannot be held liable. As stated by this court, "design compliance is 'an essential element' in evaluating a claim for 'negligently prepared defective plans and specifications'" *C.H. Guernsey & Co.* 65 Fed. Cl. at 596 citing BRUNER & O'CONNOR § 17:40 at 636; see also *Lafaye Associates, Inc.*, 89-1BCA ¶ 21,270, 1988 WL 115898 at 40 (1988). The Boards have similarly' stated that "[w]here negligence of the architect consists in the furnishing of defective plans, specifications, and drawing, it is essential to prove that the builder substantially complied with such plans and specifications and that in consequence of such compliance damages were sustained by [the Government]." *Ralph M. Parsons Company*, 85-1, BCA P 17787, ASBCA NO. 24347 (1984), aff'd on reconsid., 85-2 BCA P18112 (1985). Therefore, as a threshold evidentiary matter, the Government, as the party with the burden of proof, must show that Pizzagalli followed the allegedly negligent design. If the design was not followed, the Government is hardly in a position to fault the designer for the construction contractor's difficulties. *Id.*

While Gee & Jenson believes the proper standard for causation is a "but for" test, under either the "substantial factor" or the "but for" test, the Government cannot prevail because the undisputed facts are that the Pizzagalli failed to properly install the sealants and the "upstand," and that if the sealants and "upstand" had been properly installed, there would be no leaks and no damages. Further, even if the Court were to determine Gee & Jenson was responsible for some damages, it would only be responsible for its proportionate share of the damages based on

comparative fault, *Spodek v. US*, 73 Fed. Cl. 1, 26 (2006), see also, Appeal of *Taisei Rotec Corporation*, 02-1 BCA P 31739, ASBCA No. 50669, and then only to the extent the Government can sufficiently document the costs attributable to Gee & Jenson. *C.H. Guernsey & Co.*, 65 Fed. Cl. at 608.

The damages claimed by the Government can be broken into two areas: (A) $63,040.00 for the Government expert's investigation and design; and (B) $99,400.00 for the costs of installing new sealant joints, which is broken into three distinct areas: (1) repairs on the first floor, (2) repairs on the second floor where flashing existed, and (3) repairs on the second floor where no flashing existed.[5] The Government has "already apportioned [these] damages" 100% to Gee & Jensons. (Response/Cross Motion, p. 13).

**A. <u>Riesberg's Investigative and Design Costs</u>.**

Gee & Jenson cannot be a substantial factor causing Riesberg's costs when the Government contends Gee & Jenson is responsible for only one (1) of twenty-one (21) alleged design and construction defects identified by Riesberg and when the claimed damages are 3% of Riesberg's estimated costs of repairs. (See DA 400: $99,400/$2,932,131 total liability). Even the Government's 30(b)(6) deponent on damages admitted that Gee & Jenson is not responsible for the full amount paid by the Government to Riesberg for the initial consultation and forensic study. PA 33-37 (McHone depo., p.4, ln. 6-14; p.6, ln. 22 - p. 9, ln. 18). Mr. McHone testified "I am telling you [the Navy]" is not looking to Gee & Jenson for the full amount of Riesberg's costs. PA 37.

[5] Gee & Jenson does not address administrative costs and interests claimed by the Government because the award of such costs is dependent on an award of damages, for which Gee & Jenson denies liability. However, if the court were to award some damages, the administrative costs would have to be apportioned based on fault and interest would run from the date of the demand, which was not before February 5, 2000. (DPFUF ¶ 40)

Mr. Riesberg was originally hired for an initial forensic consultation at the cost of $4,613.00. DA285-286. The report that followed concluded that the exterior walls were leaking as a result of numerous defects that implicated both the A-E and the contractor. DA289-293. The report also stated that "the manifestations of leaks are few and the resulting damage, to date, appears to be light to moderate." DA289. The comprehensive forensic study that followed costs $41,413.00. DA296-297. That study revealed some 21 alleged defects in the design and construction of the building, 18 of which involved problems with water intrusion. Of those eighteen (18) dealing with water intrusion, five (5) deal with the precast sill at issue in this case, and four (4) involve construction defects that would have allowed water to enter the building. DA300-319 (See Items WP-1.1, WP-1.2, WP-1.4, WP-2.1, and WP-3). The Government now contends that Gee & Jenson is responsible for only one of the twenty-one alleged defects in the forensic report, but contends Gee & Jenson is responsible for reimbursing the Government 100% of the cost incurred. The position in the Government's Response and Cross Motion is in stark contrast to the Government's position stated to Gee & Jenson in November of 1999 when the Government accepted responsibility for 51.32% of Riesberg's cost, and assigned Gee & Jenson 23.29% responsible. DA400.

In addition to the $46,026.00 for the initial consultation and the forensic study, the Government contends that Gee & Jenson is responsible for $17,014.00 paid to Riesberg to prepare the "design fix." Significantly, Riesberg stated that the design repair corrected two defects: (1) the absence of flashing which the Government contends is Gee & Jenson's responsibility, and (2) the failure to provide an upstand at the back of the flashing which the Government admits was a construction defect. PA 11-12 (Riesberg depo., p. 40, ln. 23 - p. 41, ln. 5), see also DA396-397. Riesberg also admitted that if Pizzagalli had installed the sealant properly, then there would have

been no leaks. PA 9-10, 14-15(Riesberg depo., p. 28, ln. 17-24, p. 33, ln. 14-17; p. 51, ln. 14 - p. 52, ln. 7). Therefore, according to the Government's expert, there were at least three separate reasons that the repair was necessary: (1) the lack of flashing allegedly attributable to Gee & Jenson, (2) Pizzagalli's failure to install the upstand, and (3) Pizzagalli's failure to properly install the sealant. Mr. Riesberg also admitted that there was no location on the building that he could say the only cause of damages was from water coming through the joint in the sill. PA 23 (Riesberg depo., p. 91, ln. 10-13). To complicate the matter, the repair was performed by the Government not just to correct unknown leaks but to enhance the life and maintainability of the building by providing adequate long term water intrusion protection to the building. Since there was no specific design criteria imposed on Gee & Jenson to "enhance the life and maintainability of the building" this is a change to the Contract under the Changes Clause for which Gee & Jenson is not responsible.

Because Riesberg's costs were incurred to correct construction defects and not as a result of the alleged design defects, the Government is not entitled to reimbursement of Riesberg's costs from Gee & Jenson. Further, even if the Court were to determine Gee & Jenson was liable for some portion of the costs, the Government cannot reasonably apportion 100% of the costs to Gee & Jenson, and the Government cannot sufficiently document what costs might be attributable to Gee & Jenson, so it cannot prevail. Accordingly, Gee & Jenson is entitled to summary judgment on this issue.

**B. <u>Costs for Installing the New Sealant Joint Recommended by Riesberg</u>**

The lack of sill flashing did not cause damages to the building - construction defects did. The Government determined that "[w]ater is entering the wall at faulty or deteriorated caulk joints between the precast sills and around faulty or deteriorated sealant joints around the windows above

precast sills." (DA381). Mr. Riesberg stated that leaks "resulted from various conditions, including failed joints, absence of flashing at the precast sills and absence of an upstand on flashing installed at walls adjacent to roofs." Riesberg Declaration ¶ 6. The Government contends flashing was required for two reasons: (1) to provide an effective deterrent against water penetration and (2) to provide means to direct penetrating water to the exterior of the building (basically, a secondary barrier system for diverting water out of the building once if got in). DA299. However, there is no contractual or code requirement for a secondary barrier system. PA 21 (Riesberg depo., p. 77, ln. 16-19). Gee & Jenson designed the building using sealants that if properly installed would have prevented any water from ever entering the building.

Gee & Jenson's design did not cause the repairs designed by Mr. Riesberg. Those repairs were designed to correct (3) problems: (1) the absence of flashing (2) the failure to provide an upstand, and (3) poor sealant joints. PA 10-12 (Riesberg depo., p. 33 ln. 14-17; p. 40, ln. 23 - p. 41, ln. 5).[6]

**1. Repairs on the First Floor**

Gee & Jenson cannot be responsible for the repair cost on the first floor because there is absolutely no evidence of damage from water intrusion into the first floor or any need for the repairs. PA 17, 22 (Riesberg depo., p. 62, ln. 10-25; p. 90, ln. 21-34). Without any evidence of water

---

[6] The Government contends Gee & Jenson is responsible for Pizzagalli's failure to install the upstand required by the contract because Gee & Jenson failed to observe the defect under the Title II Inspection Services Contract. The Government's position cannot be sustained for three (3) reasons: (1) the Government failed to issue a Contracting Officer's Decision that Gee & Jenson breached the Title II Inspection agreement so this Court does not have jurisdiction to consider the argument; (2) the Government admits that the failure to install the upstand was Pizzagalli's responsibility (DA 396-97, par. d), and (3) the Government prevented Gee & Jenson from performing inspections under the Title II Contract. DA343; PA 29-31 (Hullihan depo., p. 74 ln. 22 - p. 76 ln. 25).

intrusion into the first floor, one has to ask why was flashing necessary and, more importantly, why did the Government perform any repairs when no damages or indication of water intrusion was present? In fact, the lack of any damage on the first floor supports Gee & Jenson's position that flashing was not necessary. Clearly, Gee & Jenson cannot be responsible for repair costs on the first floor when there was no evidence that repairs were necessary.

Since the undisputed facts demonstrate that no "damages [on the first floor were] caused by the breach," the Government cannot prevail on its claim for damages for repair to the first floor, and Gee & Jenson is entitled to summary judgment on this issue. *C.H. Guernsey & Co.*, 65 Fed. Cl. at 595.

**2. Repairs on the Second Floor Where Flashing Existed.**

On the second floor Gee & Jenson included sill flashing in the design in areas where there was a built-up roof over the first floor. In these areas, Pizzagalli installed the flashing; however, Pizzagalli failed to install an upstand on the inside of the flashing as required by the design. According to the Government's expert, there was no reason to perform the repairs on the sill other than the lack of the upstand that Pizzagalli failed to install. PA 14-15 (Riesberg depo., p. 51, ln. 14 - p. 52, ln. 7). Since the only reason to perform the repairs on the second floor where flashing exists was because of a construction defect, Gee & Jenson certainly cannot be responsible for these costs. Pizzagalli was the sole reason that the repairs had to be performed in these areas according to the Government's own expert.

Based on the fundamental legal principle that the A-E cannot be held liable for defects if the construction contractor did not follow the design, *C.H. Guernsey & Co.*, 65 Fed. Cl. at 596, and the undisputed fact that the construction contractor failed to install the upstand, Gee & Jenson cannot

be held responsible for repair costs in this area, and it entitled to summary judgment.

**3. <u>Repairs on the Second Floor Where Flashing Was Not Required by the Design</u>.**

Gee & Jenson cannot be responsible for repair cost where flashing was not installed on the second floor because the damages were caused by the construction contractor's failure to properly install sealants and the Government's failure to maintain the building. According to the Government, the undisputed facts are "[w]ater is entering the wall at faulty or deteriorated caulk joints between the precast sills and around faulty or deteriorated sealant joints around the windows above precast sills." DA381. The lack of flashing did not allow the water to get into the building, but the construction defects with the sealant installation did. Even Mr. Riesberg admitted that there was no location on the building that he could say the only cause of damages was from water coming through the joint in the sill. PA 23 (Riesberg depo., p. 91, ln. 10-13). Everyone acknowledges that if Pizzagalli had installed the sealant properly, no water would have gotten into the building. Further, flashing alone would not prevent water from entering the building. Even if flashing had been installed, it would require sealants to perform properly. DA300-316 (Riesberg report, Items WP-1.1, WP-1.2, WP-1.3, WP-1.4, WP-1.5 and WP-2.1).

Again, based on the fundamental legal principle that the A-E cannot be held liable for defects if the construction contractor did not follow the design, *C.H. Guernsey & Co.*, 65 Fed. Cl. at 596, and the undisputed fact that the construction contractor failed to properly install the sealants, Gee & Jenson cannot be held responsible for repair costs in this area, and it entitled to summary judgment.

**5. CONCLUSION**

Gee & Jenson's Motion for Summary Judgment should be granted, and the Government's

Cross Motion denied, because the Contract did not specifically require sill flashing, the building code did not require sill flashing, the guide specifications did not require sill flashing, sill flashing was not required by any standard of care, the use of sealants in the design was not a breach of the standard of care, and the claimed damages were caused by construction defects, not design defects.

Respectfully submitted.

**PEDERSEN & SCOTT, P.C.**

S/William A. Scott

William A. Scott
775 St. Andrews Blvd.
Charleston, SC 29412
(843) 556-5656
ATTORNEY FOR PLAINTIFF

Dated this __3rd__ day of _April_, 2008.