**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **GEE & JENSON ENGINEERS, ARCHITECTS AND PLANNERS,** | |
| **Plaintiff,** | Case Number: 1:05-cv-00457-LJB |
| **vs.** | |
| **UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY,** | |
| **Defendant.** | |

**APPENDIX TO PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

WILLIAM A. SCOTT
Pedersen & Scott, P.C.
775 St. Andrews Blvd.
Charleston, SC 29412
(843) 556-5656
Attorney for Plaintiff

# TABLE OF CONTENTS TO APPENDIX

Repair Specifications Section 01110N, p. 1 . . . . . 1

TEK 126, Flashing Concrete Masonry . . . . . 2

Transcript Excerpts of Deposition of William Riesberg . . . . . 6

Transcript Excerpts of Deposition of Timothy Hullihan . . . . . 24

Transcript Excerpts of Deposition of Gregory McHone . . . . . 32

Transcript Excerpts of Deposition of Kenneth Schneider . . . . . 38

Exhibit 20 to Deposition of Kenneth Schneider . . . . . 41

Affidavit of Timothy Hullihan . . . . . 47

Affidavit of Kenneth Schneider . . . . . 49

# SECTION 01110N

# SUMMARY OF WORK

## PART 1 GENERAL

### 1.1 WORK COVERED BY CONTRACT DOCUMENTS

#### 1.1.1 Project Description

The work includes replacement of sealant joints between precast concrete sills with a two-stage sealant joint composed of an inner compression seal and an outer sealant joint with backer rod and incidental related work.

#### 1.1.2 Location

The work shall be located at the SPAWAR Engineering Center, approximately as indicated. The exact location will be shown by the Contracting Officer.

### 1.2 EXISTING WORK

In addition to "FAR 52.236-9, Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements":

a. Remove or alter existing work in such a manner as to prevent injury or damage to any portions of the existing work which remain.

b. Repair or replace portions of existing work which have been altered during construction operations to match existing or adjoining work, as approved by the Contracting Officer. At the completion of operations, existing work shall be in a condition equal to or better than that which existed before new work started.

## PART 2 PRODUCTS

Not used.

## PART 3 EXECUTION

Not used.

NCMA-TEK

An Information series from National Concrete Masonry Association 126

(33C)

National Concrete Masonry Association

UNIT MASONRY 4 Concrete Units

# Flashing Concrete Masonry

## INTRODUCTION

In addition to its basic structural function, an exterior wall provides a barrier between indoor and outdoor environments, such that the indoor environment may be suitably maintained. Control of the passage of water vapor, both below and above grade, and protection against rain penetration, may be achieved using concrete masonry combined with the cooperative efforts of the designer, material supplier, and builder.

At critical locations throughout a building, moisture which manages to penetrate a wall is collected and diverted to the outside by means of flashing. Depending upon exposure conditions, configuration and location of openings, and general condition of the areas requiring protection, the type and installation details of flashing may vary.

## DESIGN CONSIDERATIONS

The primary purpose of flashing is to intercept the movement of moisture and redirect it to the exterior. During the design stage, areas of a structure conducive to water flow should be identified and examined individually. Such areas include, but are not limited to:

- Wall bases
- Opening sills
- Opening heads
- Wall-floor junctures
- Wall-roof junctures
- Projections and recesses
- Parapets
- Landscaping

Proper flashing design involves comprehensive review of all individual conditions. A complete evaluation of each detail should be conducted to insure that:

- Flashing should not be penetrated by shelf angle bolt-nut anchorage.
- Flashing should not be penetrated with masonry anchors.
- Flashing should be continuous around building or terminated with an end-dam (an upward terminus of the flashing within a head joint).
- Flashing requiring lapping of sections should be joined using the proper adhesive to prevent water flow around the lapped joint.
- Flashing should lead to weep holes, and the collar joint or cavity should be free of mortar droppings or extruded mortar which might bridge the collar joint.
- Flashing of the through-wall type should be bedded and covered with a thin layer of mortar before laying the next course or cap.
- Flashing in walls of the through-wall type should extend into the




TEK 126 © 1982 National Concrete Masonry Association

interior sufficiently to allow a 1-inch lip between the interior surface and the furring or adhered board insulation.

- Flashing terminating as a drip ledge should extend ½-inch beyond the wall surface and be bent downward at a 45 degree angle.
- Isolate dissimilar metals in contact where galvanic corrosion may occur in the presence of an electrolyte.
- Terminate flashing within the interior masonry wythe or in reglets installed and provided by other trades.
- Be attentive to tolerances of all trades so that masonry work and flashing will not require the use of unusual construction methods.

### Wall Bases

Depending upon the location of the wall, flashing design may involve a consideration of either water migration upward or water flow downward. To prevent upward or inward migration, through-wall flashing should be installed between the water source and the masonry wall or within the masonry wall. When water migration is upward, a dampcheck should be installed—when inward, the exterior wall surface should be parged.

To accommodate water flow downward, flash masonry so the collar joint or cavity interrupts and causes water flow downward and to the exterior. An extension of the flashing should project outward and downward to serve as a drip ledge. The inner portion of the flashing must serve as an eave to direct the water toward weep holes in the exterior wythe. Flashing should either be extended up one or more courses of masonry into the interior wythe or continue through the interior wythe and bent to form a 1-inch lip between the masonry and the inner face of furring or board insulation.

### Sills

Flashing of masonry openings depends on sill shape. Flash sloped sills and horizontal sills behind and below the sill unit, extending the flashing at least one unit beyond jambs and provide a 1-inch end-dam in the vertical head joint. The flashing should form a drip ledge under the sill which may be concealed beyond the jamb. The flashing at the window or opening enclosure should be integrated to form a weather-tight joint. Level sills should contain an inverted V-drip.

### Heads

Flashing is compulsory at the head of an opening unless a projection with a drip is immediately above.

### Wall-Floor Junctures

Flashing at spandrels may be continuous over the depth of the spandrels or embedded in a reglet formed during concreting.

### Projections and Recesses

Rain concentrates and snow accumulates in projections and recesses such that flashing is compulsory. Flash projections at their top surface, extending the flashing over the projected surface. Flash recesses at their botton surfaces, providing a drip and an interior eave within the masonry.

### Wall-Roof Junctures

Flashing is necessary in this critical area. To prevent the entrance of water under the roofing, flash from the roof material over the cap plate. A cap should then be secured to the cap plate. Design considerations include projecting the cap downward at least one masonry course and utilizing watertight joint design.

### Parapet Flashing

Parapets are the most weather sensitive portion of the wall. Parapets having pervious coping or caps dictate through-wall flashing below the topmost unit. Where impervious coping or caps are used, flashing may not be required. Flash parapet-roof junctures by placing flashing within roofing elements and into the mortar joint, providing a through-wall flashing with downward flashing for protection.

## SPECIAL DESIGN CONSIDERATIONS

### Vents

During normal exposure, moisture and temperature conditions are dynamic. The resulting temperature-humidity conditions within an unfilled collar joint or cavity are equally dynamic. Condensation can form within the collar joint during cooling periods and be a potential source of water or ice damage to masonry. Venting to the atmosphere of the masonry collar joint or cavity, or from cores of the block, may be beneficial toward lessening the moisture content of the masonry.

### Weep Holes

Whenever flashing is installed, weep holes must be provided to allow water to flow to the exterior. Weep hole spacing is arbitrary, but should not exceed 32 inches. Weep holes should be provided in head joints immediately above the flashing.

### Garden Walls

Flashing of garden walls may or may not be necessary depending upon their design. Garden walls should either be topped by solid masonry with an impervious cap or flashed as a parapet wall.

## MATERIALS

### General

A wide variety of flashing materials is available, i.e. bituminous fabric, copper, stainless steel, zinc, aluminum, plastic, or combinations thereof. Although no one flashing material is both best and most economical, durability should be the overriding consideration. Replacement costs greatly decrease initial cost concerns.

During material selection, performance characteristics of the flashing materials should be known. To provide longevity, the flashing material must be able to resist caustic compounds that may be leached from the masonry and also acidic environmental exposure. Such materials are readily available.

Additionally, the flashing material should not contribute to masonry discoloration. If high concentrations of water and caustic compounds are within the masonry, the soluble constituents of the flashing should be low enough to preclude the solutes from bleeding to the masonry surface where they may disrupt the coatings or discolor the masonry.

### Bituminous Fabric

Bitumen saturated fabrics, known to be insoluble in water, have served as a forerunner to metal and plastic flashings. Although effective, their longevity is judged to be less than that of plastic or metal flashings.




HEADS OF OPENINGS




SILLS OF OPENINGS

### Copper

This excellent metal flashing has many desired attributes, i.e. resistance to water and caustic compounds, ease of use, and reliable performance. However, copper may occasionally stain adjacent masonry and deteriorate in high chloride environments.

### Stainless Steel

Flashing with stainless steel results in an excellent water barrier with superior chemical resistance. The use of preshaped sections limits field installation. Sealing of joints and field modification are more difficult than for other flashing materials.

Stainless steel flashing with conventional annealed finish should meet the requirements of ASTM Specification A167. Generally, Type 304 stainless steel with a minimum thickness of 0.010 inches is satisfactory. Lapped seams of 3 to 4 inches are common. For joining sections at the lap, the proper solder should be used (ASTM Specification B-32: 60 percent tin and 40 percent lead).

### Zinc

Galvanized flashings provide better resistance to corrosion than their natural counterparts, while possessing a surface more receptive to mortar bond. Their sensitivity to damage caused by bending lessens their durability. Some zinc alloy flashings are less prone to construction damage and deterioration.

### Aluminum

Uncoated sheet aluminum is susceptible to attack by caustic alkalies in fresh, unhardened mortar. Consequently, its use as a flashing is not recommended.

### Plastics

Plastic flashings are common throughout masonry, though there is little information regarding their durability. The manufacturer of the plastic should be consulted regarding: (1) the compatibility of plastic with alkaline masonry mortar (pH 12.5 – 13.5), (2) composition of the plastic, and (3) ease of working at temperatures of 20° F to 100° F.

### Combinations

Combinations of bitumen impregnated cloth, kraft, copper, and lead are readily available as flashing materials. The combinations are designed to provide the water and chemical resistivity sought in flashing materials. Their availability is listed in architectural references; the proper selection based on desired performance characteristics should be verified with the manufacturer.

## CONSTRUCTION

The attention given installation of flashing within masonry will determine the ultimate water resistivity of the structure. Proper installation of flashing requires that all water permeating the masonry must be directed toward the building exterior. Where the design requires the flashing to be continuous, all lapped joints must be adequately sealed to prevent water ingress. If not continuous around the perimeter of the structure, an end-dam should be used to terminate the flashing.

Penetration of the flashing, either unintentionally or to accommodate a shelf angle bolt, nut, or metal tie, should be resealed to prevent water passage.

Workmanship should be of high quality for all masonry. Head and bed joints should be filled; joints should be properly tooled to yield weather resistive surfaces.

Through-wall flashing should be laid in a thin bed of mortar, and another mortar layer provided after positioning.

Cavities should be free of mortar droppings. Weep holes should be open and extend through the entire outer wythe of masonry.

Cold weather construction considerations regarding flashing will affect flashing design and installation. During periods preceding cold weather, the desire to close in a building with infill masonry and later build the exterior wythe of masonry may alter the selection of flashing material. Flashing exposed to the elements during these cold weather periods must be able to withstand the effects of cold and wind.

FOR THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION OF WILLIAM F. RIESBERG

COPY

GEE & JENSEN ENGINEERS,
ARCHITECTS AND PLANNERS,

Plaintiff,

vs.

CASE NO. 1:05-cv-00457-LIB

UNITED STATES OF AMERICA,
DEPARMENT OF THE NAVY,

Defendant.

---

DEPONENT: WILLIAM F. RIESBERG

DATE: APRIL 5, 2007

TIME: 9:00 A.M.

LOCATION: PEDERSEN & SCOTT, P.C.
775 St. Andrews Boulevard
Charleston, South Carolina 29412

REPORTED BY: DENISE MCCAULEY, RPR, IA-CSR, GA-CCR
CLARK & ASSOCIATES
P.O. Box 73129
North Charleston, South Carolina 29422
(843)762-6294

any problem with the detail between the window and the sill, the top of the sill?

A. No. The YKK framing member, in this case that is a receptor and it's designed to collect water that may have leaked into the assembly and redirect it to the exterior.

Q. Okay. Is that window considered a self-flashing window?

A. No.

Q. And it has a caulking and backer rod seal there?

A. Yes.

Q. And that's acceptable?

A. In this design, it is.

Q. Why is it acceptable in this design?

A. Well, excuse me, had there been through-wall flashing underneath the precast sill, that flashing would have intercepted any water that may have leaked from the window assembly.

Q. I'm not sure I understand. I thought I was asking --

A. I was trying to explain.

Q. Okay. Okay.

A. That had there been through-wall flashing underneath the precast sill, any leakage that may occur

from the window would be intercepted and redirected to the exterior.

Q. Well, but that detail of the window to the top of the sill in itself is an acceptable detail?

A. It's typical.

Q. Okay. And the use of a backer rod and sealant is acceptable in that configuration?

A. Yes, it is.

Q. Okay. If the caulking joint and the backer rod wasn't installed properly, water could get in through that joint?

A. Yes.

Q. Did you find evidence of that anywhere?

A. No.

Q. How did water get in at this --

A. Through the joints between the adjacent precast members.

Q. And what detail -- well, what was the requirement for the joint between those precast joints?

A. That they have sealant and backer rod.

Q. And was that installed?

A. Yes.

Q. Was it installed properly?

A. As it turns out, most of it was not in the end. When I was there in 1998, most of the joints were

performing well. There were some pinholes where water could get in. By the time I did the repair design in 2004, the majority of the sealant joints had failed.

Q. Do you know if they had ever been redone by anyone between the time you originally did this report and the time that you went back in 2004?

A. They had not.

Q. Had you recommended that those joints be redone?

A. In the repair design, we did redo them.

Q. But in the original report?

A. No. I stated in my original -- that's not the right word.

Q. Well --

A. This report.

Q. -- exhibit Number 2?

A. Yes. I stated that most of them were performing well.

Q. If they were performing well, then water would not have gotten through --

A. Yes.

Q. -- that joint; correct?

A. Yes.

Q. When you say yes, you're agreeing that water would not have gone through?

Q. Where was the tape actually? Was it on the sill or underneath the sill?

A. Well, you had tape on the top of the sill and tape down below depending on how far we brought this polyethylene.

Q. And so you had it taped off basically on the nose of the sill?

A. Yes.

Q. And then that --

A. And down onto the masonry below.

Q. So the only place you were testing was this horizontal joint that's coming out from the wall?

A. Yes.

Q. And in that, if the caulking had performed as it was intended, water would not have gotten through; isn't that correct?

A. Yes.

Q. Okay. And where did the water get to on the inside?

A. On those places adjacent to the roof, it got to the top of the flashing.

Q. Okay. And what did it do once it got to the top of the flashing?

A. Spilled into the room.

Q. And if you look at WP-2, this is WP-1.2?

Q. The windows from above, the sill, through the sill or from underneath the sill?
A. Directly underneath the sill.
Q. Okay.
A. Where there was flashing.
Q. Where there was flashing. Where there wasn't flashing, how would water get in?
A. Joints between the adjacent precast panels.
Q. Any other way?
A. Possibly the window itself.
Q. And the windows, those would have been construction defects with the caulk -- with the joints?
A. Yes.
Q. And had no, nothing to do with the government -- I mean, with A/E?
A. Correct.
Q. All right. Did you ever distinguish in any of these areas where the water came solely from one cause and no other causes?
A. Isolated sealant joints that were defective.
Q. Okay.
A. And the failure to provide an upstand.
Q. Okay. So the repair that you eventually designed for Hitt, what did it correct?
A. The absence of flashing and the failure to

provide an upstand.
Q. And the failure to provide the upstand was the contractor's responsibility?
A. Along with joint responsibility with the A/E.
Q. And it was only in these areas above the northeast and northwest wings?
A. Correct.
Q. In the other areas where there was no sill flashing, were there places where the only source of damage was, I mean, the only source of water was the sill?
A. I believe all of it is that.
Q. Just from the sill?
A. Yes.
Q. Is it your position today that all of the water that got into this building was from defects or the failure in that caulking joint and the sill?
A. There's no known aluminum window leakage.
Q. There was when you did the report?
A. Yes. It was repaired.
Q. Okay.
A. I don't know from the bottom of the sill down. That was not part of my charge.
Q. Okay. When you -- so water could have

A. Yes.
Q. And the government gave you approval of your design?
A. Yes.
Q. And, in fact, the government gave A/E approval of its design; isn't that true?
A. In effect, yes.
Q. So both of those systems, yours and the one designed by the A/E, Gee & Jensen, met the building code?
A. Well, not technically.
Q. Well, both -- neither of them?
A. Their design was not submitted under the alternative materials. There is a specific code citation that requires use of flashing except where impractical. There is nothing impractical about providing flashing.
Q. But the code section provided that you could propose an alternative and the building official could approve it?
A. Yes.
Q. And that was done in both cases?
A. I don't think so.
Q. Well, I'm confused. I thought you just said it was?

says if you design -- if you want to do this as an alternative you must submit it with some cover letter or something else?

A. No.

Q. Okay. So do you know of any requirement in the code that Gee & Jensen failed to meet with regard to how they presented this design to the government?

A. I don't understand your question.

Q. Well, I want -- there's no requirement that you know of, any special requirement, that Gee & Jensen had to follow to have this, their design, approved as an alternative method; is there?

A. No.

Q. You talked about the A/E's inspection requirements. There's no -- you're not questioning the inspection that the A/E did of the sealant joints in these precast sills; are you?

A. No.

Q. The only thing you're questioning is his inspection of the upstand on the flashing?

A. The absence of the upstand on the flashing.

Q. And I think you would agree if the upstand had been installed on this second floor area over these wings, whether or not the sealant joint was installed improperly or not, wouldn't have made a difference. The

flashing with the upstand should have gotten the water out?
A. Yes.
Q. So except for the lack of the upstand, would there be any reason to do any repairs on these two areas?
A. No.
Q. The report, Exhibit 2, I think the government charged or you charged them around $41,000 for it. Do you recall that?
A. That sounds right.
Q. Did that include the cost of the estimate that was prepared at that time also?
A. Yes.
Q. And that estimate was for work that was not done, as I understand it?
A. Some of it was done by Pizzagalli.
Q. The estimate for the work for the sill flashing, that was not done?
A. Correct.
Q. I was just trying to figure out where the cost of this was included and that's --
A. Okay.
Q. And that's really --
A. The cost to produce it?

Q. If they met the code, would they meet the standard of care?
A. No.
Q. You mean you would have to build higher than the code to meet the standard of care?
A. Typically, yes. The code is an absolute minimum.
Q. Do you know of any requirement in the contract that said that they had to exceed the requirements of the building code?
A. No.
Q. Do you know of any instructions that they were provided and were required -- any instructions by the Navy or the government that were included as part of the contract that they were required to comply with that required sill flashing as you have stated?
A. No.
Q. So the only thing you know of is you say they didn't meet the code?
A. Yes.
Q. But if they had submitted something to the government as an alternative method as the code provided, the government accepted that as a building official, would that meet the code?
A. Technically, yes.

Q. -- 13, 17 --
A. -- 16, 15, 14 --
Q. -- 17?
A. -- 17.
Q. And I may be wrong, but the pictures didn't go in order, so I couldn't really --
A. No. We had a team out there, so -- I know there was in here. See if I've got another. Here we go.
Q. And, Mr. Riesberg, I'm going to show you a drawing that you just pulled out of your notebook, and can you tell me what this is?
MS. HOGAN: Do you have another copy?
MR. SCOTT: Yes. I'm sorry.
A. Locations of destructive openings for my forensic destructive investigation.
Q. And can you tell on here whether they're on the first floor or second floor?
A. Second floor.
Q. These are all on the second floor? Were there any openings on the first floor?
A. No.
Q. Do you have any evidence of damage on the first floor?
A. No.

sealant.

Q. Could that have led to water infiltration?

A. No.

Q. Okay. But that would have been whose responsibility?

A. Contractor.

Q. I want to show you two drawings -- two pages, 798 and 799. Can you tell me what those are?

A. The upper one is poorly applied sealant.

Q. And is that on a window, or is that sealant that would have allowed water infiltration?

A. No.

Q. It is not dealing with water infiltration?

A. It had not failed. It was just poorly done.

Q. Could it have led to water infiltration?

A. Eventually.

Q. Did you test at that site to find out if water was, in fact, coming in?

A. No. The joint had not failed.

Q. Okay. Did you only test where you thought joints had failed?

A. No.

Q. I want to show you ID 810, and it deals again with opening 13. Can you tell me what the bottom picture shows?

A. It says, "Voids in the mortar between the precast and aluminum flashing, which also correspond to observed leaks."

Q. That would have been a contractor defect; correct?

A. Yes.

Q. And that would not have been something that the A/E was responsible for; isn't that correct?

A. Yes. But for the Title II observation requirements.

Q. I'd like to show you ID 820, and I think that's at 18?

A. That's at the attorney's office.

Q. Tell me what that shows.

A. Corrosion, leakage, sealant joint to window frame leaked, also shows the absence of flashing under the sill.

Q. So how did the water get in there?

A. Looks like failed sealant joint.

Q. That would be a contractor problem?

A. Yes. The presence of sill flashing wouldn't have mediated.

Q. But, again, if the caulking joint around the nose of the sill had been installed properly and the sealant on the window had been installed properly, that

wouldn't have been a problem?
A. Eventually it would.
Q. How many years?
A. Depends on the quality of the installation.
Q. I think you said minimum of ten years if it was installed properly?
A. Yes.
Q. Do you know if the government has a maintenance program?
A. They have full-time maintenance staff.
Q. And it would be normal for them to perform normal maintenance on this building every so often?
A. Yes.
Q. And it would include replacing or repairing any caulking joints?
A. Yes.
Q. And that would be done basically on something ten years or slightly less to ensure there were no problems; correct?
A. Yes.
Q. And all these leaks occurred clearly within that ten-year period?
A. Yes.
Q. So they would have all resulted from poor workmanship in the caulking?

A. Yes. Or poorly mixed sealant.
Q. But not an A/E problem?
A. Well, had there been flashing, those leaks wouldn't have gone anywhere.
Q. And in the same token, if they had installed caulking properly, there would have been no need for any other flashing?
A. I don't believe that. Can't rely upon sealant as a primary deterrent.
Q. But you can rely on a neoprene gasket?
A. Yes.
Q. What's the difference?
A. Fully adhered to both sides, you've got a material that is impervious and there's a drainage channel.
Q. Is there any requirement that you know of in the contract or the code that requires a secondary barrier system?
A. No, there's not.
Q. I'm going to show you ID 832, the bottom picture. Can you tell me what that is?
A. It was a water test at opening 5, which we looked at earlier.
Q. So is that six or five?
A. Five.

A. Yes.
Q. So this isn't water coming through the sill. It's coming down from the window above?
A. Yes.
Q. And I don't recall, but did you test the sill at this point to see if water was coming through the sill?
A. I don't recall.
Q. Okay. Mr. Riesberg, if you didn't find any damage on the first floor, you didn't see any evidence of damage and you didn't do any openings in the first floor, why would you recommend doing this repair that you suggested on the entire first floor?
A. Sealant joints will fail. They're unreliable, and flashing should have been installed.
Q. But your design, which meets the design requirements, does not include flashing; correct?
A. Yes.
Q. That's a correct statement?
A. It is.
Q. And you would admit that on the first floor there is no damage, evidence of damage, from water infiltration?
A. I agree.
MR. SCOTT: I think those are about all the

questions I have. I want to take just a minute or two and see, and we'll wrap this up.

MS. HOGAN: Okay.

(A break was taken.)

Q. Mr. Riesberg, is there any --

MS. HOGAN: Are we back on the record? I'm sorry.

MR. SCOTT: Yeah. Back on the record real quickly.

Q. Is there any place on this building that you can say that the only cause of damage was from water coming through the joint in the sill?

A. No.

MR. SCOTT: Those are all the questions I have.

EXAMINATION

BY MS. HOGAN, at 11:38 a.m.:

Q. I just have a few questions. Would you consider Gee & Jensen's original design to be an alternative to the normally specified flashing?

A. No.

Q. Why not?

A. The code requires flashing. There's nothing impractical about installing it at this location.

Q. Why is it not impractical?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CASE NO.: 05-457C
(Judge Bush)

GEE & JENSON ENGINEERS,
ARCHITECHTS AND PLANNERS,

Plaintiff,

VS.

UNITED STATES,

Defendant.

West Palm Beach, Florida
September 27, 2007

COPY

DEPOSITION OF TIMOTHY HULLIHAN

Taken on behalf of the Defendant, before ALEX RAMIEREZ, a Notary Public within and for the County of Palm Beach, State of Florida, pursuant to Subpoena re Deposition.

A In some cases there's a secondary means of waterproofing via flashing. In some cases, there's not in all cases. In all cases there's a vertical membrane. That keeps moisture from moving horizontally through the building. Again, my information, unfortunately, is only based on Mr. Riesberg's report and I honestly don't know how accurate it is.

Q Okay. Can you mark this as exhibit seventeen? Exhibit seventeen that has just been handed to Mr. Hullihan is the standard building code 1991, section 811, veneered walls.

A Do you want me to take a minute to read it?

Q Sure.

A Or is there a particular paragraph you want me read?

Q Well let me just start by, we agreed earlier that the 1991 standard building code was the code was to be used for the design of this building, right?

A That's the one we used. Yes.

Q Okay. Can you take a look at section 811, point 1.4, which is the last?

A Okay.

Q Go ahead and take a minute to read that.

A Okay. I've read it.

Q Okay. In this building there were veneered walls, right?

A Yes. Absolutely.

Q Okay. So the first section in that sentence says, flashing shall be provided as necessary to prevent the entrance of water at openings in or projections through veneered walls. Was that incorporated into the design?

A I found that very difficult to understand. So I have to read it three or four times.

Q Sure. Go ahead.

A Okay. I would say that we provided flashing where it was necessary.

Q Okay. And where was it necessary?

A Again, the only source of information is Mr. Riesberg's report and I don't know how accurate it is. But from that report it shows that in some cases we provided flashing where water is more likely to be a problem. Such as a roof and relied on sealant where water was -- it was reasonable to assume that water would not be a problem.

Q Okay. The second sentence says flashing shall be provided at intersections of veneered walls of different material unless such materials provide a self-flashing joint in another point subject to the entrance of water. Did the design provide flashing at intersections of veneered walls and different materials?

A I believe it did.

Q Okay. Were talking about these windows that have the pre-cast sills. Would that sentence not apply to that

detail?

A I guess you have to read the whole thing together. The last sentence where it says sealant -- the correct term actually is sealant, caulking is interior and sealant is exterior. Sealant shall be used where the flashing isn't practical. It's clear from the drawings that I've been provided that in some cases we relied on the sealant rather than flashing. I'm left to assume that there was some impracticality at those particular details.

Q What would have been the impracticality?

A It's hard to say. Clearly there's -- again there are three hundred sheets of drawings that had numerous details in them. Looking at all of those would show us which ones had flashing and which ones didn't. We might find a pattern there.

Q Generally speaking where would it be impractical to provide flashing?

A Impractical means it's a very complicated condition. The existence of the flashing does nothing because the flashing itself is penetrated by something so many times that it doesn't do anything for you. You put the flashing in and you put a spike through it and you made a big hole in the flashing. What's the point of putting the flashing in? That appears to be the case in this detail.

Q I'm sorry. Which detail are you referring to?

A The one that was provided to me that's in the Riesberg report. There's a pin that goes from the sill to the metal frame that if the flashing were there would have by its very existence created a hole and what you're trying to use as waterproofing. So that certainly falls into the heading of impractical. You spend all this money on flashing then put a hole in it.

Q I'm sorry. Can you go back and tell me what page you were looking at? All right. So we're on page ten of thirty-four on the November 11th Riesberg report and the detail provided under WP-1.1.

A Again I don't recall specific discussions. I'm trying to put pieces together from the information I'm being provided today. That would certainly be one possibility. I would have to look at the entire set of drawings to refresh my memory as to where our thoughts were.

Q Did the building official tell you that flashing would be impractical?

A I don't recall. There isn't really a building official. The Navy acts as their own building official. I don't remember.

Q To your knowledge the Navy never told Gee & Jenson that flashing would be impractical?

A I don't recall any direct conversation but the fact that this detail exists as it is after exhaustive reviews by

MS. HOGAN: Go for it.

MR. SCOTT: Mr. Hullihan my name is Bill Scott. We have not met but we have talked before. As you know I represent Gee & Jenson. I just have a few questions.

A Okay.

Q First off, are you aware of any code that was applicable at the time that the design was that required a metal flashing underneath the sill that's an issue in this case?

A No. I'm not.

Q Are you aware of any design requirements by the government that require a metal flashing underneath the sill that's an issue in this case?

A No. I'm not.

Q Are you aware of any code that precluded the use of caulking between the sills as was actually done?

A No. I'm not.

Q Are you aware of any design requirements by the government that precluded the use of caulking between the sills as was done in this case?

A No. I'm not.

Q I understand that during the contract Gee & Jenson also had an inspection contract or portion of the contract to do inspections on site is that correct?

A I wouldn't use the word inspections. Third parties

handle a lot of the inspection work -- quality control officer. People like that that are under the employ of the government or the contractor. We had title two services and it's a mixture of construction, administration and facilitation and that kind of thing.

Q In this case there was a person named George Cummings?

A Yes.

Q What was his role at the site?

A He was our guy in the field and his real gift is facilitation. To keep projects moving to keep getting issues resolved. To keep any dialogue between the contractor and the architect open and cooperative.

Q Was he there to sort of watch what the contractor did?

A Um -- you know that's certainly part of his responsibility but George taught me long ago even before this project that part of the magic of his position is to not get in the way so much. Let the contractor do his job. He certainly has an expertise and he certainly has enough knowledge that he can build a building without meddling of the architect and the engineer. Certainly he has to be there to make sure everything going in and correct quantities and so on. Means ands methods are the contractor's responsibility and you want to stay away from that.

Q During the course of contract did there come a time were some disputes between the government and Gee & Jenson about this persons role? And what he could and couldn't do?

A There came a point in time where, as I mentioned earlier when Tara was asking me questions, we didn't have a contractor who was interested in providing the best possible for the government. He was interested in other things. That in itself makes a relationship with the architect very strained from the get go because architects are very interested in providing the best, absolute best product for their clients. And George's role there, being there day in and day out, he would be witness to things that were not appropriate. They eventually got to the point where they didn't like having someone witness these things and were successful in getting George confined to the trailer.

Q Was the government or the contractor that told George not to leave the trailer?

A The government.

Q Do you know what stage of the contract that this was in as far as construction?

A Oh, it was -- I think the building was built over a eighteen month to two year period. It was close to the end of the first half.

Q Would the windows have been installed at this time?

A I would say no.

FOR THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION OF GREGORY T. MCHONE

GEE & JENSEN ENGINEERS,
ARCHITECTS AND PLANNERS,

Plaintiff,

vs. CASE NO. 1:05-cv-00457-LIB

UNITED STATES OF AMERICA,
DEPARMENT OF THE NAVY,

Defendant.

COPY

---

DEPONENT: GREGORY T. MCHONE

DATE: APRIL 4, 2007

TIME: 11:00 A.M.

LOCATION: NAVFAC, SOUTHERN DIVISION
2155 EAGLE DRIVE
NORTH CHARLESTON, SOUTH CAROLINA

REPORTED BY: DENISE MCCAULEY, RPR, IA-CSR, GA-CCR
CLARK & ASSOCIATES
P.O. Box 73129
North Charleston, South Carolina 29422
(843)762-6294

GREGORY T. MCHONE,

having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SCOTT, at 11:04 a.m.:

Q. Mr. McHone, my name is Bill Scott. As you know, I represent Gee & Jensen in a claim that they brought against the government relating to some alleged defects in the design of the N.I.S.E. East Building. You've been designated to testify regarding a damages claim by the government?

A. Right.

Q. Are you familiar with that?

A. Yes.

Q. And have you seen this letter, the March 29 letter?

A. Yes, sir. I believe I have.

Q. Okay. It's really this -- this is the area I'm going to ask you questions about, and it's pretty much limited to that area. First off, you said you've been deposed once. Just so we sort of make sure everything is on the record properly, if you don't understand my question or you want me to restate it, please say so, so that we know the answer you give is to the question I've asked. Is that agreeable?

Acquisition.

Q. Well, in the time frame of 2000 -- before that what did you do?

A. I was the branch head of the Acquisition Policy and Support Branch for NAVFAC Southeast.

Q. And with regard to the contract for repairs to this building, what was your involvement?

A. I worked on it first as a contract specialist. I inherited it from Gerald Turner, who had been the contract specialist assigned to it previously, and he retired, as I recall, it was towards the end of '80 -- '04 rather. And at that time I, being the only other contract specialist in the branch, I took it over and then, you know, kind of updated the calculations and those types of things, confirmed with these folks, and whenever they asked me what the current amount was that, you know, as far as our demand was concerned, I would update it based on, you know, what the latest numbers were and accrual of interest and that type stuff.

(Marked for identification was Exhibit Number 7.)

Q. Okay. Well, to sort of make this shorter and get right to the point, I've given you what's been marked as Exhibit Number 7, and that's Page 5 out of the government's initial disclosures, and it sets forth what

I understand are the government's claim for damages. Is that your understanding?

A. Yes.

Q. Are these numbers that you provided?

A. Yes.

Q. Okay. Can you tell me what each number is, where it came from, and why the government believes it's entitled to that from my client?

A. Well, the 4,613 value is, as it says there, is for the initial consultation when we originally discovered that we had issues with the building, with the water infiltration issues in the building.

Q. That's what the first issue with Bill Riesberg?

A. Yes. That was the initial consultation, you know, come take a look at it, give us what you think we need to do from this point and that type of stuff, initial consultation.

Q. And did you know that there were design issues or construction issues or anything at that time, or do you know?

A. At the point that I inherited the file, it was already obvious that there were, you know, multiple issues of work there.

Q. That's the total amount for that initial

consultation; correct?
A. Correct.
Q. Why is the government saying that all of that should be the responsibility of the A/E?
A. Is there any way we can talk off record just with us?
MS. HOGAN: No. If he asks a question, you need to answer it.
A. Okay. Well, as I recall during our most recent attempt at negotiations, we had relaxed that somewhat and it was rejected by Gee & Jensen. We had recognized a lesser amount.
Q. Well, can you explain to me why you think that, because that's what they're claiming now?
A. Uh-huh.
Q. Can you say -- as I understand it, the investigation showed that there were really maybe three areas of responsibility: The A/E --
A. Uh-huh.
Q. -- the contractor, and the government. Do you understand that?
A. I wasn't aware of the government part, no.
Q. Okay. Can you tell me why, your understanding of why the whole amount would be assessed to the A/E as opposed to a portion of it based on either

the value or the number of or anything else? I don't know. I just need to know why that should be assessed against us.

A. Well, like I said, I think that the most recent attempt at negotiations we had with Gee & Jensen recognized a share ratio for that number and for the engineering study underneath it. And it was still rejected by Gee & Jensen.

Q. But I need to know can you tell me why the government thinks all of it should be a --

A. I'm telling you they don't.

Q. Okay. That's what I needed you to tell me.

A. Okay.

Q. Would that be the same for the forensic engineering study?

A. Correct.

Q. For the $41,000?

A. Yes.

Q. And would that be the same for the design fix?

A. No. That was specific to the work that was done, which was as a direct result of the flashing issue.

Q. And that's what I've been confused on, because I have -- we didn't mark this as an exhibit, but

FOR THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION OF KENNETH G. SCHNEIDER, JR.

GEE & JENSEN ENGINEERS,
ARCHITECTS AND PLANNERS,

Plaintiff,

vs.

CASE NO. 1:05-cv-00457-LIB

COPY

UNITED STATES OF AMERICA,
DEPARMENT OF THE NAVY,

Defendant.

---

DEPONENT: KENNETH G. SCHNEIDER, JR.

DATE: APRIL 5, 2007

TIME: 1:00 P.M.

LOCATION: PEDERSEN & SCOTT, P.C.
775 St. Andrews Boulevard
Charleston, South Carolina 29412

REPORTED BY: DENISE MCCAULEY, RPR, IA-CSR, GA-CCR
CLARK & ASSOCIATES
P.O. Box 73129
North Charleston, South Carolina 29422
(843)762-6294

(A break was taken.)

MS. HOGAN: One last document. Let's mark this Exhibit 20.

(Marked for identification was Exhibit Number 20.)

Q. Okay. Take a look at what's been marked as Exhibit 20, and let me know if you've seen this document before in the documents you reviewed.

A. I don't recall seeing this document, no.

Q. Okay. My understanding of this document is that it's part of the basis of design that Gee & Jensen provided to the government as part of their A/E contract, and if you look at Item Number 4, the statement, the title is, "Building criteria and codes." And underneath that it says, "Standard Building Code 1991 edition"?

A. Yes.

Q. So I think we had talked earlier that we thought that the Standard Building Code 1991 edition was the applicable code, but now that we see what Gee & Jensen said they would use, do we all agree that the Standard Building Code 1991 edition was the proper code?

A. Yes.

Q. And I want to take -- have you take a look at the second-to-last page. The top of it should say,

"C, life cycle cost analysis"?
A. Yes.
Q. And the second item underneath that says, "Life 50 years"?
A. Yes.
Q. Would you agree that the 50 years would be the life cycle of this building?
A. Yes. That would be normal for NAVFAC to want to do that. That's what we asked for for the state buildings.
MS. HOGAN: Okay. Mr. Schneider I don't have any more questions for you.

EXAMINATION

BY MR. SCOTT, at 4:11 p.m.:
Q. I just have a few. Mr. Schneider, on Exhibit 19, the statement of work --
A. Yes.
Q. -- do you know when this building was actually constructed?
A. No.
Q. Have you seen any documents from the government on when the inspections were actually done during construction?
A. No.
Q. If you look at the last page of this, it

3. BUILDING PROFILE
Permanent Building (25 Years +)

The Schematic Design provides an Engineering Center constructed with a composite steel joist and beam system, masonry/curtain wall enclosure with insulated glazing and concrete over metal deck floor and roof systems.

4. BUILDING CRITERIA/CODES
(Standard Building Code 1991 Edition)

A. BUILDING OCCUPANCY

Building occupancy is classified by the SBCCI 1991 edition, as "Group B" Business Occupancy: any building used for office, professional or service type transactions.

B. TYPE OF CONSTRUCTION

Based on the size of the facility, Table 400 of the SBCCI requires that the building be classified as a Type II construction.

The following fire - resistive components are the required minimum for a Type II building listed in Table 600 of the SBCCI.

| | |
|---|---|
| Interior Bearing Walls | 2 hr |
| Structural Frame | 2 hr |
| Floor Ceiling Construction | 2 hr |
| Roof Ceiling Construction | 1 hr |
| Shaft Enclosures | 2 hr |
| Partitions - Permanent | Non-combustible |

C. MEANS OF EGRESS

Means of Egress requirements are based on the National Fire Protection Association (NFPA) 101 Life Safety Code, 1991 Edition.

Occupant loads for the building were determined in accordance with Section 5-3.1.2 of NFPA 101. The following loads were assigned to the two floors as follows:

| | |
|---|---|
| 1st Floor | One Person/100 S.F. = 1532 People |
| 2nd Floor | One Person/100 S.F. = 1026 People |

Egress capacity for stairs and level components were determined in accordance with Section 5.3.3.1 of NFPA 101.

Egress Capacity

Stairways .3 inch/person
Level Components .2 inch/person

The schematic concept currently reflects four stairwells for the second floor. Maximum travel distance to exit will be 200 ft.

EXHIBIT
tabbies
20
4-5-07

From a conceptual standpoint, the following criteria establish a minimum standard for approved components of means of egress for this facility.

Stairways

1000 people x .3" = 300 ÷ 12 = 25'

25' minimum egress capacity

25' ÷ 4 stairs = 6.25 clear minimum stairway width

Level Components

1000 people x .2" = 200" ÷ 12 = 16.6'

16.6' ÷ 3 corridors = 5.5' clear corridor width (Hypothetical)

5. HANDICAP ACCESSIBILITY

Special attention was taken during the Schematic Design to implement design considerations and procedures required to comply with Federal Register Part III, Volume 56, No. 144 specifically "Americans with Disabilities Act" as well as local Handicap Accessibility codes.

Two passenger type elevators will be provided near the lobby area and will be sized to meet both Federal Law and meet the demand of the NISE East Facility. Final Design documents will reflect the required standards as outlined in the Federal Register providing for a barrier-free facility where all individuals will have equal enjoyment to all services of the facility.

6. BUILDING MATERIALS AND FORMS

A. GEOMETRY

The building geometry reflects the A/E's interpretation of the program guidelines outlined early in the design phase. It identifies the service/access core as a centralized function while still maintaining the required lab/office inter-relational function critical to this facility.

The concept provides for a centralized command lab as the primary visual impact once patrons have entered the lobby providing the desired "High Tech" corporate image.

B. EXTERIOR/MATERIALS

The typical exterior wall assembly consist of a "curtain wall" veneer of brick, stucco, precast concrete, and glass. The curtain wall skin is backed-up by light gauge metal framing, gypsum sheathing and fluid-applied damp-proofing. The light gauge framing is supported by the primary structural system. Roofing material will be a modified bitumen-type roofing system.

C. BEAP COMPLIANCE

Inquires by the A/E into the existence and relevance of a Base Exterior Architecture Plan (BEAP) for the South Annex of the Naval Weapons Complex in Charleston, South Carolina were inconclusive. The Master Plan for the Naval Weapons Station refers to the WPNSTA BEAP, Appendix B, but this document was prepared prior to the construction of the Consolidated Brig or the planning of this project. Consequently, the contents of the Master Plan document have been judged (other than by the A/E) to be irrelevant because of its age and/or significance. Because of the size of this projects size, it will establish an architectural context for the South Annex.

The selection of exterior finishes such as brick and stucco was based on the A/E previous design experience with facilities at Charleston Naval Complex and such finishes are intended to blend with the established architectural themes of the Naval Weapons Station.

7. FURNISHINGS AND EQUIPMENT

A. FURNISHINGS

A furniture layout will be provided at specified intervals during the design phase. Furnishings, as provided by the user, will include office desks, filing systems, conference tables, chairs, work tables and book stacks for the Main Library.

As part of the orientation meeting, it was determined that the facility be designed as a flexible building to facilitate the changing needs of the NISE East organization.

It was determined at the Schematic Design Conference that "hardwall" offices be limited to the Branch Manager level and all other offices be provided movable partitions systems.

This will ensure maximum flexibility of office space. By strategically placing hardwall offices, maximum natural light is provided for personnel at other staff levels.

B. EQUIPMENT

The nature and function of this facility requires extensive computer and laboratory equipment. Items will include lab tables, equipment racks, shelving, computers, word processing systems, copy machines and communication equipment. Approximately 35,000 s.f. of computer access floor is identified for the Engineering Center. Refer to architectural plans for specific locations.

The "no-ownership" concept of lab space requires maximum operational flexibility. Accordingly, the schematic concept provides for either a service or freight elevator centrally located to the lab functions to facilitate the moving of equipment between floors.

8. LIFE CYCLE COST ANALYSIS

BASIS: EXTERIOR CLOSURE SYSTEMS - 30' WIDE SECTION

A. ALTERNATIVE NO. 1: Brick-Precast Panels-Single Glazing-Batt Insulation-Concrete Column Cover

SYSTEM COST: (30' w x 40' ht = 1,200 SF):

| | | |
|---|---|---|
| 4"w. Std. Brick | 360 SF x 8.00= | $2,880 |
| 2" th. P/C Panels | 180 SF x 25.00 = | 4,500 |
| Stucco/Paper Backed Lath | 450 SF x 4.60 = | 2,070 |
| Gypsum Sheathing | 450 SF x 1.00 = | 450 |
| Dampproofing | 1,000 SF x 1.15 = | 1,150 |
| Sealant | 60 LF x 2.10 = | 126 |
| Ledger Angle | 60 LF x 24.30 = | 1,458 |
| Single Glazing | 300 SF x 30.00 = | 9,000 |
| 8" CMU | 120 SF x 4.50 = | 540 |
| Precast Sills | 60 LF x 8.00 = | 480 |
| Metal Studs, LB | 780 SF x 2.60= | 2,028 |
| Metal Coping | 30 LF x 8.30= | 249 |
| 20" Dia. Concrete Col. Cover, Round | 15 LF x 50.00= | 750 |
| Batt Insulation | 780 SF x 0.50 = | 390 |
| 5/8" Gypsum board | 900 SF x 0.87 = | 783 |
| Ext. Painting/Sealer | 1,000 SF x 0.60 = | 600 |
| Int. Painting | 900 SF x 0.35 = | 315 |
| Flashing | 70 SF x 4.15 = | 290.5 |
| ALTERNATE NO. 1 - TOTAL | | $28,060 |

B. ALTERNATE NO. 2: Brick - EIFS Band - Double Glazing - Rigid Insulation - Metal Column Cover

SYSTEM COST: (30' w x 40' ht = 1,200 SF):

| | | |
|---|---|---|
| 4"w. Std. Brick | 360 SF x 8.00 = | $ 2,880 |
| EIFS panels | 180 x 4.00 = | 720 |
| Stucco/Paper Backed Lath | 450 SF x 4.60 = | 2,070 |
| Gypsum Sheathing | 450 SF x 1.00 = | 450 |
| Dampproofing | 1,000 SF x 1.15 = | 1,150 |
| Sealant | 60 LF x 2.10 = | 126 |
| Ledger Angle | 60 LF x 24.30 = | 1,458 |
| Double Glazing | 300 SF x 50.00 = | 15,000 |
| 8" CMU | 120 SF x 4.50 = | 540 |
| Precast Sills | 60 LF x 8.00 = | 480 |
| Metal Studs, LB | 780 SF x 2.60 = | 2,028 |
| Metal Coping | 30 LF x 8.30 = | 249 |
| Metal Col. Cover | 78 SF x 15.00 = | 1,170 |
| Rigid Insulation | 600 SF x 1.20 = | 720 |
| 5/8" Gypsum board | 900 SF x 0.87 = | 783 |
| Ext. Painting/Sealer | 820 SF x 0.60 = | 492 |
| Int. Painting | 900 SF x 0.35 = | 315 |
| Flashing | 70 SF x 4.15 = | 291 |
| ALTERNATE NO. 2 TOTAL | | $30,922 |

C. LIFE CYCLE COST ANALYSIS

| COST ITEMS | ALTERNATE NO. 1 | ALTERNATE NO. 2 |
|---|---|---|
| Construction Cost | $28,060 | $30,922 |
| Life | 50 years | 50 years |
| Maintenance | 2% | 2% |
| Replacement: | | |
| EIFS @ 10 years | None | $720 @ 10, 20, 30 and 40 yrs. |
| Salvage | None | None |
| Interest | 10% | 10% |

**DIAGRAMS:**

ALTERNATE NO. 1




ALTERNATE NO. 2




D. FUTURE WORK AT THE END OF 30 YEARS

ALTERNATE NO. 1:

| | | | |
|---|---|---|---|
| Initial investment: | $28,060 x 17.4494 | = | $489,630 |
| Maintenance: | $28,060 x 0.02 x 164.4940 | = | 92,314 |
| **ALTERNATE NO. 1, FUTURE WORTH TOTAL** | | | **$581,944** |

ALTERNATE NO. 2:

| | | | |
|---|---|---|---|
| Initial investment: | $30,922 x 17.4494 | = | $539,570 |
| Maintenance: | $30,922 x 0.02 x 164.494 | = | 101,730 |

Replacement Recurring Cost

| | | |
|---|---|---|
| 720 x17.4494 | = | 12,564 |
| 720 x 6.7275 | = | 4,844 |
| 720 x 2.5937 | = | 1,867 |
| **ALTERNATE NO. 2, FUTURE WORTH TOTAL** | | **$660,575** |

## E. CONCLUSION

Alternate No. 1 has the lower initial cost and the lower life cycle cost, however, main difference in costs comes from glazing and the use of EIFS. The use of single glazing in lieu of double glazing increases consumption of energy and may upset the final result.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **GEE & JENSEN ENGINEERS, ARCHITECTS AND PLANNERS,** <br> **Plaintiff,** <br> **vs.** <br> **UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY,** <br> **Defendant.** | ) | Case Number: 1:05-cv-00457-LJB |

**AFFIDAVIT OF TIMOTHY F. HULLIHAN**

Timothy F. Hullihan, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1. I am currently self-employed as an architect and am a licensed architect in the State of Florida.
2. With regard to the NISE East Building in Charleston that is the subject matter of this litigation, I worked for Gee & Jenson as the project architect.
3. While I was familiar with the reference to Guide Specifications in the A/E Guide, it was not my understanding that the guide specifications invoked any specific design requirement.
4. The Government provided Gee & Jenson with design guide manuals, but these are very different from the guide specifications. The design guide manuals were used during the design, but the guide specifications were used in support of the design, and not as a basis for the design.
5. My understanding was that the guide specifications were to be used in the

development of the construction specifications to be used by the contractor during construction.

I declare under penalty or perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 3/31, 2008.

FURTHER DEPONENT SAYETH NOT.

Timothy F. Hullihan

Sworn to and subscribed before me
this 31st day of ~~April~~ March, 2008.

Tammy Rotmen

Notary Public for Florida
My Commission Expires: 12-4-2010

TAMMY ROTMEN
Notary Public - State of Florida
My Commission Expires Dec 4, 2010
Commission # DD 619569
Bonded Through National Notary Assn.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **GEE & JENSEN ENGINEERS, ARCHITECTS AND PLANNERS,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**UNITED STATES OF AMERICA, DEPARTMENT OF THE NAVY,**<br><br>**Defendant.** | Case Number: 1:05-cv-00457-LJB |

**AFFIDAVIT OF KENNETH G. SCHNEIDER, JR.**

Kenneth G. Schneider, Jr., pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1. I am an architect registered, or licensed, in the States of Alabama, Arkansas, Colorado, Florida, Georgia, Indiana, Kentucky, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Virginia.

2. I am a member of the American Institute of Architects and other professional associations.

3. My resume is attached to this declaration.

4. During the past 31 years, I have specialized in roofing, the building envelope, and moisture migration in buildings.

5. My practice involves both original design and remediation work for commercial,

industrial, multi-family and residential construction. I have been involved in investigations of over 1,000 projects experiencing a variety of problems, many of which have involved design, materials and methods of construction, moisture migration, and contract performance issues.

6. I was retained by Gee & Jenson in this case to provide an opinion regarding Mr. Riesberg's forensic study dated November 11, 1998, and to provide an opinion regarding the design and the standard of care on various issues.

7. As litigation proceeded, the primary issue became the precast sill under the windows, and the use of sealant and flashing to prevent water intrusion.

8. It is my opinion that the building code applicable to construction of the NISE East Building did not require flashing under the precast sill. The code provides for flashing "as necessary" so that the architect has discretion on when and where flashing is actually required. In this case, this opinion is supported by the fact that no water intrusion was found on the First Floor where no flashing was included in the design. It is unreasonable and unnecessary to install flashing in absolutely all cases in a design.

9. Gee & Jenson's design relied on sealants to prevent water from intruding into the building through the precast sills.

10. Sealant technology has developed significantly over the last 20 to 30 years, and the reliance on sealants as an effective barrier against water intrusion has increased accordingly. In 1993, when the NISE East building was designed, sealants were (and still are) commonly used by architects to prevent water intrusion.

11. It is my opinion that Gee & Jenson's use of sealants to prevent water intrusion between the precast sills was an acceptable design comparable with other designs by professionals under similar circumstances, and the use of sealants was, and still is, normal and typical in that installation. It is also my opinion that not including flashing under the sill was an acceptable design comparable with other designs by professionals under similar circumstances. As such, it is my opinion that Gee & Jenson fully met or exceeded the standard of care by exercising skill and competence normally exercised by other architects under similar circumstances.

I declare under penalty or perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 02 April 2008.

FURTHER DEPONENT SAYETH NOT.

Kenneth G. Schneider, Jr.

Kenneth G. Schneider, Jr.

Sworn to and subscribed before me
this 02 day of April, 2008.

Anne Shaffer Keenan

Notary Public for South Carolina
My Commission Expires: July 19th 2009

SCHNEIDER AND ASSOCIATES
ARCHITECTS
CHARLESTON, SOUTH CAROLINA

**RESUME**

**KENNETH G. SCHNEIDER, JR., AIA, NCARB, RRC**

## EDUCATION

The McCallie School, Chattanooga, Tennessee
Princeton University: A.B. in Architecture
National Council of Architectural Registration Boards (NCARB):
Tennessee Resident Registration - 1961
Licensed in Alabama, Arkansas, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas and Virginia
University of Michigan/ASCE: Certificate Values-Management Engineer - 1976
Certified Professional Roofing Consultant (RRC), certified by Institute of Roofing and Waterproofing Consultants (IRWC) – 1986; Re-certified Registered Roofing Consultant by Roof Consultants Institute (RCI) – 1999
Accredited in Asbestos-Containing Roof Materials, ACRM Project Design & Work Supervision: South Carolina and Georgia
Certified Diplomate by American College of Forensics Examiners – 2000

**GRADUATE:** Built-up Roofing Systems Institute (BURSI) - 1974 (Updates 1977, 1979, 1980, 1985)
**GRADUATE:** Roofing Industry Education Institute (RIEI) - 1980
**GRADUATE:** RIEI Seminar of Elasto/Plastics Sheet Applied Roofing Systems; Roof Inspection, Diagnosis & Repair - 1981
**GRADUATE:** RIEI Seminar on Design and Specifications – 1982
**GRADUATE:** Construction Litigation Superconference - 1986
**GRADUATE:** RIEI Seminar on Standing Seam Metal; Latest Developments; Assets Management - 1987
**GRADUATE:** Tennessee Construction Law (NBI) - 1987
**GRADUATE:** SBCCI/NFIP/FEMA Design Conference on Hurricane Resistant Construction - 1992
**GRADUATE:** Exterior Insulation and Finish Systems Technical Training – 1996
**GRADUATE:** Florida Building Code Administrative Core Online - 2005

3690 Bohicket Road, Suite 1-D • John's Island, South Carolina 29455 • (843)768-1333 • (800)522-7663 • FAX (843)768-1716

**PROFESSIONAL ACTIVITIES:** (Is now or has been a Member of the following):

American Institute of Architects (AIA)
AIA Architects in Government
American Society for Testing Materials (ASTM)
American Society for Testing Materials (ASTM) D08.03 Committee
American Society for Testing Materials (ASTM) Symposium on Mechanisms and
Measurement of Water Vapor Transmission through Materials and Systems – December 1987
Construction Specifications Institute (CSI)
Institute of Roofing and Waterproofing Consultants (IRWC)
Secretary/Treasurer - 1983, 1984, and 1985; Vice President - 1986
National Conference of States on Building Codes and Standards (NCS/BCS) - 1980
National Roofing Contractors Association (NRCA Liaison Committee)
National Roofing Litigation Center (NRLC) - 1981 - 1984
Society of American Military Engineers
Society of American Registered Architects
Southern Building Code Congress International (SBCCI); International Code Council (ICC)
ORNL Low-slope Re-roofing Workshop - 1994
Building Environmental Thermal Envelope Council (BETEC) - 1996

**SEMINAR FACULTIES AND SPONSORSHIP**

1st Collective Roofing Symposium (1978): Chairman
2nd Collective Roofing Symposium (1979: Honorary Chairman, ex-officio
Roofing Industry Educational Institute (RIEI Faculty) - 1980
Roofing Industry Educational Institute (RIEI Faculty) - 1984
Louisiana Institute of Building Sciences (LIBS Faculty) - 1984
Second International Symposium on Roofing Technology - 1985: Presenter
Metalcon '92 - 1992: Presenter
Green Buildings Symposium - 1996: Presenter
Fourth International Symposium on Roofing Technology - 1997: Presenter
Construction Management / Design-Build – 2002: Presenter

**OUTSTANDING CONTRIBUTIONS**

ASTM Single-ply Ballast Standards, resulting from extensive research in the fields of on-surface drainage, freeze-thaw, and related degradation.

Colorado Multiple Project (Wind) Investigation Study, a 37-building wind study, analyzing the behavior of single-ply roofing systems.

Treatise on analysis of and resulting from the Colorado Wind Studies selected by National Bureau of Standards for presentation at the Second International Symposium on Roofing Technology – 1985

Author of the first computerized software for the Wind Design Analysis of Loose-laid Ballasted Single-ply Roofing Systems.

National Regulatory Board: Preparation of single-ply EPDM Ballasted System data for submittal to NRB for all-codes approval.

Author of the first computerized Life-Cycle Costing and Energy Analysis program, interfaced with investment payback schedules and adaptable to extrapolated fuel costs and current inflation factors. Software released for national sales distribution in 1994.

An analysis of Life-Cycle performance of roofing systems obtained through demographics derived from Life-Cycle Costing and Energy Analysis program and developed into Life-Cycle Trends of Roofing Systems, 1982 - 1992, selected for presentation at Metalcon '92. Also selected by the National Institute of Science and Technology for presentation at the Fourth International Symposium on Roofing Technology, 1997.

Author of articles on the subject of moisture migration in buildings and roofing technology.

**EXPERIENCE**

Consultant specializing in behavior of moisture migration in buildings, roof and wall assemblies, structural adequacy and roofing and cladding technology in its relationship to building envelope failures.

Investigation of roofing, waterproofing and wall assembly failures for industrial complexes, commercial and institutional facilities, churches, colleges, shopping centers and hotels.

Plans and specifications for new and remedial wall waterproofing, flashings and roofing.

Preparation and negotiations of contacts, arbitration of contract disputes, job supervision and evaluation.

Representation of behalf of insurance companies involving losses due to roofing and structural failure.

Seven years Chief Architect, State of Tennessee. Responsible for architectural design and construction of 500 Million Dollars worth of State construction.

Project Engineer, Old Hickory Power House, Cumberland River, Civil Works Program, U.S. Army, Corps of Engineers.

Military Service: Commissioned Officer 87th Engineer Battalion (Construction); Engineer Service Test Unit, Engineer Research and Development Laboratory (ERDL), Ft. Belvoir, VA.

Distinguished Military Student, Princeton.