# In the United States Court of Federal Claims

No. 05-457C

(Filed November 7, 2008)

**UNPUBLISHED**

| | |
|---|---|
| * * * * * * * * * * * * *   * | |
| GEE & JENSON ENGINEERS,   * | Breach of Contract Claim; 41 |
| ARCHITECTS, AND PLANNERS  * | U.S.C. §§ 605(a), 609(a)(3) |
| * | (2000); RCFC 56; 48 C.F.R. § |
| *Plaintiff,*   * | 52.236-23 (2007); Failure to |
| * | Design Building in Accordance |
| v.   * | with Contract Specifications; |
| * | Professional Standard of Care; |
| THE UNITED STATES,   * | Breach of Contract Damages |
| * | Resulting From Faulty Design. |
| *Defendant*.   * | |
| * * * * * * * * * * * * *   * | |

*William A. Scott*, Washington, D.C., for plaintiff.

*Tara K. Hogan*, United States Department of Justice, with whom were *Gregory G. Katsas*, Acting Assistant Attorney General, *Jeanne E. Davidson,* Director, *Donald E. Kinner,* Assistant Director, Washington D.C., for defendant. *Pamela J. Nestell,* United States Department of the Navy, Washington, D.C., of counsel.

———————————

# OPINION

———————————

**Bush**, *Judge*.

This contract dispute is currently before the court on cross-motions for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).  Oral argument was neither requested by the parties nor required

by the court.  For the reasons given below, plaintiff's motion is denied and defendant's cross-motion is granted.

## BACKGROUND[1]

## I.    The Contract Dispute

Plaintiff Gee & Jenson Engineers, Architects and Planners (Gee & Jenson), a business located in West Palm Beach, Florida, provides architectural and engineering services (A/E services).  Compl. ¶ 1; Def.'s App. at 2.[2]  On July 20, 1993, Gee & Jenson entered into Contract No. N62467-93-D-0911 (the contract) with the United States Department of the Navy (Navy) to "design and provide engineering services for construction of buildings, some of which were located in Charleston, South Carolina."  Compl. ¶ 3.

Gee & Jenson ostensibly completed the work required by the contract, and the buildings were constructed in accordance with plaintiff's design.  In the spring of 1998, the Navy discovered water leaks in what is called the "NISE East building" located in Charleston, South Carolina.[3]  On June 2, 1998, the Navy met with Gee & Jenson to discuss methods to resolve the water problems in the NISE East building. Gee & Jenson contended that it was not responsible for the water damage in the NISE East building while the government argued that Gee & Jenson was responsible for the water damage because plaintiff failed to include flashing in the building design.[4]  This is the central issue of the contract dispute between the

---

[1]/  The facts set forth are undisputed unless otherwise indicated.

[2]/  "Def's App." refers to the appendix to defendant's cross-motion for summary judgment.

[3]/  "The NISE East Building is a two-story masonry and brick veneer building with a window wall extending essentially all the way around the building on each floor.  The windows sit on a precast concrete sill."  Pl.'s Mot. at 2.

[4]/  The Navy's expert, William F. Riesberg, defines flashing and its purpose as follows:

> The purpose of flashing is to protect exterior walls, floors exposed
> to the weather, and roofs to prevent water infiltration or to redirect
> water to the exterior.  A flashing material is impervious.  Through-

(continued...)

parties.  The court will briefly discuss the parties' arguments below, with a more detailed discussion set forth later in the opinion.

Defendant argues that Gee & Jenson breached the contract when plaintiff failed to comply with a mandatory requirement of the contract:  "the requirement for flashing at obstructions in exterior walls, such as precast sills, in all buildings constructed for SOUTHDIV."  Def.'s Mot. at 2.  Defendant contends that the contract required the NISE East building "to be designed in accordance with criteria identified by NAVFAC Southern Division, including NAVFAC guide specifications, regional guide specifications, technical guidance documents, and other referenced sources for criteria such as military handbooks, design manuals, and NAVFAC Publications.  All of these criteria required use of flashing."  Def.'s Reply at 3 (citation omitted).  Defendant asserts that Gee & Jenson's failure to provide flashing in the building as mandated by the contract resulted in the Navy incurring "reasonable and foreseeable monetary damages associated with correcting the effects of the defective design in the NISE East building."  Def.'s Mot. at 3.  Expanding upon these arguments, the government states its position as follows:

> The pivotal issue is not the cause of the initial water infiltration in 1998.  The issue is that without flashing, there was no way for water to escape from the building.  Rather, the issue is whether Gee & Jenson's omission of the flashing caused the Government to incur costs for a remedial design.  The lack of flashing in the constructed building is directly attributable to one party:  Gee & Jenson.  Without reliable or adequate water intrusion protection in the NISE East Building, including a means of egress once the water has entered the building, the Navy faced the possibility of severe damage in the future.  Gee & Jenson's contention that it should not be

---

[4](...continued)
> wall flashing, as its name implies, typically goes through the components that compose a wall assembly to redirect water to the exterior.  Properly designed and constructed, through-wall flashing redirects water to the exterior, regardless of the source of water.

Def.'s App. at 479.

responsible for ensuring the "life and maintainability" of the building throughout the life–cycle is a non-sequitur. Gee & Jenson expressly contracted to provide a building which would last for fifty years. The Navy was entitled, at a minimum, to a building which did not leak within one year of construction.

Def.'s Reply at 11-12 (citations omitted). Because of Gee & Jenson's alleged breach of contract, defendant requests the court to grant summary judgment in its favor, dismiss plaintiff's complaint, and enter judgment in favor of defendant in the amount of $172,186.40, plus interest and attorney fees.

Alternatively, defendant argues that if the court does not find that the A-E Guide and the NAVFAC guide specifications were incorporated into the contract by reference, the court should determine that plaintiff breached the professional standard of care by its failure to install flashing in the building design.

In response to defendant's breach of contract claim, Gee & Jenson contends that it was not responsible for the water damage found in the NISE East building, and therefore it did not breach the contract. Plaintiff makes several arguments in this regard. First, plaintiff states that Gee & Jenson was "required to design the building in accordance with the applicable building code in effect at the time, the 1991 Standard Building Code." Pl.'s Mot. at 5. Plaintiff further states that "[t]here was no requirement in the Contract that required Gee & Jenson exceed the requirements of the building code." *Id.* (citations omitted). Because the building code did not mandate flashing, plaintiff argues that Gee & Jenson did not breach the contract.

Second, plaintiff asserts that the contract did not require Gee & Jenson to design the building in accordance with the guide specifications. "While Gee & Jenson acknowledged the guide specifications had to be used for development of the construction specifications, Gee & Jenson did not understand that the guide specifications impose specific design requirements." Pl.'s Reply at 7. Plaintiff further asserts that "[e]ven if the Court were to determine that the guide specifications were required to be followed in the design of the project, the guide specifications do not require sill flashing in this design." *Id.* at 8. Finally, plaintiff argues that the lack of flashing was not the actual cause of the water damage. Gee & Jenson contends that the water damage in the NISE East building was caused by the construction defects of the construction contractor, Pizzagalli Construction Company (Pizzagalli), and the government's failure to maintain the building. "[I]f

4

the joints had been installed properly by Pizzagalli, and if the Government maintained the building, the caulking joints between the precast sills would never be a problem."  Pl.'s Mot. at 8; Pl.'s Facts ¶¶ 13,16.  Because of the foregoing reasons, plaintiff concludes that it is not responsible for the alleged design error of the NISE East building.

## II.    Events Preceding the Alleged Breach of Contract

As previously discussed, the government entered into Contract No. N62467-93-D-0911 with Gee & Jenson for design and engineering services.  The contract included design services for different buildings under separate delivery contracts. Attached as a part of the contract was Appendix B entitled "Architect-Engineer Clauses, Indefinite Delivery Requirement (IDR) Contract" dated June 1993.  Def.'s Facts ¶ 2; Pl.'s Resp. to Def.'s Facts ¶ 2.  Appendix B incorporated several clauses by reference into the contract, including FAR 52.236-23.   FAR 52.236-23 defined the A/E contractor's responsibility under the contract as follows:

> (a) The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor under the contract.  The Contractor shall, without additional compensation, correct or revise any errors or deficiencies in its design, drawings, specifications, and other services.
> (b) Neither the Government's review, approval, or acceptance of, nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or any other cause of action arising out of the performance of this contract, and the Contractor shall be and remain liable to the Government in accordance with applicable law for all damages to the Government caused by the Contractor's negligent performance of any of the services furnished under this contract.
> (c) The rights and remedies of the Government provided for under this contract are in addition to any other rights and remedies provided by law.
> (d) If the Contractor is comprised of more than one legal

entity, each such entity shall be jointly and severally liable
hereunder.

48 C.F.R. § 52.236-23 (2007); Def.'s App. at 21.

On September 3, 1993, the Navy awarded Delivery Order 00001 under the
A/E contract for the design of the NISE East Complex, including the "construction
of a new engineering center, conversion of several buildings to lab spaces and
upgrading of warehouses at the Naval Weapons Station, in Charleston, South
Carolina."  Def.'s Facts ¶ 3; Def.'s App. at 35.  Attached as part of the delivery
order under the contract was Attachment A, Statement of Work (SOW); Section 2
of the SOW described the scope of Gee & Jenson's services as follows:

> Phase I of A/E services includes project development, and
> on site analysis sessions.  Phase II of A/E Service includes
> on site schematic sessions, facilities studies, and
> parametric cost estimating and programming, for the
> Project.  Phase III of A/E services includes development
> of a complete design for the Project including preparation
> of drawings, specifications, design calculations, and
> detailed estimates of construction cost.  *The A/E shall
> conform to the requirements of
> SOUTHNAVFACENGCOM P-141 (A-E Guide), except as
> modified herein.*  The A-E will be held responsible for the
> quality of their work.  If the EIC/AIC determines that a
> design submittal is unacceptable, thus necessitating a
> resubmittal, the Contracting Officer may require the A/E
> to travel to SOUTHNAVFACENGCOM at no additional
> cost to the Government to resolve the problems with the
> design.

Def.'s Facts ¶ 4; Def.'s App. at 40 (emphasis added).[5]  Additionally, Section 3.1 of
the SOW, entitled "Design Criteria and Project Specifications" also provided that
Gee & Jenson was required to design the project according to the criteria and guide

---

[5]/ The term SOUTHNAVFACENGCOM is the abbreviation for Southern Division,
Naval Facilities Engineering Command.  Def.'s App. at 79.

specifications listed in the current SOUTHNAVFACENGCOM Index of Criteria:

>A/E shall design the project and prepare the project specifications in accordance with criteria and guide specifications listed in the current "SOUTHNAVFACENGCOM Index of Criteria" (Guide 00001), and with other criteria as may be provided by the EIC/AIC.  This "Index of Criteria" lists Guide Specifications, NAVFAC Design Manuals, Military Handbooks, and other types of criteria documents; the "Index of Criteria" can only be obtained from SOUTHNAVFACENGCOM.  The Compact Disc-Read Only Memory (CD-ROM) system titled Construction Criteria Base (CCB), distributed by the National Institute of Building Sciences (NIBS), includes most of the criteria used for SOUTHNAVAFACENGCOM projects; this same criteria is available (in paper copies) from the Naval Publications and Forms Center.

Def.'s Facts ¶ 8; Def.'s App. at 53.  Section 3.1.2 entitled "Design Kit," provided that the SOUTHNAVAFACENGCOM Index of Criteria would be furnished to the A/E contractor as part of the design kit upon contract award:

>After the award of the A/E contract, (and after each amendment to an Indefinite Quantity A/E contract,) the A/E will be provided with a "Design Kit."  This Design Kit will include the following regional information (which is not available from the CCB); the current SOUTHNAVFACENGCOM Index of Criteria, a set of the current SOUTHNAVFACENGCOM interim Regional Revisions to the NFGS Guide Specifications, and other applicable regional guidance.  Paper copies of guide specifications included in the CCB will be provided.  The EIC/AIC may include some of the pertinent Design Manuals, Military Handbooks, and other design criteria at this time.  Ensure that a current DESIGN KIT is on hand before starting each project, if not, request one from the EIC/AIC.

Def.'s App. at 53-54.  Section 3.1.3 entitled "Specifications" described the preparation of the project specifications, and reiterated that the A/E contractor must use the guide specifications listed in the current SOUTHNAVFACENGCON Index of Criteria:

> The project specifications shall be prepared utilizing the "SPECSINTACT" system of the "Construction Criteria Base" (CCB).  Note the emphasis on the requirement to use the "SPECSINTACT" system, merely subscribing to CCB and then developing specifications by any other method, other than "SPECSINTACT," will not be acceptable.  *The A/E shall use the Guide Specifications listed in the current "SOUTHNAVFACENGCOM Index of Criteria" for each project.  Most of these Guides are included in the "NAVY" Master, or the "SOUTHDIV" Master, of the "SPECSINTACT" System.  Additionally, the A/E shall incorporate all applicable SOUTHNAVFACENGCOM interim Regional Revisions, and any other pertinent specification information that the EIC/AIC may provide*.  Should there be a substantial time lapse between the A/E's receipt of the initial Design Kit for a project and the time the A/E actually starts preparation of the specifications (more than three months), the A/E shall obtain a current SOUTHNAVFACENGOM Index of Criteria, and a current set of SOUTHNAVFACENGCOM interim Regional Revisions before preparing specifications.

Def.'s Facts ¶ 9; Def.'s App. at 54 (emphasis added).

The SOW required plaintiff to follow the provisions of the Navy's A-E Guide.  Def.'s Facts ¶ 4; Def.'s App. at 40, 47.  In the A-E Guide, Section 2, entitled "Command Design Policy," paragraph 2, provided that the A/E contractor should review the current criteria, including the guide specifications prior to beginning the design of the project:

> Before beginning the design, the A/E should review current criteria, instructions and guide specifications

8

provided by SOUTHNAVFACENGCOM, and make a
thorough study of conditions at the site and the
requirements of the project.  If, after an analytical review,
the A/E is of the opinion that a deviation from
instructions, Navy criteria or building codes would be of
benefit to the Government, the A/E shall bring the matter
to the attention of the EIC for a decision.  Government
construction is also required to conform to the nationally
recognized building codes, which predominate in the local
area.

Def.'s Facts ¶ 5; Def.'s App. at 76.  Section 5, entitled "Responsibilities of the
A/E," paragraph 3, of the A-E Guide, described the A/E's quality of work and
obligation to stand behind its work as follows:

The work of the A/E will be reviewed by
SOUTHNAVFACENGCOM to the extent necessary to
establish conformance with the authorized scope and
applicable Navy design criteria, and to establish a
reasonable assurance that the work can be completed
within the funds authorized.
SOUTHNAVFACENGCOM WILL NOT UNDERTAKE
A DETAILED TECHNICAL REVIEW OF THE WORK.
It will be the responsibility of the A/E, acting in a
professional capacity, to ensure the accuracy,
completeness and correctness of the cost estimate and all
engineering concepts and details of the work, including
the coordination of the various architectural, structural,
mechanical, electrical, and other subdivisions thereof with
each other and with the specifications.  THE A/E
ASSUMES FULL RESPONSIBILITY FOR THE
TECHNICAL ACCURACY AND PROFESSIONAL
ADEQUACY of all work which he presents over his
signature.  THE A/E SHALL ASSIGN COMPETENT
ARCHITECTS AND ENGINEERS, EXPERIENCED IN
THEIR RESPECTIVE DISCIPLINES, TO THE
VARIOUS PARTS OF THE WORK TO INSURE ALL
ELEMENTS ARE DESIGNED CORRECTLY AND IN

> ACCORDANCE WITH THE BEST ARCHITECTURAL
> AND ENGINEERING PRACTICES.  ERRORS
> AND/OR DEFICIENCIES IN THE A/E'S
> PERFORMANCE SHALL BE CORRECTED OR
> REVISED BY THE A/E AT NO ADDITIONAL FEE.

Def.'s Facts ¶ 6; Def.'s App. at 82.  Section 5, paragraph 4, mandated that the design work performed by the A/E contractor must be in accordance with current criteria:  "All work shall be in accordance with current SOUTHNAVFACENGCOM criteria, instructions and guide specifications, and shall be in accordance with the best architectural and engineering practices."  Def.'s Facts ¶ 7; Def.'s App. at 83.

In addition to the A-E Guide, the NAVFAC Unit Masonry guide specification (NFGS-04200), dated September 30, 1993, was also incorporated by reference into the contract.  Def.'s Facts ¶ 11; Def.'s App. at 199.  Section 2.3.5 of the NFGS-04200 guide specification entitled "Through-Wall Flashing" provided:

> Note D:  *Require flashing* in exterior masonry walls,
> including single-wythe construction, at all obstructions
> such as bond beams, *sills*, lintels, and concrete tie beams.
> The wall design and detailing must conform to National
> Concrete Masonry Association (NCMA) publications:
> TEK 13A, "Details for Building Dry Concrete Masonry
> Walls; TEK 53, "Design OF Concrete Masonry for Crack
> Control"; and TEK 126, "Flashing Concrete Masonry."
> Show locations and details on project drawings.  This is a
> regional requirement which shall be used, when
> applicable, for SOUTHNAVFACENGCOM projects;
> when appropriate, the requirements may be used for
> projects in other areas.

Def.'s Facts ¶ 12; Def.'s App. at 213, 224 (emphasis added).

Plaintiff completed the design of the NISE East building, and on September 16, 1994, the Navy awarded construction Contract No. N62467-93-C-1096 to Pizzagalli for the construction of the NISE East building.  Def.'s Facts ¶ 15; Def.'s App. at 228.  Attached to the construction contract was the completed design of Gee

10

& Jenson.  The design included specification Section 04200 Unit Masonry (09/93), Section 07600 Flashing and Sheet Metal (09/93), and architectural drawings A62, A63, A65, A97.[6]  Def.'s Facts ¶ 15; Def.'s App. at 236-267.

On September 29, 1995, the Navy modified Gee & Jenson's design contract to include Title II Inspection and Surveillance Services at the NISE East building. Def.'s Facts ¶ 16.  The modification's SOW described Gee & Jenson's Title II inspection duties as follows:

> The Architect-Engineer (A-E) Engineer Services (E-S), Gee & Jenson EAP Inc., contract #93-R-0911, contractor shall provide the services indicated below in connection with construction contract listed in paragraph 10 [N62467-93-C-1096] to assure compliance with construction contract plans and specifications.  The specific requirements of the A-E/E-S representative is to inform the Resident Officer in Charge of Construction (ROICC) of whether or not the work meets the contract requirements.  The A-E/E-S representative has no authority to direct the construction contractor in any way regarding methods or procedures and shall not interfere with the contractors method of performance.  The ROICC will be responsible for and execute signature upon all correspondence and specific directives to contractors.

Def.'s Facts ¶ 16; Def.'s App. at 271.  Under the supervision of Gee & Jenson, the construction of the NISE East building was completed in or about May 1997.

Soon thereafter, in the spring of 1998, the tenants of the NISE East building complained of water stains on the interior walls of the second floor of the building. Defendant assessed the damage, and noticed that water leaks were present at several locations in the building. On June 2, 1998, defendant had a meeting with Gee &

---

[6]/ Although Gee & Jenson attached a masonry guide specification to its finished design, the court notes that the attached masonry guide specification is not the one mandated by the disputed guide specification (NFGS-04200) and this masonry guide specification makes no reference to the requirement for flashing under the precast sills.  Additionally, neither party actually explains the genesis of this particular masonry guide specification.

11

Jenson to discuss the water leaks in the building.

## III.   Events After the Alleged Breach of Contract

To determine the source of the water leaks, the government hired a forensic architectural firm, Riesberg Lunn, LLC (Riesberg), on June 16, 1998, to conduct a forensic consultation.  On July 7, 1998, Mr. William Riesberg submitted a report of his forensic findings.  Mr. Riesberg found that the exterior walls of the NISE East building were leaking.  He described the damage as "light to moderate," cautioning, however, that "if the leaks [were] left unattended, substantial damage will result."  Def.'s App. at 289.  Mr. Riesberg opined that the source of the "water infiltration was the joint below the precast sill, which extended continuously under the ribbon windowall system."  Def.'s Facts ¶ 22; Def.'s App. at 290.  Mr. Riesberg concluded that further investigation was needed to determine the cause of the water infiltration, and to find a solution to the problem.

On October 15, 1998, the Navy re-hired the Riesberg firm to conduct a comprehensive study of the water infiltration at the NISE East building.  On November 11, 1998, Mr. Riesberg submitted another report which revealed that the water damage was "moderate," but "active damage [was] still occurring."  Def.'s App. at 301.  The report predicted that the damage would become severe over time if corrective measures were not taken to resolve the situation.  Def.'s Facts ¶ 24; Def.'s App. at 301.  The report also indicated that the installation of flashing would have prevented the water leakage:

> FAILURE TO FLASH UNDER THE PRECAST SILL
> Flashing directs water that has entered a wall assembly to the exterior face.  The architect failed to indicate flashing under the precast sill of the typical windowwall.  No flashing was installed.  The architect indicated only a 1/8" slope on top of the precast sill.  With such a slight slope, water cannot rapidly drain off.
> . . . .
> In addition, the joints between the ends of adjacent pieces of the precast sill are sealed.  The sealant with backer rod follows the curved nosing and the top of the sill (which [is] essentially a flat horizontal plane).  Sealant cannot be expected to provide the only line of defense, especially on

> a horizontal joint.  While the sealant is generally installed
> correctly, we found places where water is entering the
> wall assembly through the sealant joint.
> Critical to long-term performance of this design is
> flashing under the precast sill.  The flashing should extend
> to the inside face of the precast sill and turn up (upstand)
> to form a pan.  Had this flashing been installed, none of
> the leakage would have occurred.

Def.'s App. at 310.  The report recommended that "[i]n conjunction with other
repairs, remove the windowwall assembly and precast sill.  Install through-wall
flashing which extends to the inside face of the precast sill."  *Id*. at 311.

In February 1999, based on the findings of Mr. Riesberg's investigation, the
Navy wrote letters to plaintiff and Pizzagalli informing them of the potential
liability issues associated with the water infiltration problems at the NISE East
building.[7]  Def.'s Facts ¶¶ 28-29; Def.'s App. at 336-37, 339-40.  Within a month,
the Navy held a meeting with Gee & Jenson to discuss the water leaks and the
findings of the Riesberg investigation.  Def.'s Facts ¶ 30.

In response to the Navy's February 1999 letter and the March 1999 meeting,
plaintiff informed the Navy that it believed that "the design furnished by Gee &
Jenson was performed with the reasonable care, skill and competence normally
exercised by other members of the profession under similar circumstances."  Def.'s
App. at 349.  Plaintiff further stated that "the details utilized were those which, in
the opinion of the designer, met the requirements of the particular situation in which
they were utilized and were also cost effective."  *Id*.  Plaintiff concluded that, in its
opinion, "based on the information furnished in the Riesberg report and upon our
knowledge of the construction of the facility, that where water intrusion is a
problem, it is due primarily to the construction not being in compliance with the
project plans and specifications as prepared."  *Id*. at 350.  Plaintiff also concluded
that the application of sealants, as utilized in the NISE East building, was becoming
the industry-wide standard for waterproofing.  "Industrywide, standards for
moisture protection and waterproofing are progressing to a level of increased

---

[7]/ On April 16, 1999, Pizzagalli informed the Navy that it would schedule the time to
repair deficiencies that it believed were its responsibility.  Def.'s Facts ¶ 32; Def.'s App. at 363-
65.

dependency upon sealants which are proving to be very cost effective." *Id*. at 349.

Pursuant to Navy procedures, as set forth in SOUTHNAVFACENGCOMINST 4335.2C, the Navy appointed an A/E liability specialist, Mr. Virgil G. Svendsen, to determine what grounds existed, if any, to pursue plaintiff for "negligent design resulting in inferior construction under construction contract N62467-93-C-0911." Def.'s Facts ¶ 33. Mr. Svendsen reviewed the Riesberg report and recommended that the Navy pursue Gee & Jenson for liability, specifically for plaintiff's failure to install flashing in the building.[8] Def.'s Facts ¶ 34; Def.'s App. at 382. On October 28, 1999, the Navy's A/E Responsibility Board (Board) upheld Mr. Svendsen's recommendation, and advised the Navy to recover the necessary costs from plaintiff.

Based on the Board's advice, the Navy wrote a letter to Gee & Jenson, dated November 24, 1999, claiming that plaintiff's failure to "provide an effective deterrent against water penetration and failure to provide means to direct penetrating water to the exterior constitutes design negligence." Def.'s App. at 399. The Navy informed Gee & Jenson that it was financially liable for damages to the government in the amount of $762,611. *Id*. at 399-401.

Gee & Jenson sent a letter to the defendant, dated January 7, 2000, informing the Navy that plaintiff intended to hire an independent expert to evaluate its design and provide an opinion on whether plaintiff was negligent in its design. Plaintiff's expert submitted a report, concluding that although "[b]est practice would certainly indicate a through wall flashing under the sill," plaintiff's design met the applicable standard of care "for detailing at the time and place." Def.'s App. at 411-12.

On June 29, 2000, the Navy sent a demand letter to plaintiff and Pizzagalli, stating that both contractors were jointly and severally liable for water infiltration problems at the NISE East building. The Navy warned the contractors that if they could not work together to resolve the problem in an acceptable manner, the government would find other means to pursue damages against both contractors.

Plaintiff responded to the Navy's demand letter on March 7, 2001, stating

---

[8]/ The report indicated that Gee & Jenson had used through-wall flashing in other SOUTHDIV projects. These projects were also designed by Tim Hullihan, the same designer for the NISE East building. Def.'s App. at 382.

that the government's allegations against Gee & Jenson had no valid basis:

> The basis of our resistance to respond to the allegations is
> the fact that there have been virtually no discernable leaks
> or signs of water intrusion in the building since the
> original leaks, which occurred primarily during the
> original construction process.  You are asking us to write
> a check for over $700,000 to correct a problem that has
> not been demonstrated to exist during a period of over 2½
> years.  It is based on opinions concerning a designer's
> choice as to where to use flashing, the appropriate use of
> sealants, and the use of a drip edge which had not been
> standard practice at that time.  As we have stated on a
> number of p[re]vious occasions, we do not feel that our
> design in either case was negligent . . . .

Def.'s App. at 439.  Gee & Jenson concluded the letter by proposing mediation
between the two parties.  *Id.*  Mediation followed, and the parties unsuccessfully
attempted to resolve the liability issue.  Subsequently, the Navy hired the Riesberg
firm, on September 25, 2002,  to conduct design services at the NISE East building
that would facilitate the repairs that Mr. Riesberg had recommended in his earlier
report.[9]

      On April 7, 2004, the Navy issued Contracting Officer's Final Decision 04-S-
03 to Gee & Jenson finding plaintiff liable to the government in the amount of
$138,083.  The Navy itemized its claimed fees as follows:  "the recommended fix to
the precast sill is $70,000.00 and the Forensic Engineering Consultation Study and
Services and associated administrative costs are $68,083.00."  Def.'s App. at 448.
The final decision also stated that plaintiff could complete the repair work or the
Navy would complete the repair work and charge the repair costs to plaintiff.  *Id.*

      The Navy waited for plaintiff to respond regarding the contracting officer's
final decision and the repair work for the NISE East building.  Defendant made
several attempts to contact Gee & Jenson and its counsel regarding the repair work

_____

      [9]/  The Navy awarded Contract No. N62467-96-D-0819/Delivery Order 0004 to the
Riesberg firm to conduct design services at the NISE East building.

to be performed on the NISE East building, however, plaintiff failed to respond.  On August 25, 2004, the Navy wrote a letter to plaintiff's counsel, expressing defendant's desire to begin repairs on the building.  Therein, the Navy stated that if plaintiff did not respond within two weeks, the government would make the repairs and pursue costs from plaintiff.  Finally, on March 14, 2005, defendant hired a construction contractor, Hitt Contracting, Inc. (Hitt), to install the remedial design.[10]  On April 8, 2005, plaintiff filed suit in this court, alleging that the Navy "wrongfully, improperly, and without cause made a claim for damages against Gee & Jenson."  Compl. ¶ 10.


**DISCUSSION**

**I.    Jurisdiction**

The Tucker Act provides the court with jurisdiction to entertain contract claims brought under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (2000) (CDA).  *See* 28 U.S.C. § 1491(a)(2) (2000).  For the court to have jurisdiction over this particular suit, however, the government, as a prerequisite, must have presented a written claim to the contracting officer.  *See* 41 U.S.C. § 605(a); *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 906 (Fed. Cir. 1990); *Morse Diesel Intern., Inc. v. United States*, 74 Fed. Cl. 601, 636 (2007).  Section 605(a), in pertinent part, provides:

> All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer.  Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim.  The preceding sentence does not apply to a claim by the government against a contractor that is based on a claim by the contractor involving fraud.  The contracting officer shall issue his decisions in writing, and shall mail

---

[10]/  The Navy awarded Contract No. N62467-01-D-8306/Delivery Order 0035 to Hitt Contracting, Inc., for installation of the remedial design.

> or otherwise furnish a copy of the decision to the
> contractor.  The decision shall state the reasons for the
> decision reached, and shall inform the contractor of his
> rights as provided in this chapter.

41 U.S.C. § 605(a).  Thus, under the provisions of the CDA, the government must
submit its claim to the contracting officer within six years after the accrual of the
claim.  *Id.*  The contracting officer is then required to issue a decision, in writing,
and then mail or furnish a copy of the decision to the contractor.  *Id.*  The contractor
has twelve months from the date of the receipt of the contracting officer's decision
to file suit in this court.  41 U.S.C. § 609(a)(3).

Here, the parties agree that the Navy issued the contracting officer's final
decision to plaintiff on April 7, 2004, demanding payment of $138,083 for the
"recommended fix to the precast sill, the forensic engineering consultation study
and services and associated administrative costs, plus interest."  Def.'s Facts ¶ 51.
Within one year of the date of receipt of the decision, in accordance with
§ 609(a)(3), plaintiff filed suit in this court on April 8, 2005.  Accordingly,
jurisdiction has been satisfied, and the court has the power to hear this case.

## II.     Standard of Review

The moving party is entitled to summary judgment "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."  RCFC 56(c).  Cross-
motions for summary judgment are not an admission that no material facts remain at
issue.  *See Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citing
*United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)).  Separate
summary judgment motions may focus on different legal principles and allege as
undisputed a different set of facts.  *Id.*  "Each party carries the burden on its own
motion to show entitlement to judgment as a matter of law after demonstrating the
absence of any genuine disputes over material facts."  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility
of informing the district court of the basis for its motion, and identifying those
portions of 'the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In the capacity of opposing a summary judgment motion, the non-movant has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. Any evidence presented by the non-movant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

## III.   Whether Flashing Was a Contract Requirement

Gee & Jenson argues that flashing was not a contract requirement. Plaintiff argues that neither the building code nor the guide specifications required flashing. Gee & Jenson contends that it is not even clear that the guide specifications were part of the contract since the contract, in plaintiff's opinion, was ambiguous. Defendant, in response, argues that flashing was a contract requirement and that Gee & Jenson misinterpreted the contract. Defendant asserts that the contract provisions were explicit in detailing Gee & Jenson's obligations, including the requirement of flashing in its design.

The issue of whether Gee & Jenson had a contractual obligation to include flashing as a design requirement in the NISE East building design is a question of law, which is appropriately decided on a motion for summary judgment. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a question of law generally amenable to summary judgment."); *Conner Bros. Constr. Co. v. United States*, 65 Fed. Cl. 657, 667 (2005) ("Issues of contract interpretation, . . . raise questions of law that are uniquely appropriate for summary judgment." (citations omitted)). Interpretation of a contract's term, including contract specifications, is a matter to be resolved by the court. *Conner Brothers*, 65 Fed. Cl. at 667 (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)).

Contract interpretation begins with the plain language of the contract. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (citation omitted).  In interpreting the language of a contract, its terms must be accorded their plain and ordinary meaning.  *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998).  If the language of the contract is unambiguous, the court must accept its plain meaning.  *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1473 (Fed. Cir. 1997).  A contract term is unambiguous when there is only one reasonable interpretation.  *Bristol-Myers Squibb Co. v. United States*, 48 Fed. Cl. 350, 355 (2000) (citations omitted).  When the contract language is unambiguous, the court's inquiry is at an end, and the plain language of the contract is controlling.  *Id*.  The mere fact that the parties may disagree with regard to the interpretation of a specific provision does not, in and of itself, render that provision ambiguous.  *See Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993); *Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed. Cir. 1991) (citation omitted).  In the present case, Gee & Jenson's contract interpretation, based on plaintiff's reading of the contract specifications is unreasonable.  The contract was unambiguous, and the plain language of the contract, as shown below, explicitly states that plaintiff was required to include flashing in the design.

### A.     Whether Flashing Was Required by the Guide Specifications

Gee & Jenson argues that the contract did not specify that plaintiff was required to design the NISE East building in accordance with the guide specifications.  Gee & Jenson argues that plaintiff "understood the Guide Specifications were provided to assist the A&E with preparation of the construction specifications for the contractor, but did not impose specific design requirements."  Pl.'s Reply at 7.  Mr. Hullihan, Gee & Jenson's architect, stated in his affidavit that:

> The Government provided Gee & Jenson with design
> guide manuals, but these are very different from the guide
> specifications.  The design guide manuals were used
> during the design, but the guide specifications were used
> in support of the design, and not as a basis for the design.
> My understanding was that the guide specifications were
> to be used in the development of the construction
> specifications to be used by the contractor during
> construction.

Pl.'s App. at 47-48 (Hullihan's Aff. ¶¶ 4-5).[11]

Plaintiff argues that even if the court finds that Gee & Jenson was required to follow the guide specifications, the guide specifications did not mandate flashing to be included in the design.  Pl.'s Reply at 8.  Plaintiff contends that the guide specifications refer to a technical publication, TEK 126, entitled "Flashing Concrete Masonry," which provides information on how to install flashing in concrete masonry construction, "but it does not include any specific requirements for sill flashing in a design similar to the one in this case."  *Id*.  Plaintiff argues that TEK 126 is significant in this case because it "specifically advises that flashing should not be penetrated by shelf 'angle bolt-nut-anchorages' or masonry anchors– the exact situation Mr. Hullihan described as making flashing impractical."  Pl.'s Reply at 9.[12]  Plaintiff also asserts that TEK 126, referenced in the guide specification, states that the A/E has discretion to design flashing "as necessary."  *Id*. at 8.  Gee & Jenson contends that it complied with the guide specifications as directed in the A-E Guide, which allowed plaintiff to "EDIT AND MODIFY THEM TO SUIT THE PROJECT REQUIREMENTS."  *Id*. at 9.  Gee & Jenson concludes that plaintiff is entitled to summary judgment because "it is ambiguous as to whether the guide specifications were a part of the contract or the guide specifications themselves are ambiguous as to whether flashing is actually required."  Pl.'s Reply at 10.

In opposition, the government argues that Gee & Jenson is mistaken in alleging that the guide specifications were not part of the contract.  Defendant asserts that the contract was explicit in requiring that Gee & Jenson design the NISE East building in accordance with the guide specifications provided by the Navy and that plaintiff's failure to follow the government's instructions in designing the building resulted in a breach of contract.  "The contract clearly required Gee & Jenson to use NAVFAC guide specifications, and the language of the particular Guide Specification for flashing in exterior walls was explicit that the inclusion of

---

[11]/ "Pl.'s App." refers to the appendix which was filed concurrently with plaintiff's motion for summary judgment.

[12]/ Gee & Jenson's architect, Tim Hullihan, in his deposition dated September 27, 2007, testified that it is "impractical" to install flashing when "[t]he existence of the flashing does nothing because the flashing itself is penetrated by something so many times that it doesn't do anything for you.  You put the flashing in and you put a spike through it and you made a big hole in the flashing.  What's the point of putting the flashing in?  That appears to be the case in this detail."  Pl.'s App. at 27.

flashing was 'mandatory.'" *Id*. at 8.  The court agrees with defendant that the contract was explicit in its instructions that Gee & Jenson was required to design the building in accordance with the guide specifications.  The guide specifications were incorporated in the contract by reference and the guide specifications were clear in requiring Gee & Jenson to design flashing underneath the precast sills.

A step by step analysis of the contract's provisions reflects that plaintiff was required to utilize the Navy's guide specifications and that the referenced guide specifications mandated the utilization of flashing in plaintiff's design.  First, Section 3 of the contract's SOW requires the A/E to follow the Navy's guide specifications.   Section 3.1 of the contract's SOW states in clear terms that the A/E "shall design the project and prepare the project specifications in accordance with criteria and guide specifications listed in the current 'SOUTHNAVFACENGCOM Index of Criteria . . . .'" Def.'s App. at 53.  Section 3.1 further states that the "Index of Criteria" consists of "Guide Specifications, NAVFAC Design Manuals, Military handbooks, and other types of criteria documents." *Id*.

Section 3.1.1 of the contract's SOW provides that the A/E contractor is responsible for obtaining all guide specifications:  "A/E is responsible for obtaining all necessary NFGS Guide Specifications listed in the 'SOUTHNAVFACENGCOM Index of Criteria' at his expense . . . ." *Id*.  Finally, in this portion of the SOW,   Section 3.1.3 reiterates that the A/E is required to follow the Navy's guide specifications. *Id*. at 54.

Section 3 of the SOW is not the only SOW provision which directs the A/E to use the Navy's guide specifications.  The A-E Guide is also relevant in that regard.   The SOW requires the A/E to follow the A-E Guide in its design of the project. Section 2 of the SOW provides that Gee & Jenson "shall conform to the requirements of SOUTHNAVFACENGCOM P-141 (A-E Guide) . . . ." Def.'s App. at 40.  In addition, Section 2.2 of the SOW states that the A/E must design the project in "accordance with the A/E Guide." *Id*. at 47.

With Section 2 of the SOW requiring the A/E to follow the A-E Guide, we turn to the provisions of the A-E Guide itself.  Section 5 of the A-E Guide provides that the A/E must design the building in accordance with the Navy's guide specifications.  Section 5, entitled "Responsibilities of the A/E," paragraph 4, reads, in relevant part, that "All work shall be in accordance with current SOUTHNAVFACENGCOM criteria, instructions and guide specifications, and

shall be in accordance with the best architectural and engineering practices." Def.'s App. at 83. Section 2 of the A-E Guide, entitled "Command Design Policy," in paragraph 2 directs that if the A/E wishes to deviate in anyway from the Navy's guide specifications, it must first get the approval of the Navy's EIC (Engineer in Charge). *Id.* at 76. Paragraph 2 of that section states specifically that "[i]f, after an analytical review, the A/E is of the opinion that a deviation from instructions, Navy criteria or building codes would be a benefit to the Government, the A/E *shall* bring the matter to the attention of the EIC for a decision." *Id.* (emphasis added). Finally, Section 18, entitled "Specifications Preparation," paragraph 1.2.1, also requires plaintiff to use the guide specifications to design the project: "The A/E *shall* utilize the Guides listed in the current SOUTHNAVFACENGCOM Index of Criteria. . . . It is the A/E's responsibility to ensure that he obtains and includes all the Regional requirements . . . ." Def.'s App. at 149 (emphasis added). Because the contract is clear that the A/E is required to follow the provisions of the guide specifications, the next query is whether any of the guide specifications require that flashing be included in the A/E's design.

The pertinent guide specifications, incorporated in the contract by reference, are found in the NAVFAC Unit Masonry guide specification (NFGS-04200). Def.'s App. at 199-225. Section 2.3.5 of NFGS-04200 entitled "Through-Wall Flashing," explicitly states the requirement for flashing as follows:

> Note D:  *Require flashing* in exterior masonry walls, including single-wythe construction, at all obstructions such as bond beams, *sills*, lintels, and concrete tie beams. The wall design and detailing must conform to National Concrete Masonry Association (NCMA) publications: TEK 13A, Details for Building Dry Concrete Masonry Wall"; TEK 53, "Design of Concrete Masonry for Crack Control"; and TEK 126, "Flashing Concrete Masonry." Show locations and details on project drawings. This is a regional requirement which shall be used, when applicable, for SOUTHNAVFACENGCOM projects; when appropriate, the requirements may be used for projects in other areas.

Def.'s App. at 213, 224 (emphasis added). Focusing on the guide specification found in NFGS-04200, the court is unpersuaded by plaintiff's argument that the

guide specifications did not require flashing in the design.  That guide specification clearly spells out in very plain language that flashing is required at all obstructions in the exterior masonry walls, including precast sills.

Despite the clear instructions found in the guide specifications, plaintiff argues that a technical publication referenced in the NFGS-04200, TEK 126, gives the A/E contractor discretion as to whether to install flashing in the building design. Pl.'s Reply at 8.  Because the A/E contractor has such discretion, Gee & Jenson argues, plaintiff had the option to determine whether flashing was "necessary" in this project.

Plaintiff's argument in this regard is unsound.  The government points out that TEK 126 addresses flashing in concrete masonry wall units as opposed to the other parts of the composite wall system designed by plaintiff, such as stucco, precast concrete panels, or precast concrete sills.  Def.'s Reply at 7.  In that regard, plaintiff, itself, has acknowledged that TEK 126 is not applicable to the specific sill flashing scenario at issue here, stating:  "The section on 'Sills' appears to address window installation as opposed to the situation in this case.  TEK 126 does not include details such as at issue in this case with windows sitting on a precast sill that sits on top of a brick veneer and metal stud wall."  Pl.'s Reply at 9 n.3.

In addition to this impediment to the application of TEK 126 in this case, the court observes that contrary to plaintiff's contention, Gee & Jenson was not vested with unfettered discretion regarding the utilization of the Navy's guide specifications in its design plans.  In addition to the clear instruction to the A/E from the guide specifications to utilize flashing, as previously outlined above, the A/E was specifically directed to seek authorization from the SOUTHNAVFACENGCOM's EIC for any deviation from "current criteria, instructions, and guide specifications."  Def.'s App. at 76-77.  Thus, before Gee & Jenson could forego compliance with the Navy's guide specifications, it was required to seek specific permission in that regard from SOUTHNAVFACENGCOM's EIC, which plaintiff did not do.  In view of the contract's requirement regarding the utilization of the guide specifications and the corollary requirement to seek authorization to deviate therefrom, TEK 126 could not excuse plaintiff from such compliance even if it had been applicable.

Plaintiff's next challenge with respect to the disputed guide specifications is its assertion that the government failed to provide any documents which show that

23

guide specification, NFGS-04200, Unit Masonry, was listed on the then current Index of Criteria.  Pl.'s Reply at 7.  In response, the Navy states that after a command-wide reorganization, which took place subsequent to the completion of this contract, SOUTHNAVFACENGCOM ceased to exist and, presumably due to the ensuing upheaval, defendant has been unable to locate its copy of the 1994 Index of Criteria.  Defendant further states that it attempted, but was unsuccessful in securing a copy of the 1994 Index of Criteria from plaintiff pursuant to a discovery request.  The government, however, asserts that "[t]he fact that Gee & Jenson included § 04200, Unit Masonry, in the project specifications is the best evidence that the guide Specifications were in the Index of Criteria."  Def.'s Reply at 6 (footnote omitted); Def.'s App. at 236-67.  Defendant has also included in its appendix a copy of the Index of Criteria for the year 2001, Def.'s App. at 532-45, and a copy of the Navy's Index of Guide Specifications, dated December 20, 1993, Def.'s App. at 546-61, and asserts that these two indices, which both include the disputed guide specification NFGS-04200, Unit Masonry, are reflective of the criteria listed in the 1993-94 version of the Index of Criteria.

The court sees no basis upon which to question the government's representations in this regard, and overall the court views Gee & Jenson's argument to be unpersuasive.  In the first instance, the A-E Guide which, as previously discussed, required plaintiff's design work to be in conformance with the applicable guide specifications, also stated that it was the A/E's responsibility to obtain those guide specifications, set forth in the Index of Criteria, from the Navy.  Def.'s App. at 53.  Accordingly, Gee & Jenson was required to have secured a copy of the guide specification, NFGS-04200, Unit Masonry, listed in the Index of Criteria, from the Navy at the outset.  In that regard, it is entirely reasonable for this court to conclude that plaintiff was, in fact, in possession of guide specification NFGS-04200, Unit Masonry, since:  (1) plaintiff was required to have obtained the Index of Criteria, which set forth the disputed guide specification; (2) the Index of Criteria would have been provided to plaintiff in the design kit upon contract award pursuant to Section 3.1.2 of the SOW; and (3) plaintiff has never asserted that the Navy failed to provide it with the referenced design kit.  Based upon the foregoing circumstances, the court has determined that the SOUTHNAVFACENGCOM Index of Criteria included guide specification NFGS-04200, Unit Masonry.

Finally, plaintiff argues that the contract language was ambiguous, and that the contract should be interpreted against the government.  Pl.'s Reply at 9.

24

Whether a contract provision is ambiguous is a question of law.  *See Community Heating*, 987 F.2d at 1579.  In order for a contract to be found ambiguous, it must be "susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language."  *Id.* (citations omitted).  Both interpretations, given by the respective parties, must fall within the "zone of reasonableness" to demonstrate ambiguity.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

In the present case, there is no ambiguity.  Gee & Jenson and the Navy do not both present reasonable interpretations of a contract term which would result in the creation of an ambiguity.  The contract provisions, as previously discussed in detail *supra*, clearly reflected that the A/E was required to include flashing in its design and thus, there were no contract terms which were reasonably susceptible to two different interpretations under the contract.  Accordingly, the court finds that the contract was unambiguous, and that Gee & Jenson's contract interpretation was unreasonable.[13]

## B.    Whether Flashing Was Required by the Building Code

Plaintiff argues that it was required to construct the NISE East building according to the Standard Building Code of 1991 and that there was no requirement in the contract that required Gee & Jenson to "exceed the requirements of the building code."  Pl.'s Mot. at 5.  Plaintiff, in essence, argues that Gee & Jenson did not have to follow the guide specifications because it had complied with the building code.  The building code, in pertinent part, provides:

> Flashing shall be provided as necessary to prevent the entrance of water at openings in or projections through veneered walls.  Flashing shall be provided at

---

[13]/  Because there is no ambiguity, the court does not need to determine whether there is a patent or latent ambiguity.  However, even if the court were to assume the presence of an ambiguity, such an ambiguity would have been patent, thus providing that Gee & Jenson would have had a duty to seek clarification of the contract language from the government prior to designing the building.  *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996).

intersections of veneered walls of different materials
unless such materials provide a self flashing joint and at
other points subject to the entrance of water.  Caulking
shall be provided where such flashing is determined by
the Building Official to be impractical.

Def.'s App. at 507 (1991 Standard Building Code, § 811.1.4).

Plaintiff argues that the building code does not require flashing but rather
provides the architect with discretion to determine whether flashing is necessary:
"Flashing shall be provided as necessary to prevent the entrance of water at
openings in or projections through veneered walls."  *Id*.  Plaintiff also argues that
the building code does not require the use of flashing when it is impractical to do
so:  "Caulking shall be provided where such flashing is determined by the building
official to be impractical."  *Id*.  Plaintiff asserts that Gee & Jenson's chief architect,
Tim Hullihan, determined that flashing in this case was not necessary because
"metal flashing underneath the sills would not have been practical because of all the
holes drilled in the metal flashing for the bolts to hold the concrete sill down."  Pl.'s
Mot. at 5-6.  In his deposition, Mr. Hullihan testified that "holes would have had to
have been cut into the flashing to allow for the bolts holding down the sill and water
would be able to pass through the flashing everywhere one of the holes existed."
Pl.'s Reply at 5.  Based on his observations, Mr. Hullihan determined that caulking
was the best alternative, and that the Navy, as the "Building Official," had approved
the design.  *Id*.  Thus, plaintiff asserts that since the building code provided the
architect with discretion to determine whether flashing was necessary, and since the
government had approved plaintiff's design without flashing, Gee & Jenson did not
breach the contract.

Although the government concedes that the building had to be designed in
accordance with the building code, defendant asserts that the building code criterion
"was not the only one governing the development of project specifications."  Def.'s
Reply at 2.  Defendant asserts that the building had to be constructed in accordance
with other criteria identified by the Navy, including the guide specifications and
other referenced sources for criteria such as military handbooks, design manuals,
and NAVFAC publications.  Defendant asserts that these criteria referenced in the
contract required the use of flashing.  In addition, defendant contends that Gee &

26

Jenson's argument that it complied with the building code to design the project is unavailing. Defendant argues that if Gee & Jenson had interpreted the building code correctly, plaintiff would have discovered that flashing was a mandatory requirement under the building code:

> Gee & Jenson contends that the first sentence of the provision grants the architect discretion to install flashing. A careful reading of this sentence with those that follow reveals that the words Gee & Jenson relied upon are generic, introductory language only. *The second sentence clearly mandates flashing at "intersections of veneered walls of different materials unless such materials provide a self flashing joint."* The concrete precast sill is a different material than the brick masonry of the building face and the joints between the adjacent precast sill members are not self-flashing. *Therefore, the second sentence of the code unequivocally required Gee & Jenson to provide flashing under the precast sill.* Rather than addressing this straightforward requirement, Gee & Jenson skips to the third sentence, contending that it would have been impractical to install flashing underneath the precast sills.

Def.'s Mot. at 20 (citations omitted) (emphasis added).

Defendant also argues that the building code did not give the architect the discretion to determine when it is was "impractical" to install flashing in a building. Defendant contends that Gee & Jenson also misinterpreted this part of the code: "[T]he code vests the responsibility for the impracticality determination with the building official, not with the architect." *Id*. at 4. In this case, defendant asserts that Gee & Jenson has provided no evidence which demonstrates that the Navy's building official made a determination that flashing was impractical and any contention by plaintiff that the Navy's overall acceptance of the project was the equivalent of such determination is unpersuasive. *See discussion infra*. In fact, defendant states that Gee & Jenson's chief architect, Mr. Hullihan, supports defendant's contention that the building code does not give the architect discretion

to determine the impracticality of flashing in this building:

> Q. Does this code give the architect the option to decide whether or not to use flashing or sealants?
>
> A. I don't think it gives the architect the option. I think it gives the architect the option to discuss it with the building official and if they agree that it's impractical then you're preceding under the code.

Def.'s App. at 531 (Deposition of Timothy Hullihan). Based on the foregoing, defendant concludes that the building code required the use of flashing in the building design and that Gee & Jenson's decision to omit flashing in the building design deviated from the contract requirements without the Navy's approval.

Upon consideration of both sides' arguments, the court is constrained to disagree with the government's contention that the building code clearly requires flashing under the precast sill. The pertinent building code provision states that flashing must be provided "at intersections of veneered walls of different material." Def.'s App. at 507. There is no dispute over the fact that the NISE East building was designed with composite walls which defendant, citing to the Means Illustrated Construction Dictionary 143 (3d ed. (Unabridged) 2000), defines as "a wall composed of multiple vertical layers of masonry, each one unit thick, in which one layer is different from others in type or grade of stone/brick or mortar used." Def.'s Reply at 3 n.2.[14] Thus, it appears that the walls of the NISE East building were uniform, that is, they were masonry composite walls, which would mean that they were not constructed of "different materials" as required by the terms of the building code in order to warrant flashing. The government's stark assertion that "[t]he concrete precast sill is a different material than the brick masonry of the building face and . . . [t]herefore the second sentence of the code unequivocally required Gee & Jenson to provide flashing under the precast sill," Def.'s Mot. at 20 (citation omitted), is not explained by defendant and appears to be unsupported by

---

[14]/ Similarly, the Dictionary of Architecture and Construction 239 (4th ed. 2006), defines a composite wall as "[a] wall built of a combination of two or more masonry units of different types of materials that are bonded together, one forming the facing of the wall and the other the backup."

the plain terms of the controlling code provision.  A concrete precast sill, by definition, is not a wall and therefore defendant's argument must fail for the apparent reason that the presence of  precast sills in the walls does not establish an "intersection of veneered walls of different materials."[15]

Although the court agrees with plaintiff's contention that the building code did not require the A/E to provide flashing under the precast sills, that fact alone cannot serve to win the day for plaintiff.  This is so because the building code sets forth only the minimum requirements acceptable within the industry and a contractor is required to comply with the contract, and guide specifications incorporated in the contract.  In that regard, the government is allowed to enter contracts that mandate more stringent requirements than that generally accepted in the industry.  *See Jowett, Inc. v. United States*, 234 F.3d 1365, 1369 (Fed. Cir. 2000) ("It is well-established that the government can vary from the norm in the trade when contracting for goods and services." (citations omitted)); *Interwest Constr. v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994) ("'the government may require performance both in excess of, or below, the standard normally accepted in a trade'") (quoting *Ralph Larsen & Son, Inc. v. United States*, 17 Cl. Ct. 39, 46 (1989))); *see also Blake Constr. Co. v. United States*, 28 Fed. Cl. 672, 688 (1993) (stating that "the government may require material specifications more or less stringent than the standards normally accepted in a trade or industry at the time"), *aff'd*, 29 F.3d 645 (Fed. Cir. 1994).  In addition, the government is allowed to insist that a contractor comply with its contract specifications.  *See Blake Construction*, 28 Fed. Cl. at 688 (stating that "the government has the right to insist on compliance with the contract specifications"); *Am. Elec. Contracting Corp. v. United States*, 217 Ct. Cl. 338, 350 (1978) ("It is settled that the Government is entitled to obtain precisely what it contracts for as long as it does not mislead the contractor.").

In the instant case, the contract's language is clear and unambiguous that flashing was required to be designed underneath the precast sills of the windows.

_____

[15]/  The Means Illustrated Construction Dictionary 586 ( 3d ed. (Unabridged) 2000), defines sill as:  "(1) The horizontal member of the bottom of a window or exterior door frame[;] (2) As applied to general construction, the lowest member of the frame of the structure, resting on the foundation and supporting the frame."

These are the specifications that the government contracted for, and these are the specifications that Gee & Jenson was required to provide under the contract.  Gee & Jenson did not have the option to divert from the requirements of the contract without the government's approval, and then claim that it was required only to comply with the building code.  As previously discussed, the building code provided a minimum requirement, but the code takes no precedence over the contract, nor any guide specifications incorporated into the contract.  *Cf. S.S. Silberblatt, Inc. v. United States*, 433 F.2d 1314, 1323 (Ct. Cl. 1970) (noting that "trade practice in the building industry cannot override an unambiguous contract provision").  Accordingly, plaintiff was required to exceed the requirements of the building code, and comply with the contract and its guide specifications.

### C.    The Government's Approval of the Design Does Not Waive Gee & Jenson's Liability

Gee & Jenson argues that because the government approved the building design without flashing, it is excused from liability.  Defendant responds that contract clause FAR 52.236-23, incorporated into the contract, provides that the government's approval of the overall design does not waive plaintiff's liability under the contract.  FAR 52.236-23, in relevant part provides:

(a) The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor under the contract.  *The Contractor shall, without additional compensation, correct or revise any errors or deficiencies in its design, drawings, specifications, and other services.*

(b) *Neither the Government's review, approval, or acceptance of, nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or any other cause of action arising out of the performance of this contract*, and the Contractor shall be and remain liable to the Government in accordance with applicable law for all damages to the Government caused by the Contractor's

negligent performance of any of the services furnished
under this contract.

Def.'s App. at 21 (emphasis added).  In the court's view, the contract's language is
explicit on the issue of liability, and Gee & Jenson remains liable under the contract
terms regardless of the government's acceptance of the design.  Consequently, Gee
& Jenson may not avoid responsibility for plaintiff's failure to install flashing in the
building by reliance upon the government's overall approval of the project.

    In addition to the language of FAR 52.236-23, a provision of the mandatory
terms of the A-E Guide contravenes plaintiff's contention that the Navy's general
approval of the project served to sanction plaintiff's failure to install flashing in its
design.  The A-E Guide's requirement that any deviation from "instructions, Navy
criteria or building codes" by the A/E required approval by
SOUTHNAVFACENGCOM'S EIC very clearly and directly contradicts plaintiff's
position by imposing a stringent requirement which plaintiff failed to meet.  Def.'s
App. at 76.  In order for plaintiff to jettison the flashing requirement, it had to first,
actually request permission from the EIC to cancel the flashing requirement and
second, obtain specific approval from the Navy's EIC to do so.  Gee & Jenson, as
previously stated, did not request nor obtain approval from the EIC to omit the
flashing.  Therefore, in accordance with the pertinent provisions of the A-E Guide
as well as FAR 52.236-23, plaintiff may not rely upon the government's overall
approval of the project to avoid its responsibility for installation of the flashing.

**IV.    Whether Gee & Jenson Breached the Standard of Care**

    The government, in the alternative, argues that if the court finds that the A-E
Guide and the guide specifications, incorporated into the contract, did not require
Gee & Jenson to include flashing in the building design, "the central issue in this
case becomes whether Gee & Jenson failed to meet the architect's professional
standard of care in its design of the NISE East building."  Def.'s Mot. at 17, Def.'s
Answer and Counterclaim ¶ 9.  The government contends that it hired plaintiff for
its expertise and technical knowledge in architectural engineering.  Def.'s Reply at
8.  Plaintiff was required under the contract to deliver those architectural services
"in accordance with the best architectural and engineering practices."  Def.'s App.

at 82 (A-E Guide, Section 5).  Because plaintiff failed to meet the standard of care, the government contends that defendant is entitled to summary judgment as a matter of law.

The court, as previously discussed, has determined that the contract was clear and unambiguous in providing that flashing was a contractual requirement.  The court has determined that Gee & Jenson was contractually obligated to provide flashing in the design of the NISE East building and that plaintiff's failure to comply with this contractual requirement breached the contract.  Accordingly, the court does not find it necessary to address defendant's alternative argument that Gee & Jenson breached the standard of care.

## V.      Whether the Government Incurred Damages as a Result of Gee & Jenson's Failure to Include Flashing in its Design

Having determined that plaintiff violated the terms of the contract by its failure to install flashing, the question remains whether the Navy is owed any damages as a result of Gee & Jenson's breach of its A/E contract.  In order for a party to recover breach of contract damages, "a party must allege and establish:  (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *see also C.H. Guernsey & Co. v. United States*, 65 Fed. Cl. 582, 595 (2005).

Plaintiff sets forth the argument that Gee & Jenson's design was not the cause of water damage in the NISE East building, and therefore it is not responsible for any damages claimed by defendant.  Gee & Jenson's main argument in that regard is that the water damage was caused by Pizzagalli's poor construction.  Plaintiff argues that Pizzagalli improperly installed the sealant joints between the precast sills and further asserts that if the sealant joints had been properly prepared and installed, the government would not have incurred damages.  Gee & Jenson also casts responsibility on the government by contending that if defendant had "a maintenance plan for checking and replacing the caulking on the building," the government would not have experienced the leakage problems.  Pl.'s Mot. at 8.

Gee & Jenson states its argument as follows:

> The sealant joints had failed because the contractor failed
> to properly prepare the sealant and failed to install it
> properly.  Mr. Riesberg also admitted that if Pizzagalli
> installed the caulking joints between the precast sills
> properly, the joints would not have allowed water to get
> through, and that a good sealant properly installed would
> last a minimum of 10 years, and can last up to 20 years.
> The Government did not have a maintenance plan for
> checking and replacing the caulking on the building.  All
> of the alleged leaks at issue with the precast sill occurred
> within ten years and a maintenance plan would have
> included replacing or repairing the caulking joints within
> that ten year period.  Therefore, if the joints had been
> installed properly by Pizzagalli, and if the Government
> maintained the building, the caulking joints between the
> precast sills would never be a problem.

*Id*. (citations omitted).

To support its main contention that Gee & Jenson was not the cause of the
water leaks, plaintiff argues that the government's expert, Mr. Riesberg, testified in
his April 5, 2007 deposition that the poorly installed caulking joints by Pizzagalli
were the cause of the water getting into the building.  Mr. Riesberg also testified
that after Pizzagalli repaired the construction defects in 2000, there was no
additional evidence of water damage.  Plaintiff contends that even when the
government hired the construction company, Hitt, in March 2005 to make repairs on
both the first and second floors of the building, there was no evidence of water
damage on the first floor.  Plaintiff further contends that Mr. Riesberg testified that
there was no evidence of water intrusion on the first floor.  Plaintiff argues that
because there was no evidence of water damage on the first floor, the lack of
flashing in the building could not be the cause the water damage:

> Without any evidence of water intrusion into the first

> floor, one has to ask why was flashing necessary, and
> more importantly, why did the Government perform any
> repairs when no damages or indication of water intrusion
> was present?  In fact, the lack of any damages on the first
> floor supports Gee & Jenson's position that flashing was
> not necessary.  Clearly, Gee & Jenson cannot be
> responsible for repair costs on the first floor when there
> was no evidence that repairs were necessary.

> Pl.'s Reply at 20-21.  Plaintiff also reasons that Gee &
> Jenson cannot be held responsible for water damage on
> the second floor.  According to the government's expert,
> the water damage was caused by Pizzagalli's failure to
> "install an upstand on the inside of the flashing as
> required by the design."  *Id*. at 21.  Plaintiff asserts that
> "[s]ince the only reason to perform the repairs on the
> second floor where flashing exists was because of a
> construction defect, Gee & Jenson certainly cannot be
> responsible for [the] [repair] costs."  *Id*.  To support its
> contention, plaintiff relies on *C.H. Guernsey*, 65 Fed. Cl.
> at 595, for the legal principle that an architect cannot be
> held liable for design defects if the construction contractor
> failed to follow the architect's design.

Plaintiff, in this instance, has mischaracterized the government's position in this case and completely missed the mark.  Defendant asserts that the "pivotal issue is not the cause of the initial water infiltration in 1998."  Def.'s Reply at 11.  The issue, according to defendant, is whether Gee & Jenson's failure to include flashing caused the government to incur costs for a remedial design and mitigative fix.  In a nutshell, the government's claim is as follows:

> *Simply put, the Government's claim for contract damages
> is not based upon the actual physical water damage to the
> building.*  Regardless of how the water entered the
> building, Pizzagalli's workmanship had nothing to do
> with the design's lack of flashing or its impact upon the

34

life and maintainability of the building.  *The Government
seeks damages it incurred as a result of identifying and
addressing the lack of flashing, including designing and
implementing an architectural solution to provide
adequate long term water intrusion protection*.  Those
damages are solely attributable to Gee & Jenson's actions.

Def.'s Mot. at 13 (emphasis added) (footnote and citation omitted).

       The government contends that plaintiff was required to design a building
with flashing to ensure the "life and maintainability" of the building throughout a
fifty year life cycle.  *Id*.  Instead, Gee & Jenson designed a building without
flashing that began to leak within one year of construction.  To prevent further
damage of the building, defendant was required to seek a long-term solution to the
water intrusion.  Initially, defendant states that the Navy wanted to remove all the
windows and precast sills in the building, and then install flashing.  However,
defendant found that such a solution would be costly and disruptive to the tenants.
Defendant claims that the cost of that remedy was estimated to be approximately
$455,000 and that this figure did not include pricing for the removal of the
windows.  Rather than installing entirely new flashing in the building, the Navy
opted for a far less costly remedial design with a price tag of $99,400.  This
remedial design consisted of a "two-stage joint, in which the outer joint is a
deterrent seal and the inner seal is a neoprene compressional seal adhered to the
precast sill."  Def.'s Mot. at 16.

       Defendant emphasizes that it did not reprocure a fix which would have
provided the government with that for which it had originally contracted –
installation of flashing – because of the exorbitant expense and disruption to the
tenants.  "What the Navy accepted as a substitute once the building had been
constructed cannot be compared with what Gee & Jenson should have designed in
the first place."  Def.'s Mot. at 22.  Defendant expected Gee & Jenson to produce a
design which included flashing under the precast sills in the NISE East building as
required under the contract.  Instead, plaintiff produced a faulty design without
flashing.  To fix plaintiff's design defect, the Navy was forced to hire a forensic
expert to investigate Gee & Jenson's design defect, engage a new architect to design
the solution, and reprocure another contractor to install the fix.  *Id.*  Defendant

asserts that Gee & Jenson breached the contract, and thus, is responsible for the costs incurred by the Navy for the forensic expert, architect, and contractor to determine and effect the remedial design.

The court is once again in agreement with defendant.  The issue with respect to damages is not who caused the water damage, or how much water damage became evident, or when, since none of those issues were determinative of the breach of contract in this case.[16]  The point that the government rightly makes is that it contracted for flashing to be included in the design in order to guard against water damage to the building throughout the useful life of the structure and in order to prolong the life of the building.  As this court has found, plaintiff breached its contract with the Navy by failing to provide flashing in its design.  After investigating the matter and determining that plaintiff had, in fact, neglected to include flashing in its design and after determining that water issues were a problem, the Navy offered to allow plaintiff to remedy the breach itself, which offer the plaintiff declined.  Thereupon, the Navy took the necessary steps to effectuate a mitigative fix to the problem.

In accordance with basic contract principles, "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).  The damages necessary to place the Navy in as good a position as it would have been had Gee & Jenson included flashing in its original design, overall, are the types of damages incurred and claimed by defendant in this case.  The government here seeks "the costs of procuring the design of the remedial fix, the cost of constructing the remedial fix

---

[16]/  Plaintiff claims that Pizzagalli caused water damage as a result of poor workmanship. Pizzagalli's poor workmanship is not dispositive with respect to the issue of breach of contract. As stated above, the absence of a flashing design is the basis upon which the court found breach of contract by plaintiff.  To the extent that Pizzagalli engaged in poor workmanship which caused leakage, the court notes that Gee & Jenson, under its Title II inspection duties, had the responsibility to inspect the overall construction of the NISE East building, yet plaintiff failed to report these deficiencies to the Navy. *See* Def.'s App. at 271.

The court also notes that Pizzagalli wrote the Navy asserting that it had repaired all water damage to the NISE East building for which it was responsible.  Def.'s App. at 426-27. Defendant's claims in this suit were not founded on water damage.  Def.'s Mot. at 13.

and the cost of the forensic consultation and report necessary to identify Gee & Jenson's architectural deficiencies."  Def.'s Reply at 14 (footnote omitted). Defendant acknowledges a dispute with the quantum assessed against plaintiff for the forensic study and report, and correctly observes that this dispute does not preclude the court from making a determination on liability.  *Id*. n.11.

The court has determined the issue of liability, and holds that plaintiff is liable for the damages that the government has incurred as a result of the faulty design.  However, the court, at this juncture, is not prepared to determine the issue of damages for two reasons.  First, plaintiff disputes the damages assessed for the forensic study and report, which is a significant portion of the damages claimed. Second, the record is not clear as to what portion of the costs pertaining to the actual design and construction of the remedial fix plaintiff challenges, if any. Because of the lack of clarity pertaining to the amount of damages, the court directs the parties to confer in an effort to stipulate to the correct amount of damages.  The parties are directed to file a joint status report regarding their progress on this matter on or before December 8, 2008.  The court holds in abeyance defendant's request for costs and attorney fees until after the issue of damages has been resolved, unless the parties also arrive at a settlement which includes these matters as well.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that

(1)     Plaintiff's Motion for Summary Judgment, filed October 31, 2007, is **DENIED**;

(2)     Defendant's Cross-Motion for Summary Judgment, filed January 18, 2008, is **GRANTED**.

(3)     The parties shall **CONFER** and **FILE** a **Joint Status Report** on or before **December 8, 2008**, reporting on their progress towards the determination of damages owed to defendant and a

final resolution of defendant's claims in the subject matter.

/s/Lynn J. Bush              

LYNN J. BUSH

Judge